## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **BMG RIGHTS MANAGEMENT (US) LLC, UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, CONCORD MUSIC GROUP, INC., and CONCORD BICYCLE ASSETS, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**ALTICE USA, INC., and CSC HOLDINGS, LLC,**<br><br>Defendants. | **CIVIL ACTION NO.  2:22-CV-471**<br><br>**JURY TRIAL DEMANDED** |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Plaintiffs BMG Rights Management (US) LLC ("BMG"), UMG Recordings, Inc., and Capitol Records, LLC (UMG Recordings, Inc., and Capitol Records, LLC, collectively "UMG"), and Concord Music Group, Inc., and Concord Bicycle Assets, LLC (Concord Music Group, Inc. and Concord Bicycle Assets, LLC, collectively "Concord") (BMG, UMG, and Concord collectively, "Plaintiffs"), by and through their counsel, for their Complaint against Altice USA, Inc., and CSC Holdings, LLC (collectively, "Altice" or "Defendants"), hereby allege as follows:

### <u>Nature of the Case</u>

1.      The Supreme Court recognized more than fifteen years ago that the level of copyright infringement on the internet was "staggering." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005). As broadband access has expanded, speeds have increased, and individuals have become more tech savvy, online piracy of music and other media has become easier and easier.

2.     The predominant means of music and other media piracy are so-called peer-to-peer ("P2P") file distribution systems. P2P is a generic term used to refer to technological systems that facilitate connecting internet users (a "peer" or "node") where the user can act as both a supplier and consumer of content.

3.     Early P2P services, such as Napster and KaZaA were centralized, and the owners or operators of such services could be made subject to enforcement by copyright owners whose rights were infringed by their users. But such services have been supplanted by more robust and efficient decentralized systems, most notably those that use a file-sharing protocol called "BitTorrent." The online piracy committed via BitTorrent is stunning in nature, speed, and scope. Utilizing a BitTorrent client—a software tool that implements the BitTorrent protocol—internet users can locate, access, and download copyrighted content from other peers in the blink of an eye. All without authorization from or payment to copyright owners or creators.

4.     The BitTorrent protocol enables a uniquely efficient means for facilitating illegal file sharing. On earlier P2P networks, an internet-connected user who wanted to download a file would have to locate another internet-connected peer on the network (like Napster) who had a copy of the desired file and then download the entire file from that peer. BitTorrent facilitates much more efficient downloading by breaking each file into multiple "chunks" or parts and allowing users to download each chunk concurrently from a different peer. Once a user has downloaded all the chunks, the file is automatically reassembled into the complete form and available for playback. This approach enables users to begin disseminating the copyrighted content even before the complete file has downloaded, which can exponentially increase the availability of unauthorized copies of pirated works to millions of people who use BitTorrent technology.

5. Not surprisingly, then, BitTorrent has been widely used as a vehicle to distribute without authorization (and thereby infringe) copyrighted works. A January 2022 report (assessing traffic in 2021) from Sandvine found that BitTorrent communications accounted for nearly 3% of all internet traffic worldwide—more than Google.[1] That same report indicated that BitTorrent communication was the number one source of upstream traffic.

| GLOBAL APP TRAFFIC SHARE | | GLOBAL APP TRAFFIC SHARE | |
|---|---|---|---|
| **TOTAL TRAFFIC** | | **UPSTREAM TRAFFIC** ⬆ | |
| **Category** | **Total Volume** | **Category** | **Total Volume** |
| 1 YouTube | 14.61% | 1 BitTorrent | 9.70% |
| 2 Netflix | 9.39% | 2 HTTP | 9.05% |
| 3 Facebook | 7.39% | 3 Google | 8.02% |
| 4 Facebook video | 4.20% | 4 Facebook | 5.77% |
| 5 Tik Tok | 4.00% | 5 Wordpress | 5.01% |
| 6 QUIC | 3.98% | 6 YouTube | 4.45% |
| 7 HTTP | 3.58% | 7 iCloud | 4.09% |
| 8 HTTP Media Stream | 3.57% | 8 Generic QUIC | 3.70% |
| 9 BitTorrent | 2.91% | 9 Netflix | 3.00% |
| 10 Google | 2.79% | 10 Facebook Messenger | 2.37% |

