**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, CONCORD MUSIC GROUP, INC., and CONCORD BICYCLE ASSETS, LLC, <br><br>        Plaintiffs, <br><br>    v. <br><br>ALTICE USA, INC., and CSC HOLDINGS, LLC, <br><br>        Defendants. | CIVIL ACTION NO. 2:22-cv-00471-JRG <br><br>JURY TRIAL DEMANDED <br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

## TABLE OF CONTENTS

I.   INTRODUCTION AND STATEMENT OF THE ISSUES ................................................. 1

II.  PLAINTIFFS' ALLEGATIONS ................................................................................. 3

III. LEGAL STANDARD ........................................................................................... 6

IV.  PLAINTIFFS FAIL TO STATE A VICARIOUS LIABILITY CLAIM ........................... 6

    A.  Plaintiffs Do Not Adequately Allege that Altice Has a Direct Financial Interest in Any Underlying Infringement.................................................................. 7

    B.  Plaintiffs Do Not Adequately Allege that Altice Has the Right and Ability to Supervise and Control its Subscribers' Alleged Infringing Activity.................... 16

V.   PLAINTIFFS FAIL TO STATE A CONTRIBUTORY INFRINGEMENT CLAIM........ 21

VI.  CONCLUSION.................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................................6, 9, 25

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................6, 9, 12, 25

*Bell v. Llano Indep. Sch. Dist.,*
    2020 WL 5370591 (W.D. Tex. Feb. 13, 2020)....................................................................7

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
    149 F. Supp. 3d 634 (E.D. Va. 2015) ................................................................................17

*Bowlby v. City of Aberdeen,*
    681 F.3d 215 (5th Cir. 2012) ..............................................................................................6

*Buck v. Jewell-La Salle Realty Co.,*
    283 U.S. 191 (1931)...........................................................................................................16

*BWP Media USA, Inc. v. T&S Software Assoc., Inc.,*
    852 F.3d 436 (5th Cir. 2017) ............................................................................................17

*Canada Hockey LLC v. Texas A&M Univ. Athletic Dep't,*
    2019 WL 13131745 (S.D. Tex. Mar. 29, 2019) ................................................................21

*CoStar Grp., Inc. v. LoopNet, Inc.,*
    373 F.3d 544 (4th Cir. 2004).............................................................................................17

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004)..............................................................................8, 9, 11, 14

*Epic Tech, LLC v. Fusion Skill, Inc.,*
    2021 WL 1599378 (S.D. Tex. Apr. 23, 2021) ..................................................................18

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
    76 F.3d 259 (9th Cir. 1996)...........................................................................................6, 16

*Football Ass'n Premier League Ltd. v. YouTube, Inc.,*
    297 F.R.D. 64 (S.D.N.Y. 2013) ........................................................................................29

*Gilmour, Tr. for Grantor Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue
    Cross & Blue Shield of Alabama,*
    2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) ..................................................................29

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ..........................................................................................23, 28

*Huss v. Gayden*,
   571 F. 3d 442 (5th Cir. 2009) ....................................................................................14

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008)......................................................................18

*Johnston v. Kroeger*,
   2021 WL 3571279 (W.D. Tex. Aug. 11, 2021) ..........................................................21

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005).......................................................................................... *passim*

*Mon Cheri Bridals LLC v. Cloudflare, Inc.*,
   2021 WL 4572015 (N.D. Cal. Oct. 6, 2021)................................................................29

*Perfect 10, Inc. v. Amazon.com*,
   508 F.3d 1146 (9th Cir. 2007) ................................................................16, 18, 19, 26

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ....................................................................................14

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007) ..............................................................................17, 18

*Playboy Enters., Inc. v. Webbworld, Inc.*,
   991 F. Supp. 543 (N.D. Tex. 1997) ........................................................................7, 8

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005)......................................................................................6

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
   316 F.2d 304 (2d Cir. 1963) ..........................................................................7, 8, 16, 18

*Shell v. Henderson*,
   2013 WL 2394935 (D. Colo. May 31, 2013) .............................................................26

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)........................................................................................ *passim*

*Sony Discos, Inc. v. E.J.C. Fam. P'ship*,
   2010 WL 1270342 (S.D. Tex. Mar. 31, 2010) .....................................................11, 21

*Swallow Turn Music v. Wilson*,
   831 F. Supp. 575 (E.D. Tex. 1993)..............................................................................7

*Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*,
    2014 WL 894805 (E.D. Tex. Mar. 4, 2014) ................................................................24

*UMG Recordings, Inc. et al. v. RCN Telecom Servs., LLC et al.*,
    2020 WL 5204067 (D.N.J. Aug. 31, 2020) ...............................................................17

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
    2020 WL 3957675 (M.D. Fla. July 8, 2020) ........................................... *passim*

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) (*Grande I*) ........................... *passim*

*UMG Recordings, Inc. v. Grande Comm'ns Networks, LLC*,
    384 F. Supp. 3d 743 (W.D. Tex. 2019) (*Grande II*) .......................................27, 30

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ...................................................................................19

*Warner Records Inc. et al. v. Charter Commc'ns, Inc.*,
    454 F. Supp. 3d 1069 (D. Colo. 2020) .....................................................................17

**Statutes**

17 U.S.C. § 512 .................................................................................................................27

17 U.S.C. § 512(h) ..............................................................................................................4

17 U.S.C. § 512(l) .............................................................................................................27

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .................................................................................................1, 6

Defendants Altice USA, Inc. and its wholly owned subsidiary CSC Holdings, LLC (collectively, "Altice") respectfully move to dismiss Plaintiffs' Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.      INTRODUCTION AND STATEMENT OF THE ISSUES

This case is the latest attempt by the music industry to engineer a copyright-liability regime that makes internet service providers ("ISPs") responsible for all infringement that takes place on the internet—and thereby turn ISPs into their *de facto* enforcers. With their claims for vicarious and contributory copyright liability, Plaintiffs seek to hold Altice liable for alleged infringement by anonymous users of peer-to-peer ("P2P") file transfer technology using a small fraction of Altice internet connections. Plaintiffs do not, and could not, allege that Altice developed or provides the P2P file transfer technology used to infringe, nor that it maintains any P2P platform or website. They do not, and could not, allege that Altice stores or hosts infringing materials, that an Altice internet connection offers some unique ability to transfer music files, or that Altice could block access to such files. And they do not, and could not, assert that Altice has any particular interest in its subscribers' unauthorized access to music—as opposed to, for example, their access to lawful streaming services like Spotify. Instead, Plaintiffs' theory, at bottom, is that Altice is liable because it provides an internet connection, and an internet connection is necessary for online infringement. No matter how Plaintiffs contort this premise, it cannot support a claim.

Convenient though Plaintiffs may find it to bring mass infringement suits against ISPs rather than suing those actually involved with infringement, copyright's secondary liability doctrines do not allow for such claims. Rather, the doctrines of vicarious liability and contributory infringement inherently limit when a defendant can be held liable for another's conduct. The touchstones are familiar: financial interest, control, causation, culpable intent. Accordingly, copyright law has long refused to impose liability on providers of products or services that can be

used for a multitude of lawful ends, even if some use them to infringe. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

The internet, of course, is the ultimate multi-use service. Altice's internet service is a passive conduit that provides subscribers (and their families, guests, employees, and customers) access to a universe of possible uses, many of them literally indispensable to modern life. As with any multi-use technology, some may use it for unlawful purposes. But Altice does not profit directly from *any* particular use, let alone any particular unlawful one—nor does it monitor, block, encourage, or influence any such uses. So it is no surprise that Plaintiffs cannot allege a single element, let alone all the required elements, of their secondary liability claims.

