**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, CONCORD MUSIC GROUP, INC., and CONCORD BICYCLE ASSETS, LLC, <br><br>          Plaintiffs, <br><br>          v. <br><br> ALTICE USA, INC., and CSC HOLDINGS, LLC, <br><br>          Defendants. | CIVIL ACTION NO. 2:22-CV-471-JRG <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

I.   Statement of the Issues......................................................................................... 1

II.  Background ............................................................................................................ 2

III. Legal Standard ...................................................................................................... 5

IV. Argument ............................................................................................................... 5

    A.  The complaint sufficiently states a claim for vicarious liability........................ 5

        1.  The complaint adequately alleges that Altice has the right and ability to stop or limit
            infringement. .................................................................................................. 6

        2.  The complaint adequately alleges that Altice receives a direct financial benefit from
            infringement committed using its services. .............................................. 11

    B.  The complaint sufficiently states a claim that Altice is contributorily liable for its
        subscribers' copyright infringement. .............................................................. 22

        1.  Altice misstates the *Grokster* and *Sony* rulings and ignores Plaintiffs' numerous
            allegations of material contribution. ........................................................ 23

        2.  Plaintiffs sufficiently pled that Altice knew of direct infringement by the users of its
            services...................................................................................................... 27

        3.  Plaintiffs sufficiently pled that Altice's provision of internet services materially
            contributed to the direct infringement using those services........................ 29

V.  Conclusion .......................................................................................................... 30

Certificate of Service ............................................................................................... 31

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ...............................................................6, 9, 10, 12

*Adobe Sys. Inc. v. Canus Prods., Inc.*,
  173 F. Supp. 2d 1044 (C.D. Cal. 2001) ..............................................................17

*After II Movie, LLC v. Grande Commc'ns Networks, LLC*,
  No. 1:21-CV-709-RP, 2023 WL 1422808 (W.D. Tex. Jan. 31, 2023) ("*After II
  v. Grande*") ............................................................................................... *passim*

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) ..........................................................................22, 24

*Arista Recs. LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d (S.D.N.Y. 2011) ........................................................................21

*Arista Recs. LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009).................................................................6, 16

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  149 F. Supp. 3d 634 (E.D. Va. 2015) ("*BMG v. Cox SJ*"), *aff'd in part & rev'd
  in part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG v. Cox Appeal*") .......................4, 7, 9

*BMG Rights Mgmt. (US) LLCv. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir.
  2018) ("*BMG v. Cox Appeal*") ........................................................... *passim*

*BWP Media USA, Inc. v. T&S Software Associates, Inc.*,
  852 F.3d 436 (5th Cir. 2017) ..............................................................................7, 8

*Canada Hockey, L.L.C. v. Marquardt*,
  No. 20-20530, 2022 WL 252186 (5th Cir. Jan. 26, 2022).....................................24

*Canada Hockey LLC v. Texas A&M University Athletic Dep't*,
  No. 20-20503, 2019 WL 13131745 (S.D. Tex. Mar. 29, 2019), *aff'd*, No. 20-
  20503, 2021 WL 4096928 (5th Cir. Sept. 8, 2021) ...............................................11

*Canada Hockey v. Texas A&M*,
  2022 WL 445172, *cert. denied*, 143 S. Ct. 118 (2022).........................................24

*Capitol Recs., LLC v Escape Media Grp., Inc.*,
  2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ............................................6, 12, 13

*Controversy Music v. Down Under Pub Tyler, Inc.*,
    488 F. Supp. 2d 572 (E.D. Tex. 2007) ...................................................................12, 14, 16

*CoStar Grp., Inc. v. LoopNet, Inc.*,
    373 F.3d 544 (4th Cir. 2004) .........................................................................................7, 8

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ........................................................................11, 15, 16, 17

*Epic Tech, LLC v. Fusion Skill, Inc.*,
    No. 4:19-CV-2400, 2021 WL 1599378 (S.D. Tex. Apr. 23, 2021), *on
    reconsideration on other grounds*, 2021 WL 2596433 (S.D. Tex. June 24,
    2021) ...................................................................................................................................11

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .................................................................................... *passim*

*Gershwin Publ'n Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971)..............................................................................16, 22, 24, 25

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011).......................................................................................................26, 27

*Io Grp., Inc. v. Veoh Networks, Inc.*,
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) ..............................................................................10

*Johnston v. Kroeger*,
    No. 20-cv-00497-RP, 2021 WL 3571279 (W.D. Tex. Aug. 11, 2021), *report
    and recommendation adopted*, 2021 WL 8442050 (W.D. Tex. Aug. 26, 2021) ....................11

*Mel NavIP LLC v. Toyota Motor N. Am., Inc.*,
    No. 2:22-CV-00152-JRG, 2023 WL 1766266 (E.D. Tex. Feb. 3, 2023) .................................5

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)................................................................................................. *passim*

*Mon Cheri Bridals, LLC v. Cloudflare, Inc.*,
    No. 19-CV-01356-VC, 2021 WL 4572015 (N.D. Cal. Oct. 6, 2021).....................................29

*Motorola Mobility, Inc. v. TiVo Inc.*,
    No. 5:11-CV-053-JRG, 2013 WL 12040725 (E.D. Tex. Jan. 25, 2013) ..................................5

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ....................................................................................9, 10, 24

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ................................................................................................21

*Perfect 10, Inc. v. Giganews, Inc.*,
No. CV 11-07098-AB SHX, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014),
*aff'd*, 847 F.3d 657 (9th Cir. 2017) ............................................................21

*Perfect 10, Inc. v. Visa Int'l Servs. Ass'n*,
494 F.3d 788 (9th Cir. 2007) .................................................................8, 9

*Playboy Enters, Inc. v. Webbworld, Inc.*,
968 F. Supp. 1171 (N.D. Tex. 1997) ("*Playboy v. Webbworld I*") ......................14, 15, 18, 19

*Playboy Enters., Inc. v. Webbworld, Inc.*,
991 F. Supp. 543 (N.D. Tex. 1997) ("*Playboy v. Webbworld II*"), *aff'd*, 168
F.3d 486 (5th Cir. 1999) ......................................................................14, 15

*R A Guthrie Co., Inc. v. Boparai*,
No. 4:18-CV-080-ALM-KPJ, 2021 WL 1148957 (E.D. Tex. Mar. 1, 2021),
*report and recommendation adopted*, 2021 WL 1141667 (E.D. Tex. Mar. 25,
2021) ...........................................................................................22, 24, 27

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
316 F.2d 304 (2d Cir. 1963) .....................................................................12

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......................................................................25, 26, 28

*Sony Discos, Inc. v. E.J.C. Fam. P'ship*,
No. CIV.A H-02-3729, 2010 WL 1270342 (S.D. Tex. Mar. 31, 2010) ......................11, 17

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
464 F. Supp. 3d 795 (E.D. Va. 2020) .......................................................... *passim*

*Stross v. PR Advisors, LLC*,
No. 3:19-CV-1086-G, 2019 WL 5697225 (N.D. Tex. Oct. 31, 2019) ....................5, 6, 15, 19

*Tierra Intellectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*,
No. 2:13-CV-38-JRG, 2014 WL 894805 (E.D. Tex. Mar. 4, 2014).......................................26

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
No. 8:19-cv-710-MSS-TGW, 2020 WL 3957675 (M.D. Fla. July 8, 2020) ................4, 17, 18

*UMG Recordings, Inc. v. Charter Commc'ns, Inc.*,
No. 1:21-cv-02020 (D. Colo. Nov. 22, 2021) (Order on Mot. to Dismiss, Dkt.
No. 46) ................................................................................................4, 7

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
384 F. Supp. 3d 743 (W.D. Tex. 2019) ("*UMG v. Grande SJ*") ..........................24, 26, 28, 30

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
   No. 17-cv-00365, Dkt. No. 458 (W.D. Tex. Nov. 3, 2022) (Jury Verdict, Dkt.
   No. 458) ....................................................................................................................4

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
   No. 17-cv-00365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ("*UMG
   v. Grande Rule 12*"), *adopted by* 2018 WL 2182282 (W.D. Tex. Mar. 26,
   2018) ..........................................................................................................4, 7, 19, 20

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
   No. 19-17272-MAS-ZNQ, 2020 WL 5204067 (D.N.J. Aug. 31, 2020)........................ *passim*

