# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, CONCORD MUSIC GROUP, INC., and CONCORD BICYCLE ASSETS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALTICE USA, INC., and CSC HOLDINGS, LLC, <br><br> Defendants. | CIVIL ACTION NO. 2:22-cv-00471-JRG <br><br> JURY TRIAL DEMANDED <br><br> ORAL ARGUMENT REQUESTED |

# DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................................................1

II. PLAINTIFFS FAIL TO ADEQUATELY PLEAD VICARIOUS LIABILITY .................1

    A. Plaintiffs fail to allege a direct financial benefit in the infringing activity. .............1

    B. Plaintiffs fail to allege that Altice can control the claimed infringing activity. ......5

III. PLAINTIFFS INSUFFICIENTLY PLEAD CONTRIBUTORY INFRINGEMENT ........7

IV. CONCLUSION ..............................................................................................................10

# TABLE OF AUTHORITIES

                                                                                  **Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
   114 F. Supp. 2d 896 (N.D. Cal. 2000) .................................................................................. 3

*A&M Recs., Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ............................................................................................... 5

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772, 791 (5th Cir. 1999) ........................................................................................ 8

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   881 F.3d 293 (4th Cir. 2018) ................................................................................................. 8

*Controversy Music v. Down Under Pub Tyler*,
   488 F. Supp. 527 (E.D. Tex. 2007) ....................................................................................... 3

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ....................................................................................... 2, 3, 4

*Fonovisa Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ........................................................................................... 3, 5, 6

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d. Cir. 1971) ............................................................................................... 8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ..................................................................................................... *passim*

*Perfect 10, Inc. v. Visa Int'l Service Ass'n*,
   494 F.3d 788 (9th Cir. 2007) ............................................................................................. 6, 7

*R.A. Guthrie Co., Inc. v. Boparai*,
   2021 WL 1148957 (E.D. Tex. Mar. 1, 2021) ....................................................................... 8

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
   316 F.2d 304 (2d Cir. 1963) .................................................................................................. 2

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) .................................................................................................. 8, 9, 10

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
   2020 WL 3957675 (M.D. Fla. July 8, 2020) .................................................................... 3, 4

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ........................................................................ 4

*Warner Records, Inc. v. Charter Commc'ns, Inc.*,
  454. F. Supp. 3d 1069 (D. Colo. 2020) ................................................................................. 6

**Statutes**

17 U.S.C. § 512(l) ............................................................................................................................. 1

**I.    INTRODUCTION**

Plaintiffs distort long-standing copyright jurisprudence in an attempt to distract the Court from what they do not and cannot plead and, in doing so, urge the Court to massively expand the doctrines of secondary liability. Aware that recent decisions have rejected materially identical vicarious liability claims on the pleadings, Plaintiffs argue that a hypothetical "economic incentive" for Altice to tolerate infringement can replace the required ***direct*** *financial benefit from infringement*. This radical departure from well-established precedent would eliminate any rational bound on vicarious liability. As to the "right and ability to control" element, Plaintiffs cannot dispute Altice's inability to monitor millions of users, block access to particular content, or thwart infringement in real time, arguing instead that the ability to terminate internet service should suffice. But the blunt tool of terminating a customer's account does not give Altice the ability to supervise a user's internet activity, nor would it stop the alleged infringement in any event given the many access points to the internet. As to contributory infringement, Plaintiffs do not even suggest that the Complaint alleges "culpable intent," which *Grokster* requires. Recognizing these deficiencies, Plaintiffs attempt to shore up their legal theories with misleading appeals to the DMCA. But that statute *does not* create a cause of action; it provides a safe harbor from damages irrespective of liability. Its plain language also forecloses that it has any bearing on liability, cautioning that qualification for it "shall not bear adversely" upon liability. *See* 17 U.S.C. § 512(l).

The Complaint fails to allege elements of both claims and should be dismissed in full.

**II.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD VICARIOUS LIABILITY**

    **A.    Plaintiffs fail to allege a direct financial benefit in the infringing activity.**

Plaintiffs try to disguise their inability to show a direct financial benefit, by inverting the order in which they address vicarious liability's two elements. But their inability to plead basic cause-and-effect—that when P2P users infringe, Altice profits, Mot. at 8—is inescapable.