6. And numerous analyses have found that as individuals found themselves increasingly confined to their homes and the internet amid the height of COVID-19 lockdowns, piracy increased precipitously.[2]

---

[1] Phenomena: The Global Internet Phenomena Report, SANDVINE, Jan. 2022, https://www.sandvine.com/hubfs/Sandvine_Redesign_2019/Downloads/2022/Phenomena%20Reports/GIPR%202022/Sandvine%20GIPR%20January%202022.pdf?hsCtaTracking=18fff708-438e-4e16-809d-34c3c89f4957%7C067d9d28-ef90-4645-9d46-c70d10279247
[2] Bode, "Movie and TV Piracy Sees an 'Unprecedented' Spike During Quarantine," VICE (April 27, 2020), https://www.vice.com/en/article/5dm7xb/movie-and-tv-piracy-sees-an-unprecedented-spike-during-quarantine; Gault, "Internet Piracy is Surging," Researchers Say, VICE (Jan. 28, 2022), https://www.vice.com/en/article/93bd8v/internet-piracy-is-surging-researchers-say.

3

7.      Plaintiffs are record companies that discover and develop recording artists and produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that develop songwriters and acquire, license, and otherwise exploit musical compositions, both in the United States and internationally. Plaintiffs and the recording artists and songwriters they represent respectively have developed, marketed, and commercially released a significant amount of popular music. That has not only required investments of money, time, and effort, but also enormous creativity. Plaintiffs own or control exclusive rights to the copyrights in well-known sound recordings from a wide array of genres and eras, as well as the copyrights to large catalogs of iconic and modern hit musical compositions and sound recordings. Plaintiffs' investments and creative efforts have shaped the musical landscape of the past and present, both in the United States and around the world.

8.      As one of the largest internet service providers ("ISPs") in the country, Altice has marketed and sold high-speed internet services to consumers in at least 21 states across the country, including Texas, Louisiana, Arkansas, New York, Connecticut, New Jersey, Pennsylvania, West Virginia, Virginia, Ohio, Kentucky, North Carolina, Oklahoma, Mississippi, Missouri, Kansas, Arizona, California, Nevada, New Mexico, and Idaho.

9.      Through the provision of high-speed internet services, Altice has knowingly contributed to and earned substantial profits from, copyright infringement committed by thousands of its subscribers. The infringement that Altice has abided, profited from, and materially contributed to has injured Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend on the proper licensing of music and the ability to be fairly compensated for the use of their music and earn a living from their vocations. Altice's contribution to its subscribers' infringement is both willful and extensive, and renders Altice liable for its

subscribers' conduct. Indeed, for years, Altice deliberately refused to take reasonable measures to curb its customers from using its service to infringe copyrights, including Plaintiffs' copyrights—even after Altice was provided specific and detailed notice of particular customers engaging in repeated, and prolonged acts of infringement. Millions of infringements by users of Altice's internet services have been detected, and Altice has been given detailed and specific written notice of those infringements. Those notices advised Altice of its subscribers' blatant and systematic use of Altice's service to illegally distribute Plaintiffs' copyrighted works using BitTorrent. Rather than work with Plaintiffs or take other meaningful or effective steps to curb this massive infringement, Altice chose to permit infringement to run rampant, prioritizing its own profits over the Plaintiffs' rights. On information and belief, the scope of rampant and repeat infringement through the use of Altice's service is far greater than Plaintiffs are even aware.