***First***, Plaintiffs fail to plausibly plead facts that could justify holding Altice vicariously liable for its subscribers' alleged copyright infringement. To plead the required elements of this claim, Plaintiffs must plausibly allege that Altice's relationship to its subscribers gives it not only (1) the right and ability to actively supervise and control their allegedly infringing actions—similar in kind to a company's right to supervise its employees, or a principal's ability to control its agents—but also (2) a direct financial benefit from those subscribers' infringements of Plaintiffs' works. Here, no allegations approach the required type of benefit, nor the necessary degree of control. Altice receives the same flat monthly fees whether subscribers uses their internet access to send emails to their children, connect to P2P networks to share files, or watch Netflix—so there is no causal connection between the alleged infringement and what Altice's subscribers pay. And instead of adequately alleging that Altice had the right and ability to control and supervise subscribers' infringing conduct, Plaintiffs contend only that Altice has the right to terminate subscribers' accounts completely. But the general ability to impose a punishment after the fact is

not the same as a practical ability to control the behavior of millions of users in real-time—as would be required to impose liability on a defendant for acting vicariously through another.

***Second***, Plaintiffs do not state a claim for contributory infringement, failing to plead that Altice provided internet service with "an affirmative intent that [it] be used to infringe," or took affirmative actions with the intent of causing users of its services to infringe, as required by the Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005). "[M]ere knowledge of infringing potential or of actual infringing uses would not be enough[.]" *Id.* at 937. Nor do Plaintiffs plead any other available basis for a contributory infringement claim: for obvious reasons, they do not and could not possibly allege that Altice's provision of access to the internet is "good for nothing else but infringement," so there is no basis upon which the required "intent to infringe" can be "presume[d] or imput[ed]" to Altice. *Id.* at 932 (quotation omitted).

Plaintiffs' claims fail as a matter of law. The Complaint should be dismissed in its entirety.

## II.   PLAINTIFFS' ALLEGATIONS[1]

***Plaintiffs' Allegations Regarding Online Infringement.*** Plaintiffs are music companies who are "the legal or beneficial copyrights owners or owners of exclusive rights under United States copyright law with respect to certain copyrights." Dkt. 1 ("Complaint" or "Compl.") ¶¶ 7, 18–23. Their Complaint takes aim at "copyright infringement on the internet," *id.* ¶ 1—in particular, what they allege is the "[t]he predominant means" of online infringement: "[P2P] file distribution systems," *id.* ¶ 2. *See also generally id.* ¶¶ 2–6.

Plaintiffs describe one of these systems—BitTorrent—as a "uniquely efficient means for facilitating illegal file sharing" because it "break[s] each file into multiple 'chunks' or parts and allow[s] users to download each chunk concurrently from a different peer." *Id.* ¶ 4. According to

---

[1] For purposes of this motion only, Plaintiffs' plausible factual allegations are accepted as true.

Plaintiffs, this process "increase[s] the availability of unauthorized copies of pirated works to millions of people who use BitTorrent technology." *Id.* Plaintiffs reference data that purports to show "that BitTorrent communications accounted for nearly 3% of all internet traffic worldwide—more than Google." *Id.* ¶ 5.

As Plaintiffs note, "[o]ver the past two decades," "record labels[] [and] music publishers" have sued P2P sites like "Napster and KaZaA," successfully shutting them down. *Id.* ¶¶ 3, 38, 54, 65. Plaintiffs have also sued the individuals who use those networks to infringe—they elliptically acknowledge that Congress created a "legal process" for rightsholders to obtain "the specific identities" of infringers to conduct enforcement activities, *id.* ¶ 38. *See* 17 U.S.C. § 512(h) ("Subpoena To Identify Infringer."). But this lawsuit does not seek to impose liability on the actors who create or maintain P2P platforms or on those who use them to download music. Instead, it is part of a litigation campaign the music industry has launched against ISPs, arguing that ISPs should bear liability for subscriber infringement merely because they supply the conduit internet connection through which an infringer can download a song.

***Plaintiffs' Allegations Regarding Altice.*** Here, Plaintiffs have filed claims against Altice, an ISP that provides high-speed internet to consumers in 21 states. Compl. ¶ 8. This is in spite of the fact that, as Plaintiffs acknowledge, Altice has "terms of service and acceptable use policies" that specifically prohibit the use of its services for unlawful purposes like copyright infringement, and that its policies provide for termination of subscribers who repeatedly infringed copyrights. *Id.* ¶¶ 35, 46.

In support of their claims, Plaintiffs allege that Altice has received "infringement notice[s]" relating to Plaintiffs' works that "identif[y] the unique IP address assigned to the user[,] the 'port' used to communicate via the BitTorrent protocol, and the date and time the infringing activity was

detected." *Id.* ¶ 40. The Complaint does not say who sent these notices, how they were created, who collected the information they purport to contain, or how, if at all, that information was verified. It also does not allege that Altice had any means to verify information in the notices that it received. But in Plaintiffs' view, once they have sent some unstated number of unverifiable notices pertaining to a particular internet connection, Altice must terminate that connection, *id.* ¶ 10, shutting off access to anyone who uses it, and anything that depends on it, from nanny cams to doorbells to point-of-sale payment applications to patient databases.

*Plaintiffs' Allegations on Their Claims.* Plaintiffs advance their notice-and-terminate regime against Altice for alleged subscriber infringement beginning in 2018. They assert claims for vicarious and contributory liability.

For their vicarious liability claims, Plaintiffs allege that Altice receives a direct financial benefit from alleged infringement through "continued monthly subscription payments and by having subscribers and account holders drawn to its service for the purpose of accessing and/or providing infringing content." *Id.* ¶¶ 64–73. Plaintiffs also allege in conclusory fashion that Altice had the right and ability to control and/or supervise infringing activity—the activity that had occurred in the past, or potential infringement that might occur in the future—solely because it could terminate subscriber accounts. *Id.* ¶ 65.

For their contributory infringement claims, Plaintiffs allege that their notices alleging past occurrences of infringement gave Altice "actual knowledge of the direct infringements occurring through its system." *Id.* ¶¶ 53–63. Plaintiffs do not assert that Altice adopted any policies or took any action with the object of promoting the alleged copyright infringement. Rather, Plaintiffs claim that Altice should be held secondarily liable because it "continued to provide its infringing

subscribers with the means of access to and distribution of infringing materials" rather than terminating accounts. *Id.* ¶ 56.

Plaintiffs claim that Altice behaved willfully and seek various remedies, including statutory damages of $150,000 for each of the more than 7,700 works they claim were infringed—a total demand of more than $1.1 billion. *Id.* ¶ 61 & Ex. A.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept any well-pleaded facts as true in a light most favorable to the plaintiff, *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012), courts "do not accept as true conclusory allegations, unwarranted factual inferences or legal conclusions[,]" *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir. 2005) (quotation omitted).