*VHT, Inc. v. Zillow Grp., Inc.*,
   918 F.3d 723 (9th Cir. 2019) .................................................................................9, 10

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012)...........................................................................................6

*Warner Records Inc. v. Charter Commc'ns, Inc.*,
   454 F. Supp. 3d 1069 (D. Colo. 2020).............................................................4, 7, 16

*Warner v. Charter*,
   454 F. Supp. 3d at 1078–79 .........................................................................................7

*Williams v. Scribd, Inc.*,
   No. 09CV1836-LAB WMC, 2010 WL 10090006 (S.D. Cal. June 23, 2010)........................10

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................................1, 5

**Legislative Materials**

H.R. Rep. No. 105-551(II) (1998) .............................................................................4, 10, 20

S. Rep. No. 105-190 (1998)............................................................................................4, 10

**Other Authorities**

3 Melville B. Nimmer, *Nimmer on Copyright* § 12.04[A][4][b] (2023) ......................................24

Plaintiffs BMG Rights Management (US) LLC, UMG Recordings, Inc., Capitol Records, LLC, Concord Music Group, Inc., and Concord Bicycle Assets, LLC (collectively, "Plaintiffs") hereby oppose the motion by defendants Altice USA, Inc., and CSC Holdings, LLC (collectively, "Altice") seeking to dismiss the complaint under Rule 12(b)(6).

## I.      STATEMENT OF THE ISSUES

Altice received specific and detailed notice that its subscribers were using its services to infringe copyrighted music on a massive scale. Rather than act to prevent it, Altice chose to provide subscribers with unfettered ability to steal Plaintiffs' copyrighted music online. Altice fostered that infringement and profited from it.

Doctrines of secondary liability in copyright law have evolved to address precisely these circumstances. An entity that benefits from copyright infringement that it could curb or prevent faces "vicarious" liability for that infringement. An entity that induces, causes, *or* materially contributes to infringement that it knows about faces "contributory" liability. To that end, the complaint states two claims: (1) vicarious liability for copyright infringement, Compl. ¶¶ 64–73, and (2) contributory liability for copyright infringement, Compl. ¶¶ 53–63. Altice moves to dismiss both claims. Dkt. No. 22 ("Mot.").

The first issue before the Court is whether Plaintiffs have adequately stated a claim for vicarious liability where the complaint alleges in detail that (a) through the series of contractual agreements and terms of service between Altice and its subscribers, Altice has the right and ability to control the infringing conduct, Compl. ¶ 46; and (b) by creating a safe haven for its subscribers to infringe at will and on a massive scale, Altice profited from monthly subscription fees by retaining and attracting infringing subscribers, *id.* ¶¶ 37, 49–50, 66.

The second issue before the Court is whether Plaintiffs have adequately stated a claim for contributory liability where the complaint alleges in detail that (a) Altice had knowledge of the

infringing activity or recklessly disregarded or willfully blinded itself to the infringing activity, *id.* ¶¶ 9, 51–52, and (b) Altice induced, caused, or materially contributed to the infringement by providing the site and facilities for the commission of the infringement, *id.* ¶¶ 36, 54.

Altice's motion to dismiss advances certain theories to dismiss each claim that have been rejected by every court to consider them and offers others that have been adopted only by outliers. As support, Altice grossly misstates the applicable legal standards, mischaracterizes authority, and without credibility or support posits that Altice simply cannot be secondarily liable for copyright infringement. Altice is wrong, and the motion should be denied.

## II.    BACKGROUND

Plaintiffs own or hold exclusive copyright interests in extensive catalogs of iconic and current musical compositions and sound recordings. Compl. ¶ 7. Plaintiffs and the songwriters and recording artists they represent have spent substantial time, money, effort, and creativity developing a wealth of music across genres. *Id.*

The theft of music online through the use of peer-to-peer technologies, such as BitTorrent, "has become stunning in nature, speed, and scope." *Id.* ¶ 3. Internet users are able to "locate, access, and download copyrighted content from other peers in the blink of an eye." *Id.* "All without authorization from or payment to copyright owners or creators." *Id.* BitTorrent-related traffic is now one of the top-ten drivers of internet traffic globally, and it is the top driver of upstream traffic. *Id.* ¶ 5. This infringement, particularly on the scale alleged here, has caused significant injury to the Plaintiffs, along with their recording artists and songwriters. *Id.* ¶ 9.

Altice is one of the largest internet providers in the country, servicing millions of subscribers across 21 states. *Id.* ¶ 8. Altice charges its subscribers monthly fees and offers a tiered pricing structure that delivers faster connections to subscribers willing to pay higher fees. *Id.* ¶¶ 10, 31–32. As a condition of access to Altice's services, Altice imposes strict conditions on the use of

2

its services through contractual terms of service and acceptable use policies. *Id.* ¶ 46. And Altice reserves the right to discipline subscribers who violate those policies, including those who commit copyright infringement, with a variety of mechanisms, including interrupting, suspending, or terminating access to its services. *Id.* ¶ 35. Altice can act to address the rampant infringement, or it can foster the infringement and profit handsomely from it. It chose the latter.

Plaintiffs have alleged that Altice's services have been used to commit internet piracy in staggering volumes. *Id.* ¶¶ 38–39. Altice knows about this infringement. *Id.* ¶¶ 39–40. Copyright owners, like the Plaintiffs here, cannot identify the individuals using Altice's services to commit copyright infringement by name. *Id.* ¶ 40. The only identifying information available is an IP address indicating, among other things, that the direct infringer used Altice's services to commit the infringement. *Id.* Here, the complaint alleges there were millions of instances of individuals using Altice's internet services to pirate thousands of Plaintiffs' works. *Id.* ¶¶ 34, 39, Ex. A. Altice received clear and detailed notice of each instance of infringement occurring through the use of its services. *Id.* ¶¶ 39–41. "Many of these infringing subscribers have continued to infringe for months and even years at a time, despite Altice being given specific details of their infringing activity." *Id.* ¶ 42. Altice allowed this infringement to continue unabated, despite having the right and ability to limit or stop it altogether. *Id.* ¶¶ 43, 46. Altice ignored this infringement for its own commercial gain and created a safe haven for online piracy, to Plaintiffs' detriment. These actions render Altice secondarily liable for copyright infringement both vicariously and contributorily. *Id.* ¶ 9.

There is no exception under those doctrines of secondary liability for companies like Altice; internet service providers have been found liable on the same legal theories. Tellingly, Congress specifically recognized the "legal exposure for infringements," including for secondary liability, in cases just like this against service providers and enacted the Digital Millennium

3

Copyright Act in response. H.R. Rep. No. 105-551(II) at 64 (1998). Congress established "threshold conditions" for internet service providers to meet in order to qualify for "safe harbor" immunization from secondary copyright liability. S. Rep. No. 105-190 at 20 (1998). If Altice were right that it could never face secondary liability, Congress would not have enacted a robust statutory regime to address that very risk.

No court has dismissed a case seeking to hold an internet service provider secondarily liable for the infringement of its users.[1] In fact, three such cases have gone to trial, and the jury ruled in favor of the copyright owners and found the service providers liable in all three cases.[2] The only court of appeals to weigh in rejected the flawed legal theories now advanced by Altice and confirmed that internet service providers like Altice could be liable for infringement committed using their services.[3] Nothing about this case is extraordinary, apart from the staggering scale of infringement using Altice's services; Altice's arguments do not warrant finding otherwise.

---

[1] *See After II Movie, LLC v. Grande Commc'ns Networks, LLC*, No. 1:21-CV-709-RP, 2023 WL 1422808 (W.D. Tex. Jan. 31, 2023) ("*After II v. Grande*"); Order on Mot. to Dismiss, *UMG Recordings, Inc. v. Charter Commc'ns, Inc.*, No. 1:21-cv-02020, Dkt. No. 46 (D. Colo. Nov. 22, 2021); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 19-17272-MAS-ZNQ, 2020 WL 5204067 (D.N.J. Aug. 31, 2020); *Warner Records Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069 (D. Colo. 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. 17-cv-00365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ("*UMG v. Grande Rule 12*"), *adopted by* 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018); *UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 8:19-cv-710-MSS-TGW, 2020 WL 3957675, at *3 (M.D. Fla. July 8, 2020); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, ("*BMG v. Cox SJ*"), 149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part & rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG v. Cox Appeal*").