Plaintiffs first try to lower the legal standard that they must satisfy, contending that Altice proffers a "heightened" "direct causality standard." Opp. at 13, 14. The element is literally named "*direct* financial benefit." "The essential aspect of the '*direct* financial benefit' inquiry" "is whether there is a *causal* relationship between the infringing activity and any financial benefit a defendant reaps." *Id.* at 11 (emphasis added) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). Only then does a defendant have the sort of "obvious and direct financial interest in the exploitation of the copyrighted materials" necessary to justify vicarious liability. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). Where, as here, a defendant does not earn revenue tied to any particular use of its services (unlike the vendor who earns a percentage of each infringing product), the causation requirement can only be satisfied if the infringing activity itself "draws" subscribers to the service. In other words, *unless* "it can be shown that '*the value* of the service *lies* in providing access to infringing material'"—*i.e.*, that "the infringing activity constitutes a draw for subscribers, not just an added benefit"—a defendant's receipt of "a one-time set-up fee and flat periodic payments for service" like those Altice receives is presumptively *insufficient* for vicarious liability. *See Ellison*, 357 F.3d at 1079 (emphasis added). It is telling indeed that the only way that Plaintiffs think they can survive a motion to dismiss is to argue that this basic cause-and-effect is "not the law," Opp. at 13. It most certainly is.

Plaintiffs attempt to side-step the direct financial benefit standard and the draw rule by arguing that they need merely to allege that Altice "has an *economic incentive* to tolerate infringing conduct." Opp. at 11-20 (emphasis added). The "incentive" they posit is not a benefit flowing from infringement itself but from continued monthly fees from the subscribers whose accounts were allegedly used to infringe. Further, this "economic incentive" sound bite comes from a case in which the notorious file sharing service Napster argued that it was immune from

vicarious liability because it had yet to generate revenue (i.e., no money, no direct financial benefit). The court disagreed, holding that because Napster's very existence depended upon infringement, it had an economic incentive to tolerate it. *See A & M Recs., Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 921 (N.D. Cal. 2000). Moreover, *Napster* is one of the most obvious "draw" cases imaginable: infringement is *all* that drew people to Napster, giving it an interest in continued infringement. That the court used the term "economic incentive[]" hardly suggests that "'an economic incentive to tolerate infringing conduct,' standing alone, is sufficient to establish a direct financial benefit." *See UMG Recordings, Inc. v. Bright House Networks, LLC*, 2020 WL 3957675, at *6 (M.D. Fla. July 8, 2020). *Napster*'s "theory" obviously has no application here; alleging as much would be implausible on its face. Altice has 4.1 million subscribers and offers broadband internet, phone, mobile, and cable television services, each of which has countless non-infringing uses. Plaintiffs do not and could not allege that Altice's existence depends upon infringement. To the contrary, Plaintiffs acknowledge that Altice's policies prohibit infringement, and it implements those policies by suspending and terminating user accounts. *See* Compl. ¶¶ 35, 46.

Plaintiffs also argue that the Ninth Circuit's decision in *Fonovisa Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) supports their "economic incentive" theory. Opp. at 13-14. But *Fonovisa* was a classic "draw" case: the defendant "**actively strive[d]** to provide the environment and the market for counterfeit recording sales to thrive," and collected fees "directly from customers who **want to buy the counterfeit recordings** at bargain basement prices." *Fonovisa*, 76 F.3d at 263-64 (emphasis added). The Ninth Circuit agreed: "We concluded in *Fonovisa* that 'the sale of pirated recordings at the [defendant's] swap meet is a 'draw' for customers." *Ellison*, 357 F.3d at 1078. On this point as well, Plaintiffs repeatedly cite to *Controversy Music v. Down Under Pub Tyler*, 488 F. Supp. 527 (E.D. Tex. 2007). Opp. at 12, 14, 16. Yet that was the paradigmatic

3

"dance hall" case (bar hires band to play infringing songs). Plaintiffs have not alleged that here.

Attempting to avoid the draw rule's implications to the claims that they have alleged, Plaintiffs also point to *Ellison*'s statement that the "draw" need not be "substantial" and argue that *anything* that makes a service "more attractive"—no matter how insubstantially—gives rise to a direct financial benefit. *See* Opp. at 11, 16. But the *Ellison* court was addressing a scenario where a defendant might claim to be "insulate[d] … categorically from vicarious liability" because its financial gain from infringement constituted only a small percentage of its total income. 357 F.3d at 1079. No one is arguing that here either. In any event, contrary to Plaintiffs' argument, *Ellison* makes abundantly clear that there still must be a ***direct causal*** relationship between the infringing activity and the financial benefit: anything less is "just an added benefit" and insufficient to impose liability. *Id.* (dismissing claim because there was no "evidence that AOL attracted or retained subscriptions **because of** the infringement or lost subscriptions **because of** AOL's eventual obstruction of the infringement") (emphases added).