10.     The law is clear that a party that knowingly and materially assists someone engaging in copyright infringement faces liability for that infringement. Further, when a party has a direct financial interest in the infringing activity and the right and practical ability to stop or limit that activity, that party faces liability unless it exercises that right and ability to prevent the infringement. Altice deliberately turned a blind eye to its subscribers' infringement and collected profits from those subscribers in the form of ongoing subscription fees. Altice failed to terminate the subscriptions of or otherwise take meaningful action against repeat infringers it knew about. Despite its professed commitment to discipline repeat offenders (and its legal responsibility to do so), Altice routinely disregarded the harm its subscribers caused to Plaintiffs using Altice's internet services and continued to provide those services to known serial infringers and to collect subscription fees from them. And Altice permitted its subscribers to sustain their infringing activities for months and even years at a time with impunity.

5

11.     Plaintiffs seek relief including for the infringement of copyrighted works by Altice's subscribers after those particular subscribers were identified to Altice through infringement notices regarding Plaintiffs' copyrighted works.

## Jurisdiction and Venue

12.     This is a civil action seeking damages and injunctive relief for copyright infringement under the copyright laws of the United States, 17 U.S.C. § 101 *et seq*.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (jurisdiction over copyright actions).

14.     This Court has personal jurisdiction over Defendants because Defendants reside in and do systematic and continuous business in Texas and in this judicial district. Defendants provide a full slate of services in Texas, including the provision of internet, TV, and phone service, among others. Defendants also have a number of stores and service centers within this judicial district including stores located at 4949 S Broadway Ave., Tyler, Texas 75703, and Green Acres Shopping Center, 1847 Troup Hwy, Suite 300, Tyler, TX 75701. In order to systematically and continuously provided service within Texas, Altice maintains sizable operations within the state. Indeed, Altice currently operates approximately two-dozen physical locations in Texas and has plans to open up 15 more locations and invest $500 million in the state in the next few years.[3]

15.     Moreover, Altice has engaged in substantial activities purposefully directed at Texas and this judicial district from which Plaintiffs' claims arise, including providing internet service to Texas subscribers who used Altice's internet services to directly and repeatedly infringe

---

[3] "Optimum Lands in Texas with New Stores in Lubbock and Amarillo," Press Release, ALTICEUSA (June 15, 2022) https://www.alticeusa.com/news/articles/press-release/corporate/optimum-lands-texas-new-stores-lubbock-and-amarillo (noting plans to open new stores across Texas, including in this district).

Plaintiffs' copyrights. Altice has continued to provide internet services to and failed to terminate the accounts of Texas customers, even after Altice received multiple notices of their infringing activity. Altice has advertised and promoted its high-speed internet services to customers in this judicial district and throughout Texas to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements. And, Altice employs a substantial number of individuals within Texas, who are responsible for the provision of services in Texas that enable rampant and repeat infringers to continue to commit copyright infringement in Texas with impunity.

16.     Many of the acts complained of herein occurred in Texas and in this judicial district. For example, a number of the most egregious repeat infringers using Altice's internet services reside in Texas and this judicial district. Plaintiffs have identified many Altice subscribers residing in Texas who have repeatedly infringed one or more of the Plaintiffs' copyrighted works. By way of example, Altice subscribers with IP addresses 74.197.190.81 and 75.108.119.200, who reside in this judicial district, committed over 1,000 acts of infringement each—of which Plaintiffs are aware—over the last few years using Altice's services. Altice received specific and detailed notices regarding these infringements, yet permitted the infringements to continue over and over again.

17.     Venue in this District is proper under 28 U.S.C. § 1391(b)–(c), and/or 28 U.S.C. § 1400(a). A substantial part of the acts of infringement complained of herein occurs or has occurred in this District, and/or this is a judicial district in which Defendants reside or may be found.

## Plaintiffs and Their Musical Compositions and Sound Recordings

18.     Plaintiff BMG Rights Management (US) LLC is a Delaware limited liability company, with its principal place of business at One Park Avenue, New York, New York 10016. BMG is the world's largest independent music publisher.