This "facial plausibility" standard means that a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Mere "labels and conclusions," the "formulaic recitation of the elements of a cause of action," or "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not do. *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.   PLAINTIFFS FAIL TO STATE A VICARIOUS LIABILITY CLAIM

Plaintiffs' vicarious liability claim should be dismissed because they fail to plausibly plead either required element of the claim. Vicarious liability is not codified in the Copyright Act. It is a

common law "outgrowth of the agency principles of *respondeat superior*." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261–62 (9th Cir. 1996). The two elements of the claim reflect its common law origins: a defendant may only be held vicariously liable for the infringing conduct of another if it: "[1] profits *directly from the infringement* and [2] has a right and ability to *supervise the direct infringer*." *Grokster*, 545 U.S. at 931 n.9 (emphasis added); *see also, e.g.*, *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307–08 (2d Cir. 1963) (department store can be liable for concessionaire's sale of infringing records); *Swallow Turn Music v. Wilson*, 831 F. Supp. 575, 578 (E.D. Tex. 1993) (tavern owner can be held liable for infringing music performance).

As two courts have recently held after analyzing materially identical claims, Plaintiffs' attempt to impose vicarious liability here is unavailing. *UMG Recordings, Inc. v. Bright House Networks, LLC*, 2020 WL 3957675, at *6 (M.D. Fla. July 8, 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *9–10 (W.D. Tex. Feb. 28, 2018) ("*Grande I*"), *adopted by* 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018). Altice has no direct financial interest in the exploitation of infringing materials—it gains no subscribers as a result of infringement and receives not a penny more in subscription fees based upon what a subscriber accesses or downloads. Nor does Altice have the power or ability to police the internet or its subscribers' online activity in order to stop infringement.

### A.    Plaintiffs Do Not Adequately Allege that Altice Has a Direct Financial Interest in Any Underlying Infringement

To state a claim for vicarious liability, Plaintiffs must allege that Altice "has a direct financial interest in the infringing activity." *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 553 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999); *see also Grande I*, 2018 WL 1096871, at *9 (same). This requires allegations that Altice earned profits "distinctly attributable" to the allegedly infringing content. *See Bell v. Llano Indep. Sch. Dist.*, 2020 WL 5370591, at *5

(W.D. Tex. Feb. 13, 2020); *see also Grokster*, 545 U.S. at 930 n.9 (vicarious liability requires showing the defendant "profit[ed] directly from the infringement"). In accord with the doctrine's roots in *respondeat superior*, vicarious liability is triggered by the defendant's own financial interest in the infringing conduct of another. In essence, Plaintiffs must plead that when subscribers infringe, Altice receives money. They fail to do so.

**1.** Plaintiffs allege that Altice "collected profits from [accused] subscribers in the form of ongoing subscription fees" rather than "terminate the subscriptions." Compl. ¶ 10; *see also, e.g.*, *id.* ¶¶ 33, 37, 49. But that is legally irrelevant to vicarious liability, because it does not claim that Altice benefits *from infringement*. Plaintiffs must allege that Altice "has a direct financial interest *in the infringing activity*" itself. *Playboy Enters.*, 991 F. Supp. at 553 (emphasis added). Instead, they allege only that Altice has an interest *in continued subscription fees*. But, as Plaintiffs implicitly concede, Altice "collected" the exact same "ongoing subscription fees" from its subscribers regardless of which of the multitude of internet activities they engaged in. Compl. ¶ 10. This is why Plaintiffs admit that "*infringing activities*" by subscribers "do not affect Altice's bottom line." *Id.* ¶ 33 (emphasis added). Altice is therefore utterly unlike the canonical department store owner who takes a commission from a concessionaire's infringing sales, *see Shapiro, Bernstein*, 316 F.2d at 307–08, or—more apt here—a business for which the "principal object was use of" its product "to download copyrighted works," *see Grokster*, 545 U.S. at 926.

**2.** That Altice receives the same flat fees regardless of whether users of its network infringe, similarly dooms Plaintiffs' other theories of direct financial benefit. It is well-settled that " 'receiving a one-time set-up fee and flat periodic payments for service … [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' " *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (alterations in original) (quoting S. Rep. No. 105–

190, at 44 (1998)); *see also Grande I*, 2018 WL 1096871, at *10 (citing *Ellison* with approval). There is one narrow exception: "'where *the value of the service* lies in providing access to *infringing material*'" and thus "the infringing activity constitutes a *draw* for subscribers, not just an added benefit." *Ellison*, 357 F.3d at 1079 (quoting S. Rep. No. 105–190, at 44–45 (1998)) (emphasis added). In applying this "draw" exception, "[t]he essential aspect … is whether there is a *causal relationship* between the infringing activity and any financial benefit a defendant reaps." *Id.* (emphasis added).

Plaintiffs fail to plausibly allege "draw" for a simple reason: they do not and cannot allege that anyone would have declined to subscribe to Altice's service, or would have paid Altice less in subscription fees, but for the ability to infringe Plaintiffs' works through Altice's network. And they certainly do not allege, as the law requires, that access to infringing material is the main draw of internet access among the countless essential and lawful uses of the internet. Subscribers' infringing conduct therefore bears no causal connection to Altice's bottom line. Plaintiffs' attempts to satisfy the "draw" rule despite this reality are just elaborate attempts to insinuate what they cannot plead.

*First*, Plaintiffs allege that "[t]he ability to download music and other copyrighted content … is a significant incentive for customers to subscribe to Altice's services." Compl. ¶ 32. This is just the sort of threadbare, formulaic recital of an element that does not satisfy *Twombly*/*Iqbal*. Plaintiffs fail to include specific contentions plausibly alleging that infringement drives internet subscriptions in any way. From email, to news sources, to social media, to streaming music, film, and radio, not to mention the many internet-connected devices in modern homes and businesses, the internet is such a necessity of modern life that virtually no one would go without it. Plaintiffs themselves cite data purporting to show that legitimate internet traffic dwarfs

BitTorrent traffic. *Id.* ¶ 5 (the top five sources of internet traffic—YouTube, Netflix, Facebook, Facebook video, and TikTok—constitute nearly 40% of traffic as compared to 2.91% for BitTorrent) (citing *Phenomena: The Global Internet Phenomena Report*, Sandvine, Jan. 2022 ("Sandvine Rpt.") at 13).[2] And while Plaintiffs note a study showing that "piracy increased" when "individuals found themselves increasingly confined to their homes and the internet amid the height of COVID-19 lockdowns," *id.* ¶ 6 (citing an article discussing "movie and tv piracy"), common experience tells us that the internet also became downright indispensable during the pandemic for myriad legitimate purposes. No one subscribed *because of* infringement, and Plaintiffs do not even allege otherwise.