As discussed below, *UMG v. Bright House* and *UMG v. Grande Rule 12* both departed from the prevailing trend of the case law by dismissing the vicarious liability claim; neither dismissed contributory liability.

[2] *See Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 807–08 (E.D. Va. 2020); *BMG v. Cox Appeal*, 881 F.3d at 298; Jury Verdict, *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. 17-cv-00365, Dkt. No. 458 (W.D. Tex. Nov. 3, 2022).

[3] *BMG v. Cox Appeal*, 881 F.3d at 307 (finding internet service provider not immunized due to non-infringing uses but remanding due to error in a jury instruction).

### III.    LEGAL STANDARD

"In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Mel NavIP LLC v. Toyota Motor N. Am., Inc*., No. 2:22-CV-00152-JRG, 2023 WL 1766266, at *1 (E.D. Tex. Feb. 3, 2023) (citing *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009); *Lowrey v. Texas A & M Univ. Sys*., 117 F.3d 242, 247 (5th Cir. 1997)). "[A] complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss . . . ." *Motorola Mobility, Inc. v. TiVo Inc*., No. 5:11-CV-053-JRG, 2013 WL 12040725, at *2 (E.D. Tex. Jan. 25, 2013). It need only plead sufficient facts to "allow the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Mel NavIP*, 2023 WL 1766266, at *1 (citation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The Court accepts well-pleaded facts as true and views all facts in the light most favorable to the plaintiff . . . ." 2023 WL 1766266, at *1.

### IV.    ARGUMENT

"Although the Copyright Act does not expressly render anyone liable for infringement committed by another, . . . doctrines of secondary liability emerged from common law principles and are well established in the law." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (citation omitted). The complaint satisfies each element of both well-established claims.

#### A.    The complaint sufficiently states a claim for vicarious liability.

"One . . . infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it." *Grokster*, 545 U.S. at 930 (citations omitted). Thus, Plaintiffs must allege, and have done so here, that (1) the defendant "had the right and ability to supervise the infringing [third] party's acts which caused the infringement," and (2) the defendant "had a direct financial interest in the infringing activity." *Stross v. PR Advisors, LLC*, No. 3:19-CV-1086-

G, 2019 WL 5697225, at *2 (N.D. Tex. Oct. 31, 2019) (quoting *ZeniMax Media, Inc. v. Oculus VR, LLC*, 166 F. Supp. 3d 697, 704 (N.D. Tex. 2015)) (alterations in original).

Altice attacks the complaint as to both elements. Mot. at 7. Once the proper legal standards are applied to Altice's arguments, however, they crumble and plainly do not warrant dismissal.

### 1.    *The complaint adequately alleges that Altice has the right and ability to stop or limit infringement.*

"The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35–37 (2d Cir. 2012) (citations omitted).[4] This element is met where an internet service provider may contractually "terminate [users'] accounts" and "revoke [access] privileges . . . ." *Capitol Recs., LLC v Escape Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015); *see also Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (element met where defendant has the practical ability to "terminate, suspend or restrict users' subscriptions").

The complaint alleges:

> During all pertinent times, Altice had the full right and ability to prevent or limit the infringements using its services. Under Altice's terms of service and acceptable use policies, which its subscribers agreed to as a condition of using its internet services, Altice was empowered to exercise its right and ability to terminate a customer's internet access. Altice could do so for a variety of reasons, including a subscriber's copyright infringement activity.

Compl. ¶ 46; *see also id.* ¶¶ 35–37. As alleged, Altice retained broad rights to discipline the users of its services, including with temporary interruptions or suspensions of service and even outright

---

[4] Some courts have referred to this element as the right and ability to "control" rather than "supervise" the activity; there is no material difference between those formulations. *See Stross*, 2019 WL 5697225, at *2 n.2.

6

termination. *Id.* ¶¶ 35–36, 46. Altice could exercise those rights for a variety of reasons, including copyright infringement. *Id.* ¶ 46. And Altice had thorough and sophisticated mechanisms to detect a variety of abuses by its subscribers. *Id.* ¶ 33. That is all the law requires. *See Grokster*, 545 U.S. at 930 (referring to the "right to stop or limit" the conduct).

Every court that has considered the arguments now advanced by Altice on the "right and ability" prong has rejected them. *See BMG v. Cox SJ*, 149 F. Supp. 3d at 674; *RCN*, 2020 WL 5204067, at *11; *Warner v. Charter*, 454 F. Supp. 3d at 1078–79; *UMG v. Charter*, No. 1:21-cv-02020, Dkt. No. 46; *UMG v. Grande Rule 12*, 2018 WL 1096871, at *9–10. Altice brushes aside these closely analogous decisions as "non-binding" and "simply wrong." Mot. at 17–18 and n.3. But it does not engage with their reasoning at all. Instead, Altice proffers an incorrect legal standard and misrepresents its own set of "non-binding" authority. It is Altice that is "simply wrong."

Altice pays lip service to the proper standard—the "right to stop or limit" the conduct. Mot. at 16. But it promptly discards that standard and insists that vicarious liability can only lie where the defendant can "*actively* police" or "*actively* monitor" the tortious conduct. Mot. at 16–19 (emphases added). This theory has been squarely rejected in the past based on well-accepted law concerning supervision and control. *See Warner v. Charter*, 454 F. Supp. 3d at 1078 (citing cases) ("[T]he defendant must only exercise the ability to 'stop or limit the direct infringing conduct.'"). The complaint alleges that Altice can act to stop or limit subscribers from using its services to infringe. Compl. ¶ 46. No other allegations are needed. Altice cites no authority for its purported "active" threshold for *vicarious liability*; none exists.

Altice attacks its strawman "active" requirement by noting that "several courts have recognized [that] ISPs . . . play a passive role in internet activity." Mot. at 17. It cites *BWP Media USA, Inc. v. T&S Software Associates, Inc.*, 852 F.3d 436, 439 (5th Cir. 2017), and *CoStar Group,*

7

*Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550–51 (4th Cir. 2004), as support, but neither is on point. Both decisions concerned *direct* infringement, not secondary liability as alleged here. Both decisions held that the service providers' involvement in the infringement of its subscribers by making intermediate copies as a technical step in providing the internet service was too passive to meet the minimal level of volition required to sustain an allegation of *direct* infringement against the service providers. *BWP*, 852 F.3d at 444; *CoStar*, 373 F.3d at 550–51. But this case is about *secondary* liability, so those decisions are entirely inapposite.[5] *CoStar* acknowledged that an "owner of machines used for copyright violations could [face] contributory or vicarious liability." *CoStar*, 373 F.3d at 549. Altice's own authority refutes its argument.

Altice then contends that the contractual right to terminate subscribers is not "control" for purposes of liability. Mot. at 17. Yet again, Altice has constructed a strawman. Altice's terms of service and acceptable use policies give it broad authority over the use of its services, and termination is just one stick in the bundle of supervisory rights it maintains. Compl. ¶¶ 35, 46. Even so, Altice is wrong, as its own cited authority demonstrates.

Altice contends that *Perfect 10, Inc. v. Visa International Services Ass'n*, 494 F.3d 788 (9th Cir. 2007), stands for the proposition that a right to refuse services can never support a claim for vicarious infringement. Mot. at 17. That is not correct. There, the defendant was a credit card company that processed payments for websites that hosted infringing images. *Id.* at 805. The owners of the copyrights in those images sought to hold the company liable because it could make it "impossible for an online website selling [infringing materials] to compete and operate at a profit" by terminating the website's payment-processing account. *Id.* at 805. The Ninth Circuit

---

[5] Although the complaint in *BWP* had asserted a secondary infringement claim, "only direct infringement [was] at issue on [that] appeal." *BWP*, 852 F.3d at 439.

rejected that theory, holding that the ability to make infringement unprofitable did not amount to the requisite supervision or control for vicarious infringement. *Id.* Critically, however, the Ninth Circuit distinguished the case in front of it from one in which a defendant had authority to "prevent . . . distribution [of infringing material] over the internet" outright, such as where the "reproduction . . . occurs over networks" that the defendant controls. *Id.* at 806. That is precisely this case, and the decisions that Altice calls "simply wrong" drew that same distinction. *E.g.*, *BMG v. Cox SJ*, 149 F. Supp. 3d at 675; *RCN*, 2020 WL 5204067, at *11.