Here, Plaintiffs are thus required to plausibly allege (and later prove) that the ability to infringe is the *draw* to Altice's service for the subscribers who are responsible for the direct infringement (irrespective of whether draw is modified with the adjective "main," "primary," etc.). A lower standard would "effectively read[] the limiting term 'direct' out of the test, allowing the imposition of vicarious liability based on indirect, highly attenuated connections between infringing conduct of the patron and alleged financial benefits." *Bright House*, 2020 WL 3957675, at *4; *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018). Plaintiffs do not and could not allege as much. *See* Mot. at 9.

Plaintiffs' claim also fails even under their proffered "any draw will do" standard. *See* Opp. at 16-19. Plaintiffs' arguments, like those they made in the *Grande* and *Bright House* cases, amount

4

to a "dog whistle" theory: that Altice's advertising of high-speed internet, tiered service offerings, and alleged "non-stickler" policing of infringement, drew some unidentified subset of its 4.1 million subscribers to its services in order to infringe. *See* Opp. at 12-13, 19. But given the alleged pervasiveness of P2P infringement, and the absence of any factual allegations supporting the inference that Altice differs from other ISPs in how it responds to infringement such that it would be a draw, Plaintiffs' conclusory assertions are implausible and legally deficient. Mot. at 9.[1]

### B. Plaintiffs fail to allege that Altice can control the claimed infringing activity.

Plaintiffs do not allege that Altice has any "right" or "ability" to control or supervise the allegedly infringing activity, but only that it maintains the ability to revoke internet access— whether temporarily through a suspension or more permanently through account termination. Opp. at 6. But this "on/off" switch does not give Altice the ability to control what individuals do when they are surfing the web. The cases Plaintiffs cite demonstrate exactly why Altice is differently situated than entities that offer closed systems (e.g., websites, apps, platforms, etc.). *Id.* at 6-7.

Plaintiffs also argue that Altice need not have "active" control or supervision over the infringing conduct, *id.* at 7, but, again, the very cases that they cite make clear that the defendant must be in a position to *actively* police the infringing conduct. In *A&M Recs., Inc. v. Napster, Inc.*, the defendant had a "right to police" its premises given its "ability to locate infringing material listed on its search indices," which were "within the 'premises[,]'" as well as the "right to terminate users access" to those premises. 239 F.3d 1004, 1023-24 (9th Cir. 2001). In *Fonovisa*, the defendant had the "ability to police … vendors" that "occupied small booths within premises that

---

[1] Plaintiffs misconstrue Altice's arguments that (a) the people who are paying subscription fees must (b) be drawn to infringe Plaintiffs' works-in-suit. Opp. at 20-22. Both are essential: a draw to the works-in-suit ensures the "causal connection between the injury and the conduct complained of," and a draw from the paying subscribers is essential because those are, obviously, the ones purportedly providing the financial benefit. Plaintiffs' argument appears designed to distract from precedent that is clear on its face. Mot. at 14-16.

5

[defendant] controlled and patrolled[,]" "had the ability to control the activities of vendors on the premises[,]" and "controlled the access of customers to the swap meet area." 76 F.3d at 262-63. Altice cannot police the internet, which is not even its "premises." It can neither stop people from getting online nor control what they do when there: if it suspends a user account, the user could access the internet through a mobile phone or the neighbor's Wi-Fi. *See Perfect 10, Inc. v. Visa Int'l Service Ass'n*, 494 F.3d 788, 803-4 (9th Cir. 2007) (distinguishing *Napster* on similar lines).

Plaintiffs' reliance on *Warner Records, Inc. v. Charter Commc'ns, Inc.*, 454. F. Supp. 3d 1069 (D. Colo. 2020) also demonstrates why Altice lacks the requisite control. *Warner* wrongly found that "Charter can 'stop or limit' infringement of plaintiffs' works by terminating those users *about whom it is notified.*" *Id.* at 1078 (emphasis added). But knowledge is not an element of vicarious liability, and, in any event, Plaintiffs' notices (i.e., emails) are alleged evidence of *past* acts of infringement. Compl. ¶ 40; Mot. at 20. Those emails do not somehow confer on Altice the technical ability to control or supervise its subscribers' **ongoing or future behavior**. Again, while that might be true of a closed system or content host, it is not true when the infringement is alleged to occur on P2P networks that no ISP controls. Moreover, Altice cannot prevent a subscriber or former subscriber from accessing P2P networks through other means (mobile device, other ISPs, etc.). *See, e.g.*, *Visa*, 494 F.3d at 805 (service "cannot stop … infringing conduct tak[ing] place on the third-party websites").