19.     Plaintiff UMG Recordings, Inc., is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404. UMG is the largest owner and holder of exclusive rights in and to copyrighted sound recordings in the United States.

20.     Plaintiff Capitol Records, LLC, is a Delaware limited liability company with its principal place of business at 2200 Colorado Avenue, Santa Monica, California 90404.

21.     Plaintiff Concord Music Group, Inc., is a Delaware corporation with its principal place of business at 10 Lea Ave., Ste. 300 Nashville, Tennessee 37210.

22.     Plaintiff Concord Bicycle Assets, LLC, is a Delaware limited liability company with its principal place of business at 10 Lea Ave., Ste. 300 Nashville, Tennessee 37210.

23.     Together, Plaintiffs own and/or administer rights in and to some of the most iconic sound recordings and musical compositions ever created. To that end, Plaintiffs are the legal or beneficial copyright owners or owners of exclusive rights under United States copyright law with respect to certain copyrights (the "Copyrighted Works"), including, but not limited to the musical compositions and sound recordings listed in Exhibit A, each of which is the subject of a valid Certificate of Copyright Registration from the Register of Copyrights or otherwise entitled to protection[4].

---

[4] Certain of the works identified on Exhibit A are pre-1972 sound recordings, which were not originally entitled to protection under the Copyright Act of 1972. Pursuant to the Music Modernization Act, effective October 11, 2018, federal copyright protection and the attendant remedies are now available for pre-1972 sound recordings. 17 U.S.C. § 1401. As applicable, Plaintiffs filed schedules with the United States Copyright Office for the pre-1972 works

## Defendants and Infringing Activities

24.     Defendant Altice USA, Inc., a Delaware corporation, has its principal place of business at 1 Ct. Square W, Queens, New York 11101.

25.     Defendant CSC Holdings, LLC, a Delaware limited liability company, has its principal place of business at 1111 Stewart Ave., Bethpage, New York 11714.

26.     Altice USA, Inc., through CSC Holdings, LLC, provides broadband communications services in 21 states across the United States.[5] Altice's terms and conditions and other subscriber agreements identify CSC Holdings, LLC, as the contracting party and provider of services, though Altice asks that emails concerning copyright infringement be directed to an email address with an "@alticeusa.com" domain name.

27.     Altice USA, Inc., was incorporated in 2015, as a spin-off from Altice Europe N.V. (now known as Altice Group Lux S.à.r.l). Since its founding, Altice has acquired a variety of companies that provide internet services across the United States.

28.     In June 2016, Altice acquired Cequel Corporation (as a contribution from Altice Europe N.V.), which operated under the Suddenlink brand. Also in June 2016, Altice acquired Cablevision Systems Corporation, which operated under the Optimum brand (formerly Cablevision).

29.     In 2021, Altice also acquired Morris Broadband, which provided internet services in North Carolina, and rebranded it under the Optimum brand.

---

identified in Exhibit A. For those works, Exhibit A identifies the date of the filing of that schedule, in lieu of a registration number. As a result, Plaintiffs are entitled to enforce their rights and seek the remedies set forth in 17 U.S.C. §§ 502–05 for those works. *See* 17 U.S.C. § 1401(a)(1) and (f)(5).

[5] Altice USA, Inc.'s website states "We are one of the largest broadband communications and video services providers in the United States, serving nearly 5 million residential and business customers across 21 states with an advanced portfolio of connectivity services, including Optimum Fiber Internet, Optimum TV and Optimum Mobile." And Altice asks that complaints about infringement be directed to an @alticeusa.com email address.

30.     In August 2022, Altice combined all of its various systems under the "Optimum" brand.[6]

31.     Altice's internet services enable subscribers to communicate with other internet-connected users via the BitTorrent protocol and—critically—to transfer files, including copies of Plaintiffs' Copyrighted Works, on a mass scale. And Altice offers a tiered pricing structure that delivers faster connections for subscribers willing to pay higher fees (i.e., ability to pirate more and larger files in a shorter period of time).