 *Bright House* is illustrative. There, like here, the plaintiffs alleged that "*access* to infringing content generally available on the internet is one of many reasons motivating some subscribers to enroll with any ISP." 2020 WL 3957675, at *5 (emphasis in original). The court observed that the plaintiffs did "not allege that there is anything unique about the service [the ISP] offers as a portal to the internet or as a portal to this alleged contraband content. Plaintiffs, moreover, [did] not allege that there is any infringing content 'available' on the [ISP's] platform, such as a storage vehicle (i.e., Cloud storage) from which a would-be infringer could seek to secure infringing content directly or indirectly from [the ISP]." *Id.* An ISP merely "offers a conduit to the 'World Wide Web'" and "the available infringing content is found on the robust peer-to-peer sharing platforms ubiquitous to the internet and driven largely by BitTorrent (and similar networks), which are … in no way affiliated with or controlled by Bright House or any other ISP, for that matter." *Id.* To hold

---

[2] *See also* Sandvine Rpt. at 14 ("Across traffic categories, 56.96% of traffic was attributable to the top-6 brands Google, Netflix, Facebook, Apple, Amazon, and Microsoft – a 33% increase in total traffic from 2019's 43.10%."; cited at Compl. ¶ 5 & n.1). Altice does not concede the accuracy, relevance, or ultimate admissibility of these studies—but only notes that they undermine, rather than support, Plaintiffs' legal theories.

otherwise, as the *Grande* court concluded, "would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services." *Grande I*, 2018 WL 1096871, at *10 (rejecting allegations that "the existence of music and the BitTorrent protocol is the draw").

As a result, Plaintiffs cannot show, as they must, that the availability of infringing content "provide[d] the *main* customer 'draw' to the [service]." *Sony Discos, Inc. v. E.J.C. Fam. P'ship*, 2010 WL 1270342, at *4 (S.D. Tex. Mar. 31, 2010) (quoting *Adobe Sys. Inc. v. Canus Prods.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001)) (emphasis added); *see also Bright House*, 2020 WL 3957675, at *4 (same, and holding that the test requires that "'the very success of the [defendant's] venture [must] depend[ ] on the [infringing] activity'") (quoting *Adobe Sys. Inc.*, 173 F. Supp. 2d at 1051). The most Plaintiffs' allegations suggest is that the ability to infringe could be "just an added benefit" of subscribing to internet service for some very small subset of people, *see Ellison*, 357 F.3d at 1079—no more a "draw" to internet subscriptions than it is to computer ownership or electricity service, both also necessary for infringing downloads, but also for an enormous range of other activities. Permitting this lesser showing would "effectively read[] the limiting term 'direct' out of the test, allowing the imposition of vicarious liability based on indirect, highly attenuated connections between infringing conduct of the patron and alleged financial benefits." *Bright House*, 2020 WL 3957675, at *4; *see also Grande I*, 2018 WL 1096871, at *10.

*Second*, Plaintiffs allege that "Altice has advertised and promoted its high-speed internet services to customers … to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements." *See* Compl. ¶ 15; *id.* ¶ 32 ("Altice's consumer marketing material … touted that Altice offered 'multigigabit broadband speeds and more'"); *id.* ¶ 37 ("For those account holders and subscribers who wanted to download and distribute files

illegally at faster speeds, Altice obliged them in exchange for higher subscription fees."). Again, notice what Plaintiffs *do not* allege: that subscribers actually do choose more expensive high-speed internet subscriptions *because of* some enhanced ability to infringe. Without that, Plaintiffs' argument is just more insinuation—and implausible insinuation at that. Plaintiffs do not even try to claim that a music download is such a bandwidth intensive activity that having some higher tier of internet speed would make a material difference on Altice or any major ISP's network. Given the current makeup of the internet, there is no plausible basis to infer as much. Once again, common experience plainly demonstrates the opposite: that uses like streaming video, or simply living in a house with multiple users, are *far* more plausible drivers of high-bandwidth and/or high-speed internet plans. *See also, e.g.*, *id.* ¶ 5; Sandvine Rpt. at 14. Plaintiffs' conclusory, implausible allegations thus "stop[] short of the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557.

The *Bright House* court, confronted with virtually identical allegations, concluded that "[i]t is not readily apparent or plausibly alleged that an internet thief would be 'drawn' by the efficiency of internet service any more than the average law-abiding purchaser of copyrighted content." 2020 WL 3957675, at *5 (rejecting the "dog-whistle theory that [the ISP] advertises faster internet speeds to surreptitiously entice the prospective infringer" as "[a]ll users presumably seek faster, more reliable internet service"). Put differently, "[a]ny proportionate value that may be ascribed by *post hoc* edict to that general enticement to purchase internet services from [the ISP] cannot constitute a direct financial benefit to [the ISP] owing principally to the draw to available infringing content." *Id.* at *6 (emphasis added).

*Third*, Plaintiffs' allegations that Altice's "failure to adequately police its infringing subscribers" served as a draw also fail, for similar reasons. Compl. ¶ 49. This is just a repackaged

version of Plaintiffs' first theory—that Altice has an interest in having customers and therefore *tolerates* infringement. Again, "the test is whether users are drawn to [the ISP's] network by the *availability of infringing content*," *Bright House*, 2020 WL 3957675, at *5 (emphasis in original), such that Altice benefits from infringement *itself*. Plaintiffs' "failure to police" theory does not assert that Altice has an interest in infringement occurring. And as Plaintiffs allege elsewhere, the "availability of unauthorized" content is not dependent on Altice or any ISP, as the content does not reside on their networks, Compl. ¶¶ 1–6, 38, but on user devices over which Altice has no control.

In any event, Plaintiffs do not allege any facts to support the lengthy chain of inferences that would be necessary before this allegation could even arguably support a vicarious liability theory, namely: that Altice somehow "policed" its network in an exceptionally loose way; that subscribers knew about this lack of policing; and that subscribers chose Altice because of it. In the absence of allegations that any *subscriber* signed up for or stayed with Altice's services *because* of its allegedly lax approach to copyright infringement—and such allegations would be false, speculative, and implausible—there is no basis to infer that any purportedly lax policing drew subscribers to pay for its service. Indeed, Plaintiffs' allegations make such an inference plainly implausible because they allege that "online piracy committed via BitTorrent is stunning" in "scope," *id.* ¶ 3, accounts for "nearly 3% of all internet traffic worldwide," *id.* ¶ 5, and is engaged in by "thousands or millions of people over the internet," *id.* ¶ 41. Given Altice's limited network footprint and subscriber base, *id.* ¶ 8, P2P networks clearly are being accessed through other ISPs and there is no reasonable basis from which to infer that Altice's "policing" has drawn subscribers seeking a better way to commit copyright infringement. *See Bright House*, 2020 WL 3957675, at *5 (rejecting claim because there were no allegations that there was anything unique about the

defendant-ISP's service). To the extent Plaintiffs claim a draw with the allegation that "egregious infringers … knew Altice would not terminate their accounts," Compl. ¶ 49, they simply renew their cardinal mistake: whatever financial benefit Altice may get from non-termination is simply the subscribers' fees, which are not "'directly attributable to the infringing activity.'" *See Ellison*, 357 F.3d at 1079 (quoting S. Rep. No. 105–190, at 44 (1998)).