None of Altice's other citations supports its assertion that a contractual right to prevent infringement by temporary and permanent measures is insufficient to state a claim.

In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit affirmed a district court's factual finding (on a preliminary injunction record) that a search engine's capacity to "change its operations" to avoid facilitating infringement was too imprecise and overbroad to constitute "control." *Id.* at 1174. That is irrelevant here; the complaint amply alleges that Altice *has already* implemented specific measures by which it *can* prevent infringement using its services. *E.g.*, Compl. ¶ 46. The problem for Altice is that it has not "exercise[d them] to [their] fullest extent" and so faces vicarious liability. *Napster*, 239 F.3d at 1023. That is sufficient on a Rule 12 standard. As with the payment processing in *Perfect 10 v. Visa*, the ability to make infringement less profitable or effective is materially distinct from the ability to prevent it altogether, as the Court recognized in *RCN*, 2020 WL 5204067, at *11, and as alleged here. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019), which Altice relies on for the same

proposition as *Perfect 10 v. Amazon*, distinguished *Napster* precisely because the defendant there had the authority to "terminate users' access." *Id.* at 746.[6]

Altice's reliance on *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008), fails for the same reason. There, the Court specifically distinguished the alleged control over infringement from the "detectable acts of infringement" at issue in *Napster*. Veoh had "taken steps to reduce, not foster" infringement. *Id*. at 1154. Altice has not; the complaint alleges Altice's actions (and inaction) have fostered infringement. *E.g.*, Compl. ¶¶ 47, 50. *Io* is not on point.

Moreover, *Io* was decided at summary judgment, with the benefit of a full record, including evidence of the "fullest extent [of policing of infringement] permitted by [the defendant's] architecture." *Io. v. Veoh*, 586 F. Supp. 2d at 1153; *see also Williams v. Scribd, Inc.*, No. 09CV1836-LAB WMC, 2010 WL 10090006, at *10 (S.D. Cal. June 23, 2010) ("The Court makes much of the fact, however, that a vicarious liability claim was dismissed in *Io Group* at the summary judgment phase."). That procedural distinction is important: Altice proffers a series of factual and technical assertions that Altice lacked the requisite control over its users' infringement, including the veracity of infringement notices, the availability of disciplinary measures other than terminating an infringer's subscription, and Altice's technical operations and capabilities. *See* Mot. at 18–20. These fact disputes are premature and should only be addressed, if at all, with the benefit

---

[6] Account termination (and the credible threat of it) was precisely the mechanism of control that Congress envisioned internet service providers would employ when enacting the DMCA. *See* H.R. Rep. No. 105-551(II) at 61 (1998) ("those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."); S. Rep. No. 105-190 at 52 (1998) (same).

of the full factual context. At the Rule 12 stage, the complaint amply states a claim that Altice has the requisite right to control infringement. That is all that is necessary.[7]

Finally, Altice's string-cite of in-circuit district court decisions dismissing vicarious liability claims is also inapposite. In *Johnston v. Kroeger*, No. 20-cv-00497-RP, 2021 WL 3571279, at *5 (W.D. Tex. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 8442050 (W.D. Tex. Aug. 26, 2021), "promotional activities" did not amount to control over a band's infringement, while a concert venue that could cancel an infringing performance could. In *Canada Hockey LLC v. Texas A&M University Athletic Department*, No. 20-20503, 2019 WL 13131745, at *12 (S.D. Tex. Mar. 29, 2019), *aff'd*, 2021 WL 4096928 (5th Cir. Sept. 8, 2021), *and aff'd*, 2022 WL 445172 (5th Cir. Feb. 14, 2022), a foundation lacked "supervisory authority" over a university athletics department, but that was because there were no facts even suggesting the foundation had any such authority. And *Sony Discos, Inc. v. E.J.C. Fam. P'ship*, No. CIV.A H-02-3729, 2010 WL 1270342, at *4 (S.D. Tex. Mar. 31, 2010), erroneously found a lack of control on essentially the same facts as *Fonovisa*. Each of Altice's in-circuit decisions is thus distinguishable. Altice had the right and authority to control the infringement.

### 2.      *The complaint adequately alleges that Altice receives a direct financial benefit from infringement committed using its services.*

"The essential aspect of the 'direct financial benefit' inquiry" for evaluating a claim for vicarious liability for copyright infringement "is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *see also Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304,

---

[7] *Epic Tech, LLC v. Fusion Skill, Inc.*, No. 4:19-CV-2400, 2021 WL 1599378 (S.D. Tex. Apr. 23, 2021), *on reconsideration on other grounds*, 2021 WL 2596433 (S.D. Tex. June 24, 2021), also directly contradicts Altice's position. *See* Mot. at 18. There, the defendant "directly controlled access to" software that enabled use of allegedly infringing programs. *Id.* at *5. No "active monitoring" was necessary. *Contra* Mot. at 17.

308 (2d Cir. 1963). Where infringement makes a service or venue more attractive to customers, the requisite causal relationship is established. *Fonovisa*, 76 F.3d at 263; *Controversy Music v. Down Under Pub Tyler, Inc.*, 488 F. Supp. 2d 572, 577 (E.D. Tex. 2007) (citations omitted).[8] "[A]s long as the service provider has an economic incentive to tolerate infringing conduct" the causal relationship is sufficiently direct. *Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) (citing *Capitol Recs., Inc. v. MP3tunes, LLC*, No. 07 CIV. 9931 WHP, 2013 WL 1987225, at *10 (S.D.N.Y. May 14, 2013)).

Here, the complaint alleges that Altice is incentivized to tolerate and foster prolific music piracy by users of its services and that the infringement it facilitates directly supports its bottom line. *E.g.*, Compl. ¶¶ 10, 31–33, 37, 49–51, 66. Altice receives monthly fees from its subscribers. *Id.* ¶ 66. If Altice exercised its authority over the users of its services to its fullest extent, up to and including terminating subscriptions of repeat infringers, it would have lost the revenue stream from their ongoing subscription fees. *Id.* ¶ 37. But that's not all. Had Altice exercised even some of its authority, such as by temporarily suspending, interrupting, or otherwise limiting service for infringers, that would have made its services less attractive to customers looking to infringe. *Id.* Altice would also face difficulty attracting new customers, if it built up a reputation as a stickler on piracy. *Id.* ¶¶ 37, 49. Taking disciplinary action against serial infringers would have incurred additional expenses as well. *Id.* ¶ 49. Altice also marketed and offered tiered pricing schemes that provided higher speed access to customers willing to pay higher monthly fees, which are more attractive to customers who use up bandwidth for their piracy. *Id.* ¶¶ 8, 31–32. These allegations establish a clear causal relationship between the rampant copyright infringement of Plaintiffs'

---

[8] Altice makes much of vicarious liability's roots in "principles of respondeat superior." *E.g.*, Mot. at 15 (quoting *Fonovisa*, 76 F.3d at 261–62). But "[i]n the context of copyright law, vicarious liability extends beyond an employer/employee relationship . . . ." *Napster*, 239 F.3d at 1022.

works by Altice's subscribers and the financial benefit Altice reaped by maintaining that relationship. Infringers knew they could use Altice's services with impunity, so they were drawn to the services and incentivized to stay. That is sufficient to state a claim for vicarious infringement. *Fonovisa*, 76 F.3d at 263; *Capitol v. Escape Media*, 2015 WL 1402049, at \*42.

The complaint also alleges that internet traffic using BitTorrent accounts for a significant proportion of use of internet services. BitTorrent is in the top ten sources of internet traffic—higher than Google. Compl. ¶ 5. It is easily plausible, therefore, that the direct infringement at issue is a significant reason people use Altice's services, not merely an incidental benefit.

Altice proffers three theories that a closer causal nexus is required. Each fails. What is required is a causal relationship, and the allegations in the complaint lay out numerous bases that establish a causal connection both taken individually and taken together.

> i.      *Altice's claim of a heightened causal nexus standard is unsupported in decades of well-established vicarious liability law.*

Altice insists that something more than a causal relationship is necessary to establish vicarious infringement, namely that "when subscribers infringe, Altice receives money." Mot. at 8. That is not the law. The weight of authority, including the leading vicarious liability cases and their progeny, unequivocally does not require a heightened causal nexus as Altice advocates.