Plaintiffs also claim that there are "fact disputes" regarding the "technical assertions that Altice lacked the requisite control over its users' infringement." Opp. at 10. Not so. Plaintiffs allege only that Altice can revoke internet access to its account holders. Compl. ¶ 46. They do not allege that Altice has the ability to actively monitor its network, remove infringing content, and prevent ongoing infringement. Such allegations would be implausible: the alleged infringement occurs on

generally accessible P2P networks, and involves files stored on physical devices, Compl. ¶ 4—"premises" that no ISP, Altice included, can control.

Plaintiffs are also wrong that Altice's ability to terminate or suspend means that it "has *already* implemented specific measures by which it *can* prevent infringement using its services." Opp. at 9 (emphasis in original). The test is not whether a party has "the literal power to 'stop or limit' the infringement," nor whether its "services are required for the third party infringers … to operate." *See Visa*, 494 F.3d at 806. The defendant must "exercise sufficient control over the actual ***infringing activity*** for vicarious liability to attach." *Id.* (emphasis added). Here, the third-party infringers are the P2P networks and their users. Altice's decision to revoke internet access to a subscriber has no bearing on whether someone with infringing content on his or her physical device will share that content through P2P networks like BitTorrent.

### III.  PLAINTIFFS INSUFFICIENTLY PLEAD CONTRIBUTORY INFRINGEMENT

Plaintiffs' only response to *Grokster* is a specious argument that taking its plain-English statement of the legal standard literally would "upend 50-plus years of established law[.]" Opp. at 23 (referring to *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)). But *Grokster* does not "upend" anything: as the pre-*Grokster* case law shows, culpable intent has long been an implicit element of contributory copyright infringement. Plaintiffs next create a straw man, claiming Altice argues that *only* an inducement theory of contributory infringement survives *Grokster*—an argument that Altice does not make. *Grokster* simply requires that whatever the nature of the conduct alleged, plaintiffs *must* establish culpable intent, which can manifest directly in cases of encouragement or inducement (which Plaintiffs have not pled[2]), or be imputed on a

---

[2] Plaintiffs' perfunctory argument that Altice "induced and encouraged" "infringers" by "creating a safe haven for infringement," Opp. at 30, is worlds away from alleging the sort of "active steps . . . taken to encourage direct infringement" that *Grokster* requires. *Grokster*, 545 U.S. at 936.

7

material contribution theory from the nature of a service, *unless* the service has substantial noninfringing uses. For similar reasons, Plaintiffs' attempt to distinguish this case from *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) and *Grokster* on its facts, *see* Opp. at 25-27, misses the point: the same controlling *law* applies here, and it bars Plaintiffs' claim.

Plaintiffs' claim that *Grokster* "intended" to preserve a non-intentional "material contribution" prong, but simply left it out when explicitly defining the legal standard, does not withstand scrutiny. *Grokster* simply clarified the doctrinal basis of earlier copyright decisions—*Gershwin* being one of them. *Grokster*'s citation to *Gershwin* did not "enshrin[e]" non-intentional material contribution "in the canon of decisions." Opp. at 23. Rather, it shows that *Gershwin*, whose holding rested on overwhelming evidence of the defendant's "intentionally inducing or encouraging direct infringement," is entirely consistent with *Grokster*. *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1161, 1163 (2d. Cir. 1971).[3] Similarly, *Alcatel USA, Inc. v. DGI Techs., Inc.* also rested squarely on the defendant's intentional conduct, and is entirely consistent with *Grokster*. 166 F.3d 772, 791 (5th Cir. 1999) (holding defendant who "knowingly induced … infringing activity" had "engaged in contributory infringement as a matter of law"). Plaintiffs' other cases that purportedly "distinguished" *Sony* and *Grokster*, *see* Opp. at 26, are either consistent with *Grokster* or were plainly wrongly decided.[4]

---

[3] The defendant in *Gershwin* had "contact[ed] local citizens and engineer[ed] the formation of an association" to stage a concert and "create[] … a market" for "[the defendant's] artists," who the defendant knew would perform copyrighted works at the concert without securing a license. *Id.*

[4] In *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, the court, relying on *Grokster*, agreed that the standard is "whether the product is distributed with the intent to cause copyright infringement." 881 F.3d 293, 306 (4th Cir. 2018). The district courts in *After II Movie* and *RCN Telecom* both ignored *Grokster*'s requirement, relying on a lower constructive knowledge standard that is expressly barred by both *Sony* and *Grokster*, and has been soundly rejected by numerous courts. *R.A. Guthrie Co., Inc. v. Boparai*, an unpublished default judgment, found clear indicia of intent by the non-appearing defendant, the direct infringer's manager. 2021 WL 1148957, at *9 (E.D. Tex. Mar. 1, 2021).