32.     The ability to download music and other copyrighted content—including without authorization—is a significant incentive for customers to subscribe to Altice's services and to pay for higher tiers of speeds. Indeed, Altice's consumer marketing material, including material directed to Texas customers, touted that Altice offered "multigigabit broadband speeds and more".[7]

33.     On information and belief, Altice has consistently and actively engaged in business practices to suit its own purposes. This includes monitoring for, and taking disciplinary and enforcement action against, non-payment, bandwidth overuse, spam, and other activity that is at odds with Altice's business interests. But Altice has not taken comparable disciplinary and enforcement action against subscribers Altice knows engage in repeated copyright infringement. Those infringing activities that do not affect Altice's bottom line, although imposing disciplinary actions such as termination against subscribers who engaged in repeated copyright infringement likely would affect Altice's bottom line. This leaves copyright owners, like Plaintiffs, and the

---

[6] "Suddenlink is Now Optimum," BUSINESS WIRE (Aug. 1, 2022) https://www.businesswire.com/news/home/20220731005070/en/Suddenlink-is-Now-Optimum.
[7] "Optimum Lands in Texas with New Stores in Lubbock and Amarillo," Press Release, ALTICEUSA (June 15, 2022) https://www.alticeusa.com/news/articles/press-release/corporate/optimum-lands-texas-new-stores-lubbock-and-amarillo.

songwriters and recording artists they represent, to bear the brunt of the harm caused by the rampant infringement, even as Altice continues to pull in lucrative subscription fees. That inequity and injustice has forced Plaintiffs to bring this litigation.

34.     At all pertinent times, Altice knew that its subscribers routinely used its internet services in order to illegally distribute or reproduce copyrighted works, including music, without authorization. As described below, companies that monitor for piracy of various copyrighted works repeatedly notified Altice that many of its subscribers were actively utilizing its service to infringe Plaintiffs' works, among others. Those notices gave Altice the infringing subscribers' unique Internet Protocol (or "IP") addresses and the "port" used to connect via BitTorrent, the date and time of the infringement detected, and the title and artist associated with the infringed works, among other information.

35.     Altice published and maintained a purported "policy" for its subscribers, claiming that it might temporarily interrupt or suspend infringers' internet access upon receiving a notice of alleged infringement and that continued instances of alleged copyright infringement could lead to full termination of a subscriber's services.

36.     Despite this purported policy to discipline infringement and ample notice of its subscribers' misconduct, Altice continued to provide internet services to even the most prolific infringers. Altice's services were essential elements of its subscriber's infringement. Without Altice's services, subscribers would not have been able to connect to other users via the BitTorrent protocol, and they would not have been able to copy or distribute Plaintiffs' Copyrighted Works.

37.     Altice's declination to terminate the subscriptions of even its notorious and serially infringing subscribers supported its bottom line. The availability of high-speed access to services and technology that facilitate music piracy on the internet served to draw customers to Altice's

services and to help retain existing subscribers. Altice's customers, in turn, purchased more bandwidth and continued using Altice's services to infringe Plaintiffs' Copyrighted Works. If Altice terminated or otherwise prevented repeat infringer subscribers from using its services to infringe, or made the services less attractive for such use, Altice would lose existing subscribers, enroll fewer new subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download and distribute files illegally at faster speeds, Altice obliged them in exchange for higher subscription fees. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Altice made.