    **3.** Further, Plaintiffs also fail to plausibly tie their conclusory "draw" allegations to the specific infringements *at issue in this case*. Instead, their vicarious liability claim is based on the impermissibly vague theory that because there is lots of infringement on the internet, Altice must somehow benefit from it. But as "[a]ny scientist or statistician must acknowledge … correlation is not causation." *Huss v. Gayden*, 571 F. 3d 442, 459 (5th Cir. 2009). A copyright plaintiff must allege a "'causal connection between the injury and the conduct complained of'" by showing that defendant derived the direct financial benefit from the "specific infringement alleged" and not from the "rights of owners and the actions of users not before the court." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also id.* at 673–74 (noting that a lesser showing would be "difficult to reconcile with Article III's standing requirements" as it implicates the "rights of owners and the actions of users not before the court") (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Even assuming some subset of subscribers may have been drawn to Altice's network to infringe generally (which, again, is not plausibly alleged), Plaintiffs do not allege that any of the "drawn" subscribers are there for Plaintiffs' works, or even that the "drawn" subscribers are the ones who actually committed each of the alleged acts of infringement of the 7,700-plus works-in-suit. *See* Compl. ¶ 66 (alleging only that subscribers were "drawn to [Altice's] service for the purpose of accessing and/or providing infringing content"). Plaintiffs' sole conclusory allegation that

subscribers were "drawn to [Altice's] service for the purpose of accessing and/or providing infringing content," *id.*, plainly is insufficient to meet this threshold.

**4.** Plaintiffs' theory of liability is flawed for the additional reason that they fail to plead that the P2P users allegedly responsible for the underlying direct infringement were Altice's *subscribers*, *i.e.*, the people who elect to pay Altice monthly flat fees for internet access and are responsible for maintaining the account. *They* are the *only* individuals for whom the draw analysis matters. The notices on which Plaintiffs rely indicate only that an IP address associated with Altice's network was used to share content on P2P networks. *Id.* ¶ 40. This means that any device (over which Altice has no control) connected through that account could be the source of the direct infringement. To take just one obvious example, a parent might decide to subscribe to Altice's services because its pricing and features are more attractive than alternatives. If the parent's child uses the connection to share copyrighted works—say, on a computer in their bedroom—it would be not just implausible, but incorrect, to say that the account holder (the parent) was "drawn" to Altice's service by the opportunity to commit copyright infringement. Thus, it cannot be reasonably inferred—and certainly not from Plaintiffs' single conclusory allegation—that the off-the-shelf, flat-fees service offerings of ISPs like Altice are a draw to any of the specific activities people perform on the generally accessible internet, much less copyright infringement in particular.

In sum, Plaintiffs have not plausibly alleged that Altice, merely by making available its high-speed internet access service, drew subscribers whose main attraction to Altice's service was that it enabled them to infringe Plaintiffs' works. Plaintiffs' vicarious liability claim is an attempt to impermissibly expand the doctrine of *respondeat superior* to encompass highly attenuated and indirect relationships. If permitted, the result would be to "impose liability on every ISP, as the music at issue is available on the internet generally, as is the BitTorrent protocol." *Bright House*,

2020 WL 3957675, at *6 (citation omitted). Courts "must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated" the "competing interests that are inevitably implicated by [a] new technology." *Sony*, 464 U.S. at 431. Plaintiffs' failure to allege a direct financial benefit necessitates dismissal of their vicarious liability claim. And because Plaintiffs will never be able to allege that infringement causes a direct financial benefit, dismissal should be with prejudice.

### B.     Plaintiffs Do Not Adequately Allege that Altice Has the Right and Ability to Supervise and Control its Subscribers' Alleged Infringing Activity

Plaintiffs' vicarious liability claim independently fails because Plaintiffs do not—and cannot—adequately allege that Altice has "a right and ability to supervise the direct infringer[s]" as a principal can supervise an agent. *See Grokster*, 545 U.S. at 930 n.9. For purposes of vicarious liability, "a defendant exercises control over a direct infringer when [it] has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1173 (9th Cir. 2007) (citing *Grokster*, 545 U.S. at 930 n.9). Thus, courts have found this element satisfied where a department store owner "retained the ultimate right of supervision" over a concessionaire, *see Shapiro, Bernstein*, 316 F.2d at 306, or a venue owner hired an infringing orchestra as an "instrumentalit[y] under its control," *see Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 201 (1931). Ultimately, a defendant is liable where it fails to stop infringement despite being in a "position to *police the conduct of the 'primary' infringer*." *Shapiro, Bernstein*, 316 F.2d at 309 (emphasis added); *see also Fonovisa*, 76 F.3d at 263 (flea market operator liable where it can "police the direct infringers").

The very notion that Altice has the practical ability to actively police the conduct of every user of every Altice internet connection is flatly implausible. Internet users are in no sense subject to Altice's control: they are millions upon millions of individuals across 21 states, anonymous to

Altice as they shop, surf, work, and scroll. As several courts have recognized, ISPs thus play a passive role in internet activity. *See, e.g.*, *BWP Media USA, Inc. v. T&S Software Assoc., Inc.*, 852 F.3d 436, 439 (5th Cir. 2017); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550–51 (4th Cir. 2004). That is why Plaintiffs do not—and could not—allege that Altice has the ability to actively monitor what its subscribers (or others using their internet connections) are doing online when they are in the privacy of their homes (nor would we want an ISP to do so). Plaintiffs also do not allege that Altice can take any action to stop one of Plaintiffs' works from being infringed on a P2P network. ISPs simply do not have the sort of relationship with users of their internet service that permits an inference of vicarious responsibility—and thus vicarious liability—for those users' conduct.

Plaintiffs' theory that Altice had the "ability to supervise and/or control the infringing conduct of its subscribers" is based entirely on the allegation that Altice had available the blunt tool of "terminating the accounts of subscribers" *after the fact*, upon receipt of one of Plaintiffs' notices alleging infringement. Compl. ¶ 65; *see also, e.g.*, *id.* ¶¶ 10, 37, 46, 49. But termination is not control. In the first place, "[e]ven though" a defendant may "have the 'right' to refuse their services, and hence the literal power to 'stop or limit' the infringement"—that is, terminate access—that power does not signify "sufficient control over the actual infringing activity for vicarious liability to attach." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 806 (9th Cir. 2007). Thus to the extent Plaintiffs may seek refuge in non-binding cases holding "the contractual right to condition the availability of internet" is enough, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015), they are simply wrong.[3] As the Ninth

---

[3] Several subsequent decisions rely on *BMG*'s incorrect rule. *See Grande I,* 2018 WL 1096871, at *10; *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *11 (D.N.J.

Circuit explained, "contractual terms" that give a defendant the right to deny service do not amount to the "absolute right" or power to "*stop*" *the infringement*. *Visa*, 494 F.3d at 804 (emphasis added). Thus, in *Visa*, while the defendant credit card company could stop offering its services to infringing websites, it did not face vicarious liability because it could not "stop websites from reproducing, altering, or distributing infringing images." *Id.* at 804–05.

For the same reasons, the Ninth Circuit in *Perfect 10 v. Amazon.com* found Google could not be vicariously liable for the allegedly infringing websites in its search results. 508 F.3d at 1174–75. As courts have recognized, "[t]he pertinent inquiry is not whether [the defendant] has the right and ability to control *[its] system*"—that is, kick a user offline—"but rather, whether it has the right and ability to control the *infringing activity*." *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) (emphasis added); *cf. Epic Tech, LLC v. Fusion Skill, Inc.*, 2021 WL 1599378, at *5 (S.D. Tex. Apr. 23, 2021) (denying defendant summary judgment on vicarious liability based on evidence that it "directly controlled access to the [infringing] software").