In a seminal vicarious liability case, *Fonovisa*, the defendant operated a "swap meet" where vendors sold a variety of merchandise, including counterfeit copies of music recordings owned by the plaintiff. 76 F. 3d at 261. The district court rejected the plaintiff's theory of vicarious liability for, among other things, failing to meet the financial benefit element. *Id.* at 262. The court of appeals reversed, explaining that "the defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices." *Id.* at 263. That was

13

sufficient to state a claim for vicarious copyright infringement. *Id.* at 264. It did not matter in *Fonovisa* that swap-meet attendees paid the same admission fees and other expenses whether or not they sought to buy infringing goods. What mattered was that the funds "flow[ed] directly from" infringers. *Id.* at 263. That was also true in *Controversy Music v. Down Under Pub Tyler*, where the owners of a pub that publicly performed the plaintiffs' music were held to have a direct financial interest by virtue of their ownership stake in the pub. 488 F. Supp. 2d at 577. The same is true here. *See, e.g.*, Compl. ¶¶ 10, 31, 33, 37, 49–51, 66.

Altice does not address the substance of *Fonovisa*. It does not address *Controversy Music v. Down Under Pub Tyler* at all. Instead, Altice principally relies on *Playboy Enterprises, Inc. v. Webbworld, Inc.*, ("*Playboy v. Webbworld II*"), 991 F. Supp. 543 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999), for its heightened direct causality standard. But that decision does not support Altice's position. *See* Mot. at 7–8. There, the defendants owned and operated a website that collected copyrighted materials and made them available to internet users for a monthly subscription fee. 991 F. Supp. at 549–50. The decision Altice cites did not examine the merits of the vicarious liability claim; Altice cites an opinion following a bench trial that extended a prior ruling to certain additional owners of the website. *Id.* at 554 (citing *Playboy Enterprises, Inc. v. Webbworld, Inc.*, ("*Playboy v. Webbworld I*"), 968 F. Supp. 1171 (N.D. Tex. 1997)).

It is understandable that Altice would not address the decision on the merits in that case: the underlying decision *rejected* Altice's proffered direct-causality standard. In the earlier decision, the district court, relying on a careful analysis of *Fonovisa*, held that the owners of the website reaped "sufficiently direct" financial benefit from the infringement to be vicariously liable because the infringing content "enhanced the attractiveness" of the services. *Playboy v. Webbworld I*, 968 F. Supp. at 1177. Plaintiffs have alleged that the availability of piracy using

14

Altice's services and Altice's indifference towards that piracy attracted customers and that proper enforcement would deter customers. *E.g.*, Compl. ¶ 37. That is sufficient to establish the "direct financial interest" under Altice's cited authority. *See Playboy v. Webbworld I*, 968 F. Supp. at 1177; *Playboy v. Webbworld II*, 991 F. Supp. at 554; *see also Stross*, 2019 WL 5697225, at *3 (holding enhanced appeal supports the inference of a "direct financial benefit in the form of increased business") (citing *Playboy v. Webbworld, I*, 968 F. Supp. at 1177).

Altice asserts that because it collects monthly fees from subscribers regardless of the magnitude of their infringement, Altice is "utterly unlike" vicarious infringers in *other* cases, such as a store owner who took commissions from infringing sales or a business whose principal object was infringement. Mot. at 8 (citing *Shapiro*, 316 F.2d at 307–08, and *Grokster*, 545 U.S. at 926). Those decisions did not establish a floor for vicarious liability, nor is either at odds with *Fonovisa*.

Altice insists that a claim for financial benefit grounded in a "one-time set-up fee and flat periodic payments" by infringers for a service can only amount to a direct financial benefit where the availability of infringing materials is the sole or main draw of customers to the service. Mot. at 8. Altice cites *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004), decided just a few years after *Fonovisa*, as support. But Altice overstates *Ellison*. *Ellison*, with the benefit of a developed summary judgment record, held that an internet service provider could not be vicariously liable for its subscribers' infringement where the record at summary judgment lacked evidence that the provider "attracted or retained subscriptions because of the infringement or lost subscriptions because" the provider blocked infringement. *Ellison*, 357 F.3d at 1079. Such evidence, *Ellison* noted, would have established that infringement was a "draw" to the defendant's services, just as the sale of infringing records was a "draw" to the swap meet in *Fonovisa*.

15

*Ellison* did *not* hold, as Altice implies, that the availability of infringement must be the *main* or *exclusive* draw for customers. That would have been at odds with *Fonovisa*. It would have been at odds with *Controversy Music v. Down Under Pub Tyler*. And it would have been at odds with the litany of so-called "dance hall" decisions like *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (cited, among others, in *Fonovisa*, 76 F.3d at 262–64), that imposed vicarious liability on businesses whose venues were made more attractive by infringing performances. *Ellison* held only that there was *no* evidence that the infringing content helped attract or retain subscriptions. *Ellison*, 357 F.3d at 1079.[9]

*Ellison* expressly noted that vicarious liability could be supported by a "causal relationship between the infringing activity and any financial benefit . . . regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Id.* A legion of other decisions are in accord. *See Arista v. Usenet*, 633 F. Supp. 2d at 157 ("the law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw— rather, it need only be 'a' draw") (citations omitted)); *Warner v. Charter*, 454 F. Supp. 3d at 1074 (The "causal relationship" needed to establish direct financial benefit does not require that "plaintiffs must show that the draw of infringing activity was '*the* attracting factor' . . . but rather *an* attracting factor.") (emphasis in original); *Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 814 (E.D. Va. 2020) ("[A] 'draw' need not be substantial . . . the inquiry must show a 'causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to the defendant's overall profits.'").

---

[9] *Ellison* also stated only that "draw" is "sufficient to state the financial benefit element." *Ellison*, 357 F.3d at 1078. It is not necessary. Whether or not Altice's financial benefit is characterized as "draw" or something else, it is abundantly clear that it is sufficiently pled under the law.

Here, at the pleading stage, Plaintiffs *have* alleged that Altice gained subscribers due to infringement and would have lost subscribers if it had disciplined infringement. *E.g.*, Compl. ¶ 37. That is sufficient to meet the standard under *Fonovisa* or *Ellison*.

The limited authorities Altice cites for its heightened "main draw" standard do not displace the thrust of authority against it. *See* Mot. at 11–14. *Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001), for example, added the word "main" to the standard without analysis or citation. *Sony Discos*, 2010 WL 1270342, at *4, simply recited *Adobe*, again without analysis. It also distinguished *Fonovisa* based on the larger volume of infringement at issue there, even though the Ninth Circuit did not rely on that fact in finding a draw. *Id.* (citation omitted). Again, *Ellison* later rejected a substantiality threshold for a draw. 357 F.3d at 1079. And *Ellison* was decided after *Fonovisa* (and thus extended it) and after *Adobe* (and thus overrode it to the extent *Adobe* required a "main" draw).

*UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 8:19-CV-710-MSS-TGW, 2020 WL 3957675 (M.D. Fla. July 8, 2020), suffers from similar flaws. Although the decision in *Fonovisa* gave no weight to the magnitude of the draw of infringement, the decision in *UMG v. Bright House* interpreted *Fonovisa* to require admission fees be driven "primarily" by the availability of infringing content. *Id.* at *3. And it made the same mistake in interpreting the "dance hall" cases, which also did not focus on the primacy of the infringement as a draw to the venues in question to the exclusion of other sources. *See UMG v. Bright House*, 2020 WL 3957675, at *3 (citing *Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 198 (1931); *Dreamland Ball Room v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir. 1929)). And *UMG v. Bright House* did not address the *only* appellate decision in a case involving secondary liability for an internet service provider based on internet piracy, *BMG v. Cox SJ*, 881 F.3d 293.

*UMG v. Bright House* rested directly on the same distortions of the case law Altice advances now in holding that the plaintiffs had failed to allege that the defendant had a direct financial benefit from infringement because infringement was not the "main" draw. 2020 WL 3957675, at *5 (citing *Adobe*, 173 F. Supp. 2d at 1051). According to *UMG v. Bright House*, the decisions that found vicarious liability based on a draw to a service that wasn't the primary or main draw "read[] the limiting term 'direct' out of the test" for vicarious liability. *Id.* at *4. But that conclusion runs directly contrary to *Fonovisa*. As discussed above, the defendant in *Fonovisa* argued that "direct financial benefit" attributable to infringement requires a financial benefit that varies directly with the infringement, such as a commission on sales of the infringing goods. *Fonovisa*, 76 F.3d at 263. *Fonovisa* rejected that theory, holding that all that was required to allege a direct financial interest was flat fees that "flow directly from" infringers to the defendant, without regard to the primacy of infringement in the infringers' minds—a holding that was not addressed by the court in *UMG v. Bright House.* Altice receives flat fees that flow directly from infringers, and it would *stop* receiving many of those fees if it were to use its authority to discipline its users for copyright infringement. Compl. ¶ 37. That is sufficient to establish vicarious liability.