Instead of grappling with *Grokster*'s intent requirement, Plaintiffs claim Altice takes the position that *only* an inducement theory of contributory infringement survives *Grokster*. Opp. at 25. Altice made no such argument, for *Grokster* itself noted that "the distribution of a product can … give rise to liability *where evidence shows that the distributor intended and encouraged the product to be used to infringe*." 545 U.S. at 940 n.13 (emphasis added). *Sony* provided another example: the required intent can be imputed if, for example, the defendant's product or service is only "good for" infringement. 464 U.S. at 456. The parallel doctrine of contributory patent infringement similarly requires intent without being coextensive with inducement.

Conceding that they fail to meet *Grokster*'s intent requirement, Plaintiffs attempt to base their claim on allegations that Altice failed to terminate service to accused subscribers after Plaintiff's agent sent "millions" of automated notices alleging past acts of infringement. Compl. ¶ 39. These vague allegations of "knowledge" in the abstract and *in gross*, with no attempt to plead that Altice had knowledge—much less intent—with respect to any specific or even representative person or infringement, would be insufficient on any theory. It is definitional that contributory infringement must "contribute" to underlying *direct* infringement, but Plaintiffs' vague, broad-brush allegations fail to connect Altice's supposed "knowledge" to any specific subscriber's direct infringement of any specific song. While Plaintiffs argue that Altice is liable not just because the internet is used to infringe, but because Altice provides internet service with "knowledge" of infringement, that impermissibly conflates knowledge with material contribution—and this sort of alleged "knowledge" of past infringing acts is insufficient where a service has substantial noninfringing uses. Indeed, in *Sony*, the manufacturer had the same degree of "knowledge" that its product would be used for infringement, but was not (and could not be) held liable for distributing a product that was "capable" of lawful use. 464 U.S. at 456. On material contribution, Plaintiffs

argue that "Altice's internet access services *are* essential elements of infringement," and therefore "material" to it. Opp. at 29 n.13. This "but-for" theory proves far too much, and shows why *intent* matters: on Plaintiff's expansive theory, everyone from the electric company to the modem manufacturer should also be liable.

Finally, recognizing that *Sony* and *Grokster* bar contributory infringement based on provision of a service with substantial noninfringing uses, Plaintiffs argue that Altice's *failure to withdraw* its service is the material contribution: in other words, that an ISP's (purported) knowledge of infringing activity creates a duty for it to act, which if breached automatically makes the ISP liable for the infringing activity that created the duty. This novel theory of *post hoc* contributory infringement—retroactively converting the (non-actionable) provision of a lawful service into (actionable) contributory infringement—has no basis in law, is incompatible with *Sony*, and is expressly barred by *Grokster*. 545 U.S. at 939 n.12 ("in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses. Such a holding would tread too close to the *Sony* safe harbor.")

Ultimately, Plaintiffs are left where they started: unable to plausibly plead that Altice acted with the culpable intent that *Grokster* unambiguously requires, with their theory of *imputed* intent foreclosed by *Sony*'s "bar[] [to] secondary liability based on presuming or imputing intent to cause infringement solely from the … distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Id.* at 933.

## IV.   CONCLUSION

In light of the Complaint's fundamental deficiencies, it should be dismissed with prejudice.

Dated: March 13, 2023                                   Respectfully submitted,

                                                        */s/ Michael S. Elkin*

10

Wesley Hill
Texas State Bar No. 24032294
Claire Henry
Texas State Bar No. 24053063
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400
wh@wsfirm.com
claire@wsfirm.com

*Attorneys for Defendants Altice USA, Inc. and CSC Holdings, LLC*

Michael S. Elkin (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
melkin@winston.com
sranderson@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Winston & Strawn LLP
101 California Street, 35th Floor
San Francisco, CA 9411
(415) 591-1506
jgolinveaux@winston.com

**CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on March 13, 2023.

                  */s/ Michael S. Elkin*