### Plaintiffs' Enforcement Activities and Defendants' Efforts to Thwart Them

38.     Over the past two decades, as P2P piracy became widespread, record labels, music publishers, studios, and other copyright owners have sought to curb the massive infringement of their copyrighted works caused by online piracy through a variety of means, including litigation against both P2P sites and internet service providers. As the Seventh Circuit recognized when commenting on means to enforce online piracy, "chasing individual consumers is time consuming and is a teaspoon solution to an ocean problem." *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003). Accordingly, in an effort to curtail online piracy, copyright owners have provided detailed notification of repeat and rampant online infringement to companies like Altice who contribute to and benefit from such infringement. Altice has been keenly aware of these efforts and the use of its services to engage in P2P piracy, and Altice has even known the specific identities of the subscribers engaging in that misconduct—information not available to Plaintiffs without legal process.

39.     Altice has received notices identifying specific instances of its subscribers' infringement through P2P activities for years, to no avail. Since 2018, Altice has received millions

of notices, detailing specific instances of its subscribers using Altice's services to distribute Plaintiffs' Copyrighted Works unlawfully using P2P protocols.

40.     Each infringement notice provided to Altice identified the unique IP address assigned to the user of Altice's services who was detected infringing, the "port" used to communicate via the BitTorrent protocol, and the date and time the infringing activity was detected. Only Altice, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber and the ability to take disciplinary action, such as by terminating that subscriber's service.

41.     The infringement notices informed Altice of clear and unambiguous infringing activity by its subscribers—that is, unauthorized distribution of copyrighted music and other works. Plaintiffs did not authorize Altice's subscribers to reproduce or distribute digital copies of Plaintiffs' sound recordings and musical compositions to anyone, let alone thousands or millions of people over the internet, and the subscribers had no other legal justification for that infringement.

42.     Altice's subscribers have pirated many thousands of sound recordings and musical compositions that are protected by copyrights and equivalent rights owned by or exclusively licensed to Plaintiffs. And many of these infringing subscribers have continued to infringe for months and even years at a time, despite Altice being given specific details of their infringing activity.

43.     Over the past several years, Altice has received over a million notices of infringement of Plaintiffs' works by Altice subscribers. These piracy notices concerned close to 20,000 Altice subscribers. Many of these are not just one-time offenders. They are chronic and repeat infringers. Thousands of the pirates identified among Altice's subscribers in the relevant

time period were detected infringing hundreds of times. The most egregious repeat infringers—many hundreds of them—were permitted to infringe thousands and even tens of thousands of times during the relevant time period.

44.     Altice's pirating subscribers continued infringing for extensive periods of time, belying any possible claim that repeat infringers face meaningful consequences for their illicit use of Altice's services. Many of Altice's subscribers continued to infringe 30 days or more after Altice first received notice of that user's infringement with regard to a Plaintiff's work. Indeed, many continued to infringe for 100 or more days, or even for six months to several years, with apparent impunity from Altice.

45.     The scope and volume of infringing activity taking place using the Altice services illustrates that, rather than terminating repeat infringers—and losing revenue attributable to those subscribers' monthly fees—Altice simply looked the other way.

46.     During all pertinent times, Altice had the full right and ability to prevent or limit the infringements using its services. Under Altice's terms of service and acceptable use policies, which its subscribers agreed to as a condition of using its internet services, Altice was empowered to exercise its right and ability to terminate a customer's internet access. Altice could do so for a variety of reasons, including a subscriber's copyright infringement activity.

47.     Despite these stated policies and despite receiving over one million infringement notices concerning Plaintiffs' works, not to mention the untold numbers of similar notices regarding other copyright owners, Altice knowingly permitted repeat infringers to continue to use its services to infringe. Rather than withhold the means of infringement from blatant repeat infringers by terminating their subscriptions to curtail their infringement, Altice knowingly continued to provide these subscribers with the internet access that enabled them to illegally

14

distribute Plaintiffs' Copyrighted Works unabated. Altice's provision of high-speed internet service to known infringers materially contributed to these direct infringements.

48.     If Altice had adopted, reasonably implemented, and enforced a policy to terminate the subscriptions of known repeat infringers, such widespread, prolific, and sustained infringement would not have been possible.