Plaintiffs cannot allege that Altice had that critical control. ISPs like Altice stand in stark contrast to website or platform operators (such as YouTube, Amazon, eBay) who actively *host* material and, like the shopkeepers and dancehall proprietors whose conduct gave rise to this line of cases, can control infringing activity by, for example, removing the offending content and stopping the infringement *at its source*. *See Shapiro, Bernstein*, 316 F.2d at 307. By contrast, Altice does not control the internet, and cannot take down content from digital premises or block access to particular corners of the web. And Altice has no control over what individuals do when they

---

Aug. 31, 2020); *Warner Records Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1078–79 (D. Colo. 2020).

access infringing content. As Plaintiffs allege, the P2P networks at issue are "decentralized" and accessible from any ISP. Compl. ¶ 3.[4] Thus, terminating an Altice subscriber, or a thousand Altice subscribers, would not stop infringers from getting online at the local coffee shop, nor stop an already-disseminated work from further making its way around the web.

To the extent Plaintiffs suggest there are hypothetical measures short of termination that Altice could take to stop infringing activity, *id.* ¶ 65, the implication runs headlong into settled law: A defendant's "failure to change its operations to avoid assisting [users] to distribute … infringing content is not the same as declining to exercise a right and ability to make [others] stop their direct infringement." *Amazon*, 508 F.3d at 1175. As the Ninth Circuit has explained, absent specific allegations that anti-infringement technological measures were *feasible and practicable*, the plaintiffs' theory of liability "suffered from both imprecision and overbreadth." *Id.* at 1174 (citation and quotation omitted); *see also VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) (Zillow lacked the "technical ability to screen out or identify infringing VHT photos among the many photos that users saved or uploaded daily" to its website).

So too here: Plaintiffs' proposed account termination remedy "suffers from both imprecision and overbreadth." As discussed above, Plaintiffs do not allege how, if at all, the notices sent to Altice are verified—yet they demand that Altice terminate an account once it receives some undefined number of such notices. Compl. ¶ 65; *see also id.* ¶¶ 10, 37, 46, 49. The actors committing the underlying alleged infringement through that account might not even be the actual account holder. And even if the account holder did commit the underlying alleged infringement,

---

[4] Plaintiffs also do not allege that the works-in-suit are only available on P2P networks as a result of Altice subscribers, which would be implausible given the global nature of P2P networks, the alleged popularity of Plaintiffs' works, and the technical nature of P2P networks. Plaintiffs' cases against other ISPs plainly demonstrate that subscribers of other ISPs also are alleged to share the same works.

others who may rely on that connection for their education, jobs, healthcare, and to stay connected with friends and family, would suffer.

These serious concerns aside, Plaintiffs' proposed termination regime would not even stop the infringing activity about which they complain. This is because all of the allegedly infringing files are located on *physical user devices* that Altice does not control, and no action Altice takes can stop works on these devices from being continually infringed. To use another obvious example, if a family's college-aged son, home visiting for Thanksgiving, connects to his parents' internet and shares some music on P2P networks from his laptop, Altice's subsequent termination of the entire household's account will not prevent the son from sharing that very same music the very next time he connects to the internet by any means and at any location—whether back in his dorm room, at work, in a coffee shop, or while sitting in a public park with free Wi-Fi. ISPs like Altice control neither the internet nor their subscribers' computers, leaving them without the "practical ability to police the infringing activities." *See Perfect 10, Inc.*, 508 F.3d at 1174.

Ultimately, Plaintiffs' "termination theory" of control confuses retroactive punishment with the real ability to police and stop infringing activity. They are not the same. Plaintiffs assert that the notices Altice receives provided it with knowledge of *past acts* of infringement. Compl. ¶¶ 40–43. They complain that Altice should have then terminated the accounts of certain of those subscribers—but without saying which subscribers Altice should have terminated, and at what point. *See, e.g.*, *id.* ¶¶ 10, 15, 35, 37, 45, 48. But Altice's non-termination of a subscriber's account does not retroactively turn that subscriber into its agent during the period when the infringement purportedly evidenced by the notice is alleged to have occurred. By the same token, the mere contractual right to terminate an account does not convert a subscriber into an agent such that all of that subscriber's activity is attributable to Altice. Such a conclusion would distort agency law

beyond recognition and render ISPs liable not only for infringement committed by their subscribers but all sorts of other unlawful activities performed online.

Where, as here, a complaint fails to plausibly allege a defendant's meaningful right to supervise and control infringing activity, courts routinely dismiss the vicarious liability claim. *See, e.g.*, *Johnston v. Kroeger*, 2021 WL 3571279, at *5 (W.D. Tex. Aug. 11, 2021), *report and recommendation adopted*,  2021 WL 8442050 (W.D. Tex. Aug. 26, 2021) (dismissing claim absent allegations that Live Nation controlled an allegedly infringing performance or managed the venue at which the performance took place); *Canada Hockey LLC v. Texas A&M Univ. Athletic Dep't*, 2019 WL 13131745, at *12 (S.D. Tex. Mar. 29, 2019) (finding defendant did not adequately plead "supervisory authority" over the allegedly direct infringers who published infringing article on the defendant's website); *Sony Discos, Inc.*, 2010 WL 1270342, at *3 (holding a flea-market operator's relationship to allegedly directly infringing vendors "is too tenuous," to support vicarious liability, as "[h]e cannot be described as an employer, master, principal, or even agent of them," the infringement did not occur "with his consent, much less at his direction," and he "is not pervasively participating in the infringement"). This Court should do the same.

## V.    PLAINTIFFS FAIL TO STATE A CONTRIBUTORY INFRINGEMENT CLAIM

Plaintiffs' contributory infringement claim should also be dismissed because Plaintiffs fail to plausibly allege that Altice acted with culpable intent, a required element of contributory infringement liability under controlling Supreme Court precedent. The 2005 *Grokster* decision is emphatic that a plaintiff seeking to plead contributory copyright infringement must show, as a bedrock requirement, that the defendant *intended* or *encouraged* the infringement. Where the requisite culpable intent is lacking, it is insufficient to merely allege that the defendant provided resources that "contributed" to another's ability to infringe. Instead, to state a claim for contributory infringement against Altice, Plaintiffs must adequately allege that it "intentionally

induc[ed] or encourage[ed] direct infringement[.]" *Grokster*, 545 U.S. at 930. Only upon such a showing can the requisite intent be shown, or if necessary, imputed. Plaintiffs do not plead inducement: that would require them to allege that Altice provides internet service "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *Id.* at 936–37. And their bare-bones, conclusory allegations fail to plead either of the other available bases for contributory liability: "imputing culpable intent as a matter of law from the characteristics or uses of a distributed product" or providing "evidence of intent if there is such evidence." *Id.* at 934. Neither of the latter theories is available where a defendant's product or service is capable of (and here, widely used for) substantial noninfringing uses. *Id.* at 943 (citing *Sony*, 464 U.S. at 442).

*Grokster* establishes *intent* as a basic requirement for any contributory copyright infringement claim, and reconciles a line of common-law contributory copyright infringement decisions with both the Supreme Court's previous *Sony* decision and the line of closely related patent cases that informed *Sony*, by defining the scope of a single unified doctrine: "One infringes contributorily *by intentionally inducing or encouraging direct infringement*." *Id.* at 930 (emphasis added). As the Supreme Court explained, *intent* is the unifying factor in both copyright and patent doctrine, and a bedrock requirement for imposing contributory infringement liability on any basis. In all cases, there must be "evidence of stated or indicated intent to promote infringing uses." *Id.* at 931. If direct evidence of intent is lacking, then there must be a sufficient basis to impute intent. *Id.* at 934 (explaining the available bases of contributory infringement liability).