Altice insists that the allegations in the complaint do not plausibly support an inference that it receives a sufficiently direct financial benefit from its subscribers' infringement. Mot. at 9. It doubles down on the fallacy that only the *main* reason a person subscribed to Altice's services can qualify as a draw for vicarious liability purposes, and it cites numerous alternative reasons people might be drawn to Altice's services, such as email, news, or streaming media, rather than media shared via BitTorrent. Mot. at 9. But as discussed above, that is not the correct view of the law. *Fonovisa* and *Playboy v. Webbworld I* rejected such a strict definition of "direct" financial benefit, and *UMG v. Bright House* ignored the reasoning of those decisions. It made no difference in

*Fonovisa* that the defendant's swap meet offered attendees access to numerous non-infringing vendors alongside infringing vendors for the same flat fee, nor did that decision examine which vendors were the primary draw for customers. *Fonovisa*, 76 F.3d at 262–63.

The complaint alleges that BitTorrent traffic has been reported as one of the top-ten drivers of internet traffic and the top driver of upstream traffic. Compl. ¶ 5. And it alleges that piracy spiked at the height of the COVID-19 pandemic. *Id.* ¶ 6. It is certainly plausible to infer that infringers—particularly the most prolific ones—were drawn to Altice's services due to Altice's high-speed access to the BitTorrent application and its vibrant community of music pirates. That draw was enhanced, as the complaint alleges, by Altice's declination to take disciplinary action against even its most prolific infringing users. Compl. ¶ 37; *contra UMG v. Grande Rule 12*, 2018 WL 1096871, at *10. Had Altice instead been a stickler about its customers' infringement, many would have sought alternatives, and Altice would have had difficulty acquiring new customers if, for example, it garnered a negative reputation among infringers. Compl. ¶ 37.

Altice proffers a different interpretation. Altice contends that the aggregate volume of internet traffic attributable to other marquee categories with general-audience appeal like Netflix or TikTok refutes Plaintiffs' claim. Mot. at 9–10 and n.2. According to Altice, these are "more plausible drivers" of subscriptions. Mot. at 12. That's irrelevant—particularly on a motion to dismiss. The question is not whether other factors plausibly drove Altice's revenue in addition to the availability of infringement. What matters is that the complaint plausibly alleges Altice reaped profits by selling high-speed internet services that were made more attractive to its infringing subscribers by virtue of the music piracy they facilitated. That is all that is required to plead a claim for vicarious infringement. *See, e.g.*, *Playboy v. Webbworld I*, 968 F. Supp. at 1177; *Stross v. PR Advisors, LLC*, 2019 WL 5697225, at *3.

19

For a similar reason, Altice's reference to the "common experience" about the importance of internet service during the pandemic has no bearing on Altice's effort to dismiss Plaintiffs' claim for vicarious liability. Indeed, the DMCA was enacted precisely because internet services were becoming so important for legitimate purposes, yet internet service providers faced exposure to vicarious liability for misconduct undertaken using those services. H.R. Rep. No. 105-551(II) at 64. In balancing those interests, DMCA did *not* eliminate vicarious liability. Rather, it set forth steps that service providers could take to prevent direct infringement they'd otherwise be vicariously liable for and created immunity for qualifying service providers.[10] Altice's entitlement to that DMCA immunity is an affirmative defense that must be pled by the defendant and cannot be resolved on a motion to dismiss the complaint. Altice's policy arguments about the "importance" of its services are simply an effort to circumvent its own burden on an affirmative defense created precisely because of those policy arguments.

Altice's factual disputes and affirmative defenses will have their day in court, in the context of a fully developed record. At this stage, the law clearly establishes that the detailed allegations in Plaintiffs' complaint support the inference that Altice has a direct financial interest in the infringement of its subscribers.

> ii.   *The complaint draws a sufficient causal nexus between the specific instances of alleged direct infringement and Altice's financial gain.*

Altice ratchets up the standard for vicarious infringement yet again by effectively insisting that Plaintiffs were required to proffer direct evidence in their complaint that the individuals who

---

[10] To that end, the concern in *UMG v. Grande Rule 12*, 2018 WL 1096871, at *10, that a theory of vicarious liability "would impose liability on every ISP" is overstated. Here, Altice does not simply provide internet service, it does so with full knowledge of the infringement committed using that service and authority to discipline it and chooses to profit anyway. In any case, that exposure is precisely what the DMCA sought to resolve. But it did so by laying out criteria that ISPs must meet to avoid liability; it did not eliminate that theory of liability.

"actually committed each of the alleged acts of infringement of the 7,700-plus works-in-suit" were also drawn to the service by that prospect. Mot. at 14. Altice is wrong. *Fonovisa* expressly rejected the defendant's position that vicarious liability required the plaintiff to "directly tie[] the sale of particular infringing items" to the financial benefit. 76 F.3d at 263. As did *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 436 (S.D.N.Y. 2011).

Altice's cited authority, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017), does not show otherwise. Before the district court, the defendant provided subscribers fee-based access to content stored on its servers and other servers. The plaintiff had offered, on a developed summary judgment record, evidence that there was "a lot of copyrighted material" on the defendant's servers and that the "copyrighted material in general constitutes a draw." *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2014 WL 8628031, at *4 (C.D. Cal. Nov. 14, 2014), *aff'd,* 847 F.3d 657. The district court held that evidence attributable to infringement of *other people's works* was insufficient to establish a material benefit attributable to the infringing activity at issue, and the Ninth Circuit affirmed. *Giganews*, 847 F.3d at 674. Here, by contrast, Plaintiffs have alleged that Altice received more than a million notices of infringement of *Plaintiffs'* copyrighted works and derived financial benefit attributable to that infringing activity. Compl. ¶¶ 9, 36–49. That is all that is necessary to state a plausible claim for vicarious liability.

### iii. Plaintiffs have alleged that Altice subscribers have committed infringement using its services.

Finally, Altice asserts that Plaintiffs were required to allege that the direct infringement at issue was committed by Altice's *subscribers*, as opposed to others who use Altice's services. Mot. at 15. First, Altice is flat wrong. Plaintiffs *do* allege throughout the complaint that Altice's "subscribers routinely used its internet services in order to illegally distribute or reproduce copyrighted works, including music, without authorization." Compl. ¶ 34; *see e.g.*, *id.* ¶ 36

21

("subscriber's misconduct"); ¶ 37 ("serially infringing subscribers"). Second, Altice cites no authority whatsoever for the contention that it can escape liability if a household member, as opposed to the named account holder, commits copyright infringement using Altice's services. Third, as noted above, "draw" is not the only way to establish a direct financial benefit. Here, the complaint alleges in detail that Altice has an economic incentive to permit copyright infringement to flourish and not risk losing lucrative and recurring monthly service fees because an account is being used to engage in repeated instances of copyright infringement.

Plaintiffs have alleged detailed facts establishing that Altice has the right and authority to supervise the use of its services to commit infringement and receives increased revenue as a direct result of its failure to exercise that right. That sufficiently states a claim for vicarious liability.

**B.    The complaint sufficiently states a claim that Altice is contributorily liable for its subscribers' copyright infringement.**

It has long been established that "[a] party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Techs., Inc*., 166 F.3d 772, 790 (5th Cir. 1999) (quoting *Gershwin*, 443 F.2d at 1162); *see also R A Guthrie Co., Inc. v. Boparai*, No. 4:18-CV-080-ALM-KPJ, 2021 WL 1148957, at *6 (E.D. Tex. Mar. 1, 2021) (applying *Alcatel* and *Gershwin*), *report and recommendation adopted*, 2021 WL 1141667 (E.D. Tex. Mar. 25, 2021).