49.     Altice's motivation for refusing to terminate the accounts of blatant infringing subscribers is simple: Altice valued corporate profits over its responsibilities (and over preventing harm to the owners and creators of the recordings and musical compositions who suffered from Altice's subscribers' infringement). Altice did not want to lose subscriber revenue by terminating accounts of infringing subscribers. Retaining infringing subscribers directly and financially benefitted Altice. Nor did Altice want to risk the possibility that account terminations would deter other existing or prospective subscribers. Moreover, Altice was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, or terminating accounts in appropriate circumstances. Considering only its own pecuniary gain, Altice permitted flagrant, repeat violations by known specific subscribers using its services to infringe, thus facilitating and exacerbating the harm to Plaintiffs. And Altice's failure to adequately police its infringing subscribers drew subscribers to purchase Altice's services, so that the subscribers could then use those services to infringe Plaintiffs' Copyrighted Works (and others' copyrighted works too). The specific infringing subscribers identified in the infringement notices concerning Plaintiffs' works, including the egregious infringers identified herein, knew Altice would not terminate their accounts despite receiving multiple notices identifying them as infringers often for sustained periods of time, and they continued to pay Altice subscription fees in order to continue illegally downloading and distributing copyrighted works.

15

50.     The consequences of Altice's support of and profit from infringement are obvious and stark. When Altice's subscribers used Altice's services to distribute infringing copies of Plaintiffs' Copyrighted Works illegally, that activity undercut the legitimate music market, caused financial and other irreparable harm. It also encouraged further infringement, deprived Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled, and diminished Plaintiffs' (and their respective recording artists and songwriters) incentives to invest in and create high-quality music.

51.     Altice has had actual and ongoing specific knowledge of the repeat infringements by its subscribers and account holders of the Copyrighted Works occurring through the use of its services for years. Nonetheless, Altice has repeatedly refused to terminate the accounts of repeat infringers. The reason that Altice did not terminate these subscribers and account holders is obvious—it would cause Altice to lose revenue.

52.     By its actions, Altice has intentionally ignored and continues to ignore the overwhelming evidence that provides it with actual knowledge of repeat copyright infringers using its services. If it responded to that evidence appropriately, such as by exercising its authority to terminate repeat infringers, there would not be such widespread, prolific, and sustained infringement as reflected in the evidence from the companies that monitor for piracy of Plaintiffs' Copyrighted Works.

### Claims for Relief

### Count I – Contributory Infringement of Copyright

53.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 through 52, inclusive.

54.     Altice's subscribers, using internet access and services provided by Altice, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, Plaintiffs' Copyrighted Works. By providing the means necessary for its subscribers to commit direct copyright infringement, by selling and providing access to the internet and the system and technology that allows for the storage and transmission of data, and by failing to terminate known repeat infringers, Altice acted affirmatively to facilitate, encourage, and materially contribute to the unauthorized reproductions and distributions of the Plaintiffs' Copyrighted Works by its infringing customers.

55.     Altice has repeatedly, over years, been provided with actual knowledge of the direct infringements occurring through its system.

56.     Altice could have taken simple measures to prevent further damages to Plaintiffs or their copyrighted works, yet continued to provide its infringing subscribers with the means of access to and distribution of infringing materials. Altice had ability and authority to withhold that means upon learning of specific infringing activity by specific users but failed to do so. By purposefully ignoring and tolerating its subscribers' flagrant and repeated infringements, Altice knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' Copyrighted Works, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

57.     Each infringement of Plaintiffs' Copyrighted Works constitutes a separate and distinct act of infringement.

58.     Altice has not acted reasonably or in good faith in response to notices of infringement and repeat infringement of Plaintiffs' Copyrighted Works.

59.     Altice's contributory infringement has been willful, intentional, and purposeful, in disregard of and indifference to Plaintiffs' rights.