It has long been black letter law that the requisite intent *cannot* be imputed, however, "from the characteristic or uses of a distributed product" or service, *unless* it is "good for nothing else"

but infringement. *Id.* at 932, 934 (citation omitted); *Sony*, 464 U.S. at 442 ("the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses"). In formulating this bright-line rule, the Supreme Court expressly relied on the doctrine of contributory infringement codified in Section 271(c) of the Patent Act, explaining this was "appropriate … because of the historic kinship between patent law and copyright law." *Sony*, 464 U.S. at 439; *Grokster*, 545 U.S. at 936 ("*Sony* took the staple-article doctrine of patent law as a model for its … rule").

*Grokster* confirms *Sony's* rule, and further explains that all other "flavors" of contributory infringement—including the inducement prong of contributory copyright infringement, which the Supreme Court also adopted from patent law—require an equivalent showing of intent. *See Grokster*, 545 U.S. at 930 ("One infringes contributorily by intentionally inducing or encouraging direct infringement"); *id.* at 942 (liability may either be "predicated on *actively encouraging* (or inducing) infringement *through specific acts* … or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses") (Ginsburg, J. concurring) (emphases added). Further underscoring the general applicability of the intent requirement, the Supreme Court subsequently made clear (in the parallel patent context) that the *scienter* required for inducement and contributory infringement is the same: both require intent as well as knowledge. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 763, 760, 765 (2011) (explaining that both contributory infringement under § 271(c) and inducement under § 271(b) require an *intent* that one's product be used to infringe a *known* patent, and noting that the Court's "decision in [*Grokster*], which looked to the law of contributory patent infringement for guidance in determining the standard to be applied in a case claiming contributory

23

copyright infringement," supports the same conclusion); *see also, e.g.*, *Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*, 2014 WL 894805, at *4 (E.D. Tex. Mar. 4, 2014) (noting that *Grokster* "explicitly treat[s] copyright and patent regimes in parallel").

Yet instead of making factual allegations that plausibly plead the required culpable intent, Plaintiffs allege merely that: (1) because unidentified third parties sent Altice notices purporting to identify instances of *past* infringement, Altice had "knowledge" of its subscribers' alleged infringing conduct; and (2) when Altice "fail[ed] to terminate" an indeterminate class of "known repeat infringers" in response to an unspecified number of third-party notices, it thereby provided a "material[] contribut[ion]" to infringement generally. Compl. ¶¶ 54–55. Under *Grokster*, more is required: here, just as in *Grokster*, "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject [Altice] to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves." 545 U.S. at 937. Here, Plaintiffs allege only that Altice:

- "acted affirmatively to facilitate, encourage, and materially contribute to" alleged infringement by "providing the means necessary for its subscribers to commit direct copyright infringement, by selling and providing access to the internet and the system and technology that allows for the storage and transmission of data, and by failing to terminate known repeat infringers[.]" Compl. ¶ 54.

- had been "provided with actual knowledge of the direct infringements occurring through its system." *Id.* ¶ 55.

- "could have taken simple measures to prevent further damages to Plaintiffs or their copyrighted works, yet continued to provide its infringing subscribers with the means of access to and distribution of infringing materials." *Id.* ¶ 56.

These allegations fall well short of stating a claim for contributory infringement because they fail to plausibly plead that Altice acted with the requisite intent. Plaintiffs' single conclusory statement that Altice "acted affirmatively to … encourage" infringement, *id.* ¶ 54, is precisely the type of "threadbare recital[] of a cause of action's elements" that does not even satisfy the

*Twombly*/*Iqbal* standard for proper notice pleading. The Complaint is devoid of any factual allegations plausibly supporting this vague, conclusory statement—which is further undermined by Plaintiffs' inconsistent contention that third parties were "encouraged" to infringe *not* by Altice's alleged conduct, but by the online actions of *Altice's subscribers*. Compl. ¶ 50 ("When Altice's subscribers used Altice's services to distribute infringing copies … [it] encouraged further infringement … ."). It is irrelevant what subjective beliefs hypothetical third parties may have formed, based on the hypothetical actions of hypothetical Altice subscribers: Plaintiffs must plausibly allege that *Altice* intentionally encouraged infringement. They fail to do so. And under *Sony* and *Grokster*, merely "supplying the 'means' to accomplish an infringing activity" is insufficient, because the law "bar[s] secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use." *Sony*, 464 U.S. at 436; *Grokster*, 545 U.S. at 933. Altice's internet service is unquestionably capable of substantial lawful use, so Plaintiffs' allegations that it "provid[ed] the means necessary for its subscribers to commit direct copyright infringement" simply by providing that service cannot establish intent as a matter of law. *See* Compl. ¶ 54.

For the same reasons, a contributory infringement claim cannot be based on Altice's "mere knowledge of infringing potential or of actual infringing uses." *Grokster*, 545 U.S. at 937; *compare* Compl. ¶ 55 (vaguely alleging that Altice "has … been provided with actual knowledge of … direct infringements" occurring in the past). Rather, to adequately allege a claim for contributory infringement, Plaintiffs must prove that Altice distributed a device or service with the *intention* of fostering infringement: that is, "by intentionally inducing or encouraging direct infringement[.]" *Grokster*, 545 U.S. at 930; *see also id.* at 936–37 ("[O]ne who distributes a device [or service] with the object of promoting its use to infringe copyright, as shown by clear expression or other

affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties … mere knowledge of infringing potential *or of actual infringing uses* would not be enough here to subject a distributor to liability") (emphasis added); *Shell v. Henderson*, 2013 WL 2394935, at *11 (D. Colo. May 31, 2013).

Also insufficient is Plaintiffs' single vague, conclusory allegation that Altice had, but did not take, "simple measures to prevent further damages to Plaintiffs or their copyrighted works." Compl. ¶ 56. They mean account termination. *Id*. Whatever utility a nuanced "simple measures" test might arguably have in the sorts of fact patterns whence it emerged—where a defendant stores allegedly infringing material on its servers and can inspect and target it for removal—this is not such a case. *See Amazon*, 508 F.3d at 1172. Any "simple measure" must be "reasonable and feasible." *Id.* Termination is neither. Cutting a whole family or business off of the internet because an incorrigible teen or customer has downloaded a handful of songs is a measure vastly out of proportion to the underlying harm to intellectual property rights, and therefore entirely unreasonable. What is more, Plaintiffs readily acknowledge that the infringing works themselves are available all over the internet, through countless far-flung users on networks other than Altice's. Compl. ¶ 3; *see supra* at 3–4 & n.4. So, terminating an internet connection is not only potentially devastating for a home or business, it has no material impact at all on the continued availability of an infringing work to others across the world. Declining to take an unreasonable and ineffective measure in no way connotes the sort of "intentional[] inducing or encouraging [of] direct infringement" that *Grokster* requires, *see* 545 U.S. at 930. The Fifth Circuit has not endorsed a "simple measures" test for contributory infringement, and this Court has not applied it in any published decision. And the mere ability to completely terminate service cannot be a basis for liability under *Grokster*: as the Supreme Court explained there, "ordinary acts incident to product

distribution," including offering customers technical support or product updates, cannot "support liability in themselves." *Id.* at 937. Not only is providing uninterrupted service patently just such an "ordinary act"—for ISPs, this *is* product distribution—but "in the absence of other evidence of intent, a court [is] unable to find contributory infringement liability *merely based on a failure to take affirmative steps to prevent infringement*, if the device otherwise was capable of substantial noninfringing uses." *Id.* at 939 n.12 (emphasis added). Indeed, the one out-of-district Texas court to have applied a "simple measures" test for contributory infringement did so by simply ignoring *Grokster*, remarking that the Supreme Court's plain definition of the contributory infringement doctrine "should not be taken" at face value. *See UMG Recordings, Inc. v. Grande Comm'ns Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019) ("*Grande II*").