Now, in direct contradiction of more than 50 years of contributory liability precedent, Altice claims that in order to properly state a claim, Plaintiffs must allege that Altice induced the infringement. Mot. at 22. Altice ignores countless decisions from the Supreme Court, this Circuit, and courts throughout the country that have held for decades that contributory infringement can be established where one "induces, causes *or* materially contributes" to the infringing activity. Ignoring the "causes or materially contributes" language, Altice now contends that inducement is

22

the only path available to sustain a contributory claim. Altice is wrong. Every court that has addressed this specious argument in an analogous setting has flat rejected it. This Court, like all before it, should do the same and deny the motion.

> ### 1. *Altice misstates the* **Grokster** *and* **Sony** *rulings and ignores Plaintiffs' numerous allegations of material contribution.*

The genesis of Altice's flawed "inducement-only" argument is a convenient misreading of *Grokster*. *See* Mot. at 21–22. According to Altice, *Grokster* changed the standard for contributory infringement to focus *only* on the "inducement or encouragement" language. Specifically, *Grokster* stated that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement" without mention of the "causation" or "material contribution" prongs of the standard. 545 U.S. at 930. This, Altice insists, abrogated those alternative prongs as bases of contributory infringement. This argument has been raised repeatedly, without success, and it should be rejected here.

The most cursory review of *Grokster* shows that the Supreme Court *did not* upend 50-plus years of established law in one sentence. Taken at face value, the statement Altice relies on, *see* Mot. at 21–22, recites a sufficient condition for establishing contributory liability. Nothing indicates that the Supreme Court intended to establish "inducement or encouragement" as the *only* viable theory. It would have been odd to do so implicitly, while enshrining *Gershwin's* "induce, cause or materially contribute*"* rule in the canon of decisions establishing the "doctrines of secondary liability" in copyright law. *Id.* (citing *Gershwin*, 443 F.2d at 1162). It also makes sense that the Supreme Court focused only on the "inducement" standard in *Groskter*, because that was an inducement case, not a material contribution case. The court of appeals had held the defendants "did *not* materially contribute" to infringement, so that prong was not at issue. *Id.* at 928.

Indeed, in the years following *Grokster*, courts have expressly determined that *Grokster* "did not suggest that a court must find inducement to impose contributory liability under common law principles." *Perfect 10 v. Amazon*, 508 F.3d at 1170 n.11. Countless courts and leading authorities, including in this District and the Fifth Circuit, are in accord. *See R A Guthrie*, 2021 WL 1148957, at *6 ("[defendant] induced, *caused, or materially contributed to* [third party's] infringing conduct") (emphasis added); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 766–67 (W.D. Tex. 2019) ("*UMG v. Grande SJ*") ("*Grokster's* expression that '[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement' should not be taken as writing out of the law liability based on material contribution, but instead stands as a simple restatement of the same principles of liability found in *Gershwin* and elsewhere"); *BMG v. Cox Appeal*, 881 F.3d at 306 (discussing material contribution); *RCN*, 2020 WL 5204067, at *9 (plaintiffs "adequately pleaded the material contribution or inducement element"); *After II v. Grande*, 2023 WL 1422808, at *4–7 ("[ISP] cannot rely on *Grokster* or *Sony* to dismiss Plaintiffs' claim of material contribution to infringing activity"); *Canada Hockey v. Texas A&M*, 2022 WL 445172, at *10 (citing *Gershwin* liability theories), *cert. denied*, 143 S. Ct. 118 (2022); *Canada Hockey, L.L.C. v. Marquardt*, No. 20-20530, 2022 WL 252186, at *2 n.1 (5th Cir. Jan. 26, 2022); 3 Melville B. Nimmer, *Nimmer on Copyright* § 12.04[A][4][b] (2023) (distinguishing intentional inducement in *Grokster* from other theories of contributory liability and suggesting intentional inducement has evolved as a new theory distinct from contributory liability).[11]

---

[11] Altice's argument that common law contributory liability theories such as those in *Gershwin* are somehow "different legal standard[s]" and inapplicable in light of *Grokster* (Mot. at 30 n.5) is misplaced. The Fifth Circuit adopted *Gershwin* in *Alcatel*, 166 F.3d at 790, and continues to apply its common law theories of contributory liability long after *Grokster*.

24

Altice does not stop there. It suggests that *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)), along with *Grokster*, established intent as an element of *all* theories of contributory copyright liability, effectively eliminating contributory liability to the distribution of products with substantial non-infringing uses. *See* Mot. at 22. It does not. The allegations in *Sony* are nothing like those here, and Altice's arguments once again fail.

*Sony* involved the question of whether the manufacture of a home video recorder, or VCR, could be secondarily liable for copyright infringement. The manufacturer, Sony, had no ongoing relationship with any direct infringers at the time of the infringement, and had no knowledge of any specific infringements. The Court thus ruled that liability could rest only "on the fact that [Sony] ha[d] sold equipment with constructive knowledge of the fact that its customers may use that equipment" to infringe. *Id*. at 439.

Analogizing to the patent law's staple article of commerce doctrine, the Supreme Court held that contributory liability was not available where a manufacturer's generalized knowledge of the possibility that a product with substantial non-infringing uses could be used to infringe. *Id*. at 439–42. Thus, "Sony barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Grokster*, 545 U.S. at 933.

Although *Sony* drew from patent law in applying the "substantial non-infringing use" rule, it also recognized that "there are substantial differences between the patent and copyright laws." 464 U.S. at 422. Importantly, *Grokster* recognized that *Sony* "did not displace other theories of secondary liability . . . ." *Id.* at 934. Indeed, *Sony* itself distinguished cases like *Gershwin* "involving an ongoing relationship between the direct infringer and the contributory infringer at

the time the infringing conduct occurred." *Sony*, 464 U.S. at 437. That distinction, very much present here, was key to the Court's decision in *Sony*. *Id*.

Plaintiffs here do not contend that Altice is liable simply because the internet can be used to infringe and Altice has some generalized knowledge of such use. This case is nothing like *Grokster* or *Sony*. Unlike *Grokster* or *Sony*, Altice provides an ongoing *service* to infringers contingent upon terms and conditions and an acceptable use policy, and it *continues to provide the service to those very same infringers*, even after it learns of the infringement. Compl. ¶ 46.[12]

Courts have routinely distinguished *Grokster* and *Sony* for precisely these reasons. *BMG v. Cox Appeal*, 881 F.3d at 307–08 (distinguishing one-off sales of VCRs as in *Sony* from providing a continued VCR leasing service); *RCN*, 2020 WL 5204067, at *8–9 (the infringement in *Sony* was "markedly different from the use of BitTorrent protocols that is alleged here"); *UMG v. Grande SJ*, 384 F. Supp. 3d at 768; *After II v. Grande*, 2023 WL 1422808, at *4–7. Altice's ongoing provision of the essential means of infringement to known infringers are more akin to the circumstances where "a person sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights . . . ." *BMG v. Cox Appeal*, 881 F.3d at 307. That knowledge is sufficient for contributory liability.

Altice's reliance on *Global-Tech Appliances, Inc. v. SEB S.A.* and *Tierra Intellectual Borinquen, Inc. v. ASUS Computer Int'l, Inc*. is similarly misplaced. Those decisions drew from *Grokster*'s discussion of patent law for guidance in interpreting inducement in the patent context.

---

[12] Altice's attempt to equate its provision of internet services to "ordinary acts incident to product distribution, such as offering customers technical support or product updates" under *Grokster*'s intentional inducement theory is similarly unavailing. Mot. at 26–27. Altice insists its provision of technical support and product updates "*is* product distribution," *Id.* at 27, but Altice ignores that those services are not incident to one-off sales but rather to its ongoing provision of the services that are essential to direct infringement.

*Global-Tech*, 563 U.S. 754, 762–63 (2011); *Tierra*, No. 2:13-CV-38-JRG, 2014 WL 894805, at *4 (E.D. Tex. Mar. 4, 2014). *Grokster* made clear that it did not disturb the doctrines of contributory liability in copyright law, and these subsequent *patent* law decisions did not hold otherwise. 545 U.S. at 931, 934–35.

Thus, neither *Sony* nor *Grokster* bars contributory liability premised on knowledge of specific instances of infringement combined with material contribution.