60.     As a direct and proximate result of Altice's contribution to infringements of Plaintiffs' Copyrighted Works and exclusive rights under copyright, Plaintiffs are entitled to damages and Altice's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

61.     Alternatively, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).

62.     Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

63.     Altice's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to injunctive relief prohibiting further contributory infringements of Plaintiffs' copyrights.

## Count II – Vicarious Infringement of Copyright

64.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 through 63, inclusive.

65.     Altice's subscribers, using internet access and services provided by Altice, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, Plaintiffs' Copyrighted Works. Altice had, and continues to have, the right and ability to supervise and/or control the infringing conduct of its subscribers and account holders through its agreements with its subscribers and account holders by, without limitation, blocking access to its subscribers and

account holders or terminating the accounts of subscribers who engage in infringing activity. But Altice has failed to exercise such supervision and/or control. As a direct and proximate result of such failure, Altice's subscribers and account holders have repeatedly infringed and will continue to repeatedly infringe Plaintiffs' Copyrighted Works on a massive scale.

66.     The ability of its subscribers to use Altice's high-speed internet facilities to illegally download and distribute Plaintiffs' Copyrighted Works has served to draw, maintain, and generate higher fees from paying subscribers to Altice's service. Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Altice, Altice has profited from revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Altice's services by the prospect of illegally downloading and distributing copyrighted works. The specific infringing subscribers identified in notices concerning Plaintiffs' works, including the egregious infringers identified herein, knew Altice would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Altice subscribers to continue illegally downloading copyrighted works. Defendants derived (and continue to derive) substantial and direct financial benefit from the infringements of the Copyrighted Works by its subscribers or account holders in the form of continued monthly subscription payments and by having subscribers and account holders drawn to its service for the purpose of accessing and/or providing infringing content.

67.     Altice has not acted reasonably or in good faith in response to notices of infringement and repeat infringement regarding Plaintiffs' Copyrighted Works. Altice is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' Copyrighted Works in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

68.     Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.

69.     Altice's acts of vicarious infringement have been willful, intentional, and purposeful, in disregard of and indifference to Plaintiffs' rights.

70.     As a direct and proximate result of Altice's vicarious infringements of Plaintiffs' Copyrighted Works and exclusive rights under copyright, Plaintiffs are entitled to damages and Altice's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

71.     Alternatively, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).

72.     Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

73.     Altice's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to injunctive relief prohibiting further vicarious infringements of Plaintiffs' Copyrighted Works.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

a.     Adjudging and decreeing that Defendants contributorily infringed Plaintiffs' Copyrighted Works;

b.     Adjudging and decreeing that Defendants vicariously infringed Plaintiffs' Copyrighted Works;

20

c.     Adjudging and decreeing that Defendants' copyright infringements were willful;

d.     Ordering that Defendants pay all damages to which Plaintiffs may be entitled, including Defendants' profits related to and/or attributable to the copyright infringement, and for actual damages in an amount as may be proven at trial. Alternatively, at Plaintiffs' election, for statutory damages amount allowed by law for each infringed Copyrighted Musical Work, or for such other amount as may be proper pursuant to 17 U.S.C. § 504(c);

e.     Enjoining further contributory and vicarious infringements of Plaintiffs' Copyrighted Works;

f.     Awarding prejudgment and post-judgment interest on all monetary awards;

g.     Ordering that Defendants pay Plaintiffs' attorneys' fees, and full costs and disbursements in this action; and

h.     Awarding such other and further relief as the Court may deem proper and just.

## **Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand trial by jury of all issues triable by right of jury.

Dated: December 14, 2022                    Respectfully submitted,

/s/ *William E. Davis III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090

Facsimile: (903) 230-9661

Michael J. Allan
(pro hac vice application forthcoming)
John William Toth
(pro hac vice application forthcoming)
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 429-3000
(212) 506-3900
mallan@steptoe.com
btoth@steptoe.com