At base, Plaintiffs' theory of liability is that Altice was aware that specific customer accounts had been accused of past infringing conduct, and that Altice did not actively disconnect all such users' internet service based solely on its receipt of notices containing the allegations. *See* Compl. ¶ 54 (alleging Altice "provid[ed] the means necessary for its subscribers to commit direct copyright infringement … by failing to terminate known repeat infringers"). This theory of liability turns on a clear misapplication of the Digital Millennium Copyright Act ("DMCA"), a law that, far from *imposing* copyright liability, establishes a voluntary framework under which online service providers like Altice are *exempted* from liability if they meet certain conditions. *See* 17 U.S.C. § 512. The statute is explicit that the DMCA has no bearing "upon the consideration of a defense by the service provider that the service provider's conduct is not infringing." *Id.* § 512(l). Plaintiffs' apparent reliance on the DMCA for the mistaken proposition that Altice had a "legal responsibility" to "discipline repeat offenders" has the law backwards—and no other authority supports the existence of such a duty, either. *See* Compl. ¶ 10.

27

Plaintiffs do not allege that Altice had any means of verifying the truth of the allegations in Plaintiffs' notices—it did not—and notably, do not allege that when Altice "failed to terminate" accounts based solely on Plaintiffs' unverifiable accusations, it did so because it had a *purpose* or *intent* to promote or encourage copyright infringement. No such allegation would be plausible in any event. To the extent Plaintiffs may argue that Altice's ongoing relationship with its customers puts it in a different category than the technology providers that *Sony* immunizes, *Grokster* scotched any such theory by expressly noting that "ordinary acts incident to product distribution, such as offering customers technical support or product updates," cannot "support liability in themselves." *Grokster*, 545 U.S. at 937; *see id.* at 939 n.12 ("a court [is] unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement").

In sum, to the extent that Plaintiffs rely on a theory that Altice may be held liable because it continued to provide multi-purpose internet service to some subscribers after Altice was "notified" (by unidentified parties) of alleged past infringement, that theory is foreclosed in these circumstances by *Sony*, *Grokster*, and *Global-Tech*, because such unverified (and unverifiable) allegations do not suffice to show the requisite intent. Indeed, Plaintiffs do not adequately allege that Altice had specific knowledge of particular acts of infringement such that it could be held liable even on a lesser legal standard: they do not allege a basis for Altice's ostensible knowledge of hypothetical *future* infringements based on unverifiable notices about alleged *past* infringements, and they fail to articulate even a basic theory of how, or how much, such "knowledge" would require account termination. It is black letter law that merely providing a multi-purpose service with knowledge that some people will use it to infringe at some point does not suffice; alleging that some individuals did so does not change the result. Plaintiffs' attempt to evade the necessity of plausibly pleading their claims by making impermissibly vague, sweeping

allegations of "over a million" secondary infringement allegations does not save their pleading: "Plaintiffs cannot attain a relaxed pleading standard merely by filing a more voluminous complaint." *Gilmour, Tr. for Grantor Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue Cross & Blue Shield of Alabama*, 2021 WL 1196272, at *8 (E.D. Tex. Mar. 30, 2021) (noting that fraud claims brought "by 9 Plaintiffs against 68 Defendants involving 777 alleged misrepresentations" failed to satisfy "even the relaxed standard" of Rule 8 notice pleading) (citation omitted); *see also, e.g.*, *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65–66 (S.D.N.Y. 2013) (noting, in the context of a putative class action, that "accumulation of all the copyright claims, and claimants, into one action will not simplify or unify the process of their resolution, but multiply its difficulties over the normal one-by-one adjudication of copyright cases.").

Nor is such a claim even facially viable where the only "contribution" alleged is provision of a product with commercially significant noninfringing uses. Moreover, Plaintiffs' vague, general allegations that Altice, just like any other ISP, provides a passive connection to the internet—a common, widely available service with countless lawful (and indispensable) noninfringing uses—would be insufficient to plead the elements of contributory infringement under any test. *See*, *e.g.*, *Mon Cheri Bridals LLC v. Cloudflare, Inc.*, 2021 WL 4572015, at *2 (N.D. Cal. Oct. 6, 2021) (online service provider was not a contributory infringer absent evidence that defendants' services "would be likely to lead to significantly more infringement than would occur without [them][,]" and services were not an "essential step in the infringement process" because withdrawing them "would not prevent the direct infringement from occurring") (citation omitted). While in a handful of similar cases some courts outside this district have simply ignored or discounted *Grokster*'s plain teaching and declined to dismiss contributory infringement claims against ISPs on a theory that liability can be triggered merely by a plaintiff sending some

indeterminate number of notices of claimed infringement, those cases lack relevance to the extent they are factually distinguishable from the instant case. To the extent they simply ignore *Grokster* and apply an inconsistent legal standard,[5] they are wrongly decided.

Plaintiffs must allege plausible facts that demonstrate intent by Altice to actively promote or deliberately encourage infringement by its customers. They fail to do so, and their contributory infringement claim should be dismissed. Because their own Complaint shows that Plaintiffs have no basis to plausibly make the required allegations, dismissal should be without leave to amend.

## VI.    CONCLUSION

Plaintiffs cannot cure the fundamental deficiencies identified in this motion. Altice respectfully requests that Plaintiffs' Complaint be dismissed in its entirety with prejudice.

Dated: February 17, 2023                              Respectfully submitted,

                                                      */s/ Michael S. Elkin*
                                                      Michael S. Elkin (*pro hac vice*)
Wesley Hill                                           Sean R. Anderson (*pro hac vice*)
Texas State Bar No. 24032294                          Winston & Strawn LLP
Claire Henry                                          200 Park Avenue
Texas State Bar No. 24053063                          New York, NY 10166
Ward, Smith & Hill, PLLC                              (212) 294-6700
1507 Bill Owens Parkway                               melkin@winston.com
Longview, TX 75604                                    sranderson@winston.com
(903) 757-6400
wh@wsfirm.com
claire@wsfirm.com                                     Jennifer A. Golinveaux (*pro hac vice*)
                                                      Winston & Strawn LLP
                                                      101 California Street, 35th Floor
*Attorneys for Defendants Altice USA, Inc.*           San Francisco, CA 9411
*and CSC Holdings, LLC*                               (415) 591-1506
                                                      jgolinveaux@winston.com

---

[5] The *Grande II* court did just that when it quoted *Grokster*'s "intentionally inducing or encouraging" standard, then proceeded—without any analysis—to rely instead on a different legal standard taken from a 1971 Second Circuit case. *See* 384 F. Supp. 3d at 766–67.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 17, 2023.

*/s/ Michael S. Elkin*