### 2.    *Plaintiffs sufficiently pled that Altice knew of direct infringement by the users of its services.*

The knowledge element of contributory liability on copyright infringement is satisfied by actual knowledge or willful blindness. *R A Guthrie*, 2021 WL 1148957, at *6 (actual knowledge); *BMG v. Cox Appeal*, 881 F.3d at 308 ("the law recognizes willful blindness as *equivalent* to actual knowledge"); *Global-Tech*, 563 U.S. at 766 ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts"); *RCN*, 2020 WL 5204067, at *8 (finding knowledge "where the person was aware of a high probability of the fact in dispute and consciously avoided confirming this fact") (citation omitted). The allegations in the complaint easily meet this standard.

The complaint alleges that Altice received millions of notices detailing specific acts of direct infringement committed by users of Altice's services. Compl. ¶¶ 39, 55. Each notice included the title and artist of each infringing work, the unique IP address assigned to an Altice customer who was detected infringing, the "port" used to communicate via BitTorrent protocol, and the date and time of infringing activity. *Id*. ¶¶ 34, 40–41. Those notices gave Altice actual notice of each such act of direct infringement. And many of the individuals committing this direct infringement using Altice's services were "not just one-time offenders" but rather "chronic and repeat infringers." *Id.* ¶ 43. And many were detected infringing via Altice's internet services for

months and even years. *Id*. ¶¶ 42–43. Throughout, Altice had the ability to identify which subscription was used to commit the direct infringement identified in each notice, so it could confirm that a notice concerning a particular IP address reflected prolific, sustained infringement by an individual user. *Id.* ¶ 40. Numerous courts have found that allegations of knowledge of infringement based on notices of infringement sent to internet service providers were sufficient to state a claim for contributory infringement. *RCN*, 2020 WL 5204067, at *8; *UMG v. Grande SJ*, 384 F. Supp. 3d at 768; *BMG v. Cox Appeal*, 881 F.3d at 307–08; *After II v. Grande*, 2023 WL 1422808, at *5–6. No court has rejected that theory of knowledge.

Altice contends it cannot be charged with knowledge of infringing activity because it could not "verify[] the truth of the allegations" in the notices. Mot. at 28. Even if that factual dispute were resolved in Altice's favor, it is irrelevant (and in no event should be resolved on a motion to dismiss). The law requires only that the defendant know of the infringing *activity* to face contributory liability; it does *not* require the defendant to "have reached the legal conclusion that those activities infringed a copyrighted work," *RCN*, 2020 WL 5204067, at *8 (quoting *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 68 (D. Mass. 2008) ("the defendant need only have known of the direct infringer's activities")); *see also Sony*, 464 U.S. at 489 (Blackmun, J., dissenting) ("Nor is it necessary that the defendant be aware that the infringing activity violates the copyright laws.").

Even if the mountain of notices informing Altice of direct infringement using its services did not give Altice actual knowledge of those activities, the complaint alleges that Altice willfully avoided that knowledge. As detailed in the complaint, Altice "purposefully ignor[ed] and tolerat[ed] its subscribers' flagrant and repeated infringements," and "intentionally ignored and continues to ignore the overwhelming evidence that provides it with actual knowledge of repeat copyright infringers using its services." Compl. ¶¶ 45, 47, 52, 56. And Altice concedes that "it did

not" undertake any effort to "verify[] the truth of the allegations in Plaintiffs' notices." Mot. at 28. And, to be sure, Altice received notices of infringement from *other* copyright owners besides Plaintiffs too, corroborating the notices of the direct infringement at issue here. *Id.* ¶ 47. That is sufficient to plead a claim for contributory infringement.

### 3.      Plaintiffs sufficiently pled that Altice's provision of internet services materially contributed to the direct infringement using those services.

As explained above, contributory liability applies where a defendant induces, causes, or materially contributes to direct infringement. The Complaint clearly alleges contributory liability.

*First*, the complaint alleges that Altice acted affirmatively to cause or materially contribute to its customers' infringement with knowledge of each infringing customer's ongoing infringement. Compl. ¶¶ 54–55. It alleges that, with knowledge of millions of individual and repeated acts of infringement by its customers, Altice continued to provide the means necessary for its customers to commit direct infringement by actively selling and providing access to the internet and the systems used to commit infringement. *Id.* ¶¶ 45–52, 54. That constitutes material contribution to the direct infringement committed using those services.[13]

Altice strains to substantively address these allegations beyond its misapplication of *Grokster*, noting only that termination of services would be unreasonable and ineffective and that the DMCA somehow exempts Altice from contributory liability. Mot. at 26–27.[14] But courts have

---

[13] Altice's reliance on *Mon Cheri Bridals, LLC v. Cloudflare, Inc.* is misplaced. No. 19-CV-01356-VC, 2021 WL 4572015 (N.D. Cal. Oct. 6, 2021). The defendant there did not provide access to the internet but rather provided services that "ma[d]e content load faster for users" on websites and other online security services. *Id.* at *1. Defendant did not "materially contribute[] to the underlying copyright infringement" because its services were not an "essential step" to infringement and blocking its services would not prevent direct infringement. *Id.* at *2. Here, Altice's internet access services *are* essential elements of infringement. Compl. ¶ 36.

[14] Altice's bald assertions that the individuals responsible for infringement using its services are an "incorrigible teen or customer [who] has downloaded a handful of songs," Mot. at 6, is speculative at best and contradicts the allegations in the complaint. Plaintiffs' allegations of chronic and repeat infringement must be accepted as true at this stage.

29

found that conduct like that alleged against Altice constitutes material contribution under substantially the same facts. *RCN*, 2020 WL 5204067, at *8; *After II v. Grande*, 2023 WL 1422808, at *7; *UMG v. Grande SJ*, 384 F. Supp. 3d at 768; *BMG v. Cox Appeal*, 881 F.3d at 307–08.

Altice also misconstrues the issues by focusing on the allegations that it failed to terminate infringing subscribers. Mot. at 26–27; *see also id.* at 29–30 (framing issue as whether "liability can be triggered by . . . some indeterminate number of notices of claimed infringement").[15] The complaint alleges that Altice materially contributes to direct infringement by providing the essential service necessary to commit that infringement. Terminating that service is just one way Altice could *stop* materially contributing to infringement, but that would not absolve Altice of secondary liability for infringement it already contributed to, unless Altice met its burden on its affirmative defense under the DMCA. But that has no relevance at the Rule 12 stage.

*Second*, Plaintiffs sufficiently pled that Altice induced or encouraged customers to infringe. Plaintiffs allege that by creating a safe haven for infringement, as described above, Altice induced and encouraged existing and prospective infringers to purchase and use Altice's services so that they, too, could infringe with impunity. Compl. ¶¶ 49–50, 54. Such conduct warrants contributory liability under *Grokster* and *Sony*, despite any potential for substantial lawful uses of Altice's services. *Grokster*, 545 U.S. at 936–37.

## V.    CONCLUSION

For the reasons stated herein, the Court should deny Altice's motion to dismiss as to Plaintiffs' claims for both vicarious and contributory liability.

---

[15] Altice's argument that termination of service would have "no material impact . . . across the world," Mot. at 6, is irrelevant to whether Altice can prevent infringement by customers of *Altice's* services at issue in *this* case, the only relevant inquiry here.

Dated: March 6, 2023

Respectfully submitted,

/s/ William E. Davis, III

| | |
|---|---|
| William E. Davis, III | Michael J. Allan |
| Texas State Bar No. 24047416 | (pro hac vice) |
| bdavis@davisfirm.com | mallan@steptoe.com |
| Rudolph "Rudy" Fink IV | John William "Bill" Toth |
| Texas State Bar No. 24082997 | (pro hac vice) |
| rfink@davisfirm.com | btoth@steptoe.com |
| **THE DAVIS FIRM, PC** | **STEPTOE & JOHNSON LLP** |
| 213 N. Fredonia Street, Suite 230 | 1330 Connecticut Ave. NW |
| Longview, Texas 75601 | Washington, DC 20036 |
| Telephone: (903) 230-9090 | (202) 429-3000 |
| Facsimile: (903) 230-9661 | (212) 506-3900 |

*Counsel for Plaintiffs BMG Rights Management (US) LLC, UMG Recordings, Inc., Capitol Records, LLC, Concord Music Group, Inc., and Concord Bicycle Assets, LLC.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on March 6, 2023.

/s/ William E. Davis, III

31