## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

<table>
<tr><td>

BMG RIGHTS MANAGEMENT (US) LLC,
UMG RECORDINGS, INC., CAPITOL
RECORDS, LLC, CONCORD MUSIC GROUP,
INC. and CONCORD BICYCLE ASSETS, LLC,

*Plaintiffs*,

v.

ALTICE USA, INC., and
CSC HOLDINGS, LLC,

*Defendants*.

</td><td>

§
§
§
§
§
§
§
§
§
§
§
§
§
§

</td><td>

CIVIL CASE NO.  2:22-CV-00471-JRG

</td></tr>
</table>

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants Altice USA, Inc. and CSC Holdings, LLC's (collectively, "Altice") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (Dkt. No. 22). In the Motion, Altice requests that the Court dismiss Plaintiffs BMG Rights Management (US) LLC, UMG Recordings, Inc., Capitol Records, LLC, Concord Music Group, Inc. and Concord Bicycle Assets, LLC's (collectively, "Plaintiffs") Complaint in its entirety. (*Id.* at 1.)  Having considered the Motion, the subsequent briefing, and for the reasons set forth herein, the Court finds that the Motion should be **DENIED**.

## I.  BACKGROUND

On December 14, 2022, Plaintiffs filed their Complaint against Altice, asserting both vicarious liability for copyright infringement and contributory copyright infringement. (Dkt. No. 1, ¶¶ 16, 18.) Plaintiffs own or hold exclusive copyright interests in extensive catalogs of musical compositions and sound recordings. (*Id.*, ¶ 7.) Altice is a large internet service provider ("ISP"), servicing millions of subscribers within the United States. (*Id.*, ¶ 8.) Plaintiffs allege that "Altice's

services have been used to commit internet piracy in staggering volumes." (Dkt. No. 23 at 9, citing Dkt. No. 1, ¶¶ 38–39.) On February 17, 2023, Altice filed this Motion to dismiss both the vicarious liability and contributory copyright infringement claims, contending that Plaintiffs' complaint fails to plausibly allege either claim. (Dkt. No. 22 at 2–3.)

## II.     LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Court can dismiss a complaint that fails to meet this standard. Fed. R. Civ. P. 12(b)(6). To survive dismissal at the pleading stage, a complaint must state enough facts such that the claim to relief is plausible on its face. *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads enough facts to allow the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court accepts well-pleaded facts as true and views all facts in the light most favorable to the plaintiff, but is not required to accept the plaintiff's legal conclusions as true. *Id.* "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Twombly,* 550 U.S. at 555.

In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "The court may consider 'the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.'" *Script Sec. Sols. L.L.C. v.*

*Amazon.com, Inc.*, 170 F. Supp. 3d 928, 935 (E.D. Tex. 2016) (quoting *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

## III.   DISCUSSION

In its Motion, Altice contends that Plaintiffs failed to meet their burden to plausibly allege the secondary liability copyright infringement theories of vicarious liability and contributory infringement. (Dkt. No. 22 at 2–3.) Altice contends that Plaintiffs failed to meet their burden to plead with respect to both required elements of the vicarious liability claim—that Altice has a direct financial interest in the underlying infringement, and that Altice had the right to supervise and control the infringing activity. (*Id.* at 6–7.) Further, Altice contends that Plaintiffs failed to adequately allege that Altice acted with culpable intent, which Altice maintains is a required element of contributory infringement. (*Id.* at 21.) The Court disagrees. As explained below, the Plaintiffs' complaint is more than sufficient to put Altice on notice of the claims at issue.

### A.  Vicarious Liability Claim

Altice asserts that Plaintiffs have not plausibly stated a claim for vicarious liability because Altice has no direct financial interest in the exploitation of infringing materials, nor does it have the power or ability to police the internet or its subscribers' activity such that it may stop infringement. (Dkt. No. 22 at 7.) The Court finds that Plaintiffs plausibly alleged both elements of the vicarious liability claim.

### i.   Direct Financial Interest

Altice argues that Plaintiffs' allegation that Altice has a direct financial interest in ongoing subscription fees from alleged direct infringers is insufficient to constitute a direct financial interest. It contends that Plaintiffs cannot show that Altice earned profits "distinctly attributable" to the infringing activity. (*Id.* at 7–8, citing *Bell v. Llano Indep. Sch. Dist.*, 2020 WL 5370591, at

*5 (W.D. Tex. Feb. 13, 2020).) Altice receives the same flat fees regardless of whether its subscribers use its services to infringe or for legitimate activities. Thus, it argues, the requisite causal relationship between the infringing activity and any financial benefit it reaps *cannot* be shown as any benefit it receives is not tied to the infringing activity itself. (*Id.*; *see also* Dkt. No. 24 at 2.)

Where a defendant does not earn revenue tied to a particular use of its services, the causation requirement can only be satisfied where the infringing activity draws subscribers to the service. (*Id.* at 2, citing *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).) Altice contends that the availability of infringing content must be the *main* customer draw to its services, and that the Plaintiffs failed to plead facts that would plausibly support such a conclusion. (*Id.* at 11, citing *Sony Discos, Inc. v. E.J.C. Fam. P'Ship*, 2010 WL 1270342, at *4 (S.D. Tex. Mar. 31, 2010).) It asserts that Plaintiffs do not and cannot allege that anyone would have declined Altice's services or paid less in subscription fees absent any ability to infringe via Altice's network. (*Id.* at 9.)

Altice argues that Plaintiffs' allegation that "[t]he ability to download music and other copyrighted content...is a significant incentive for customers to subscribe" (Dkt. No. 1, ¶ 32) is inadequate under *Twombly/Iqbal*. (Dkt. No. 22 at 9.) Altice relies heavily on *UMG Recordings, Inc. v. Bright House Networks, LLC*, where a district court in Florida granted an ISP's motion to dismiss the plaintiffs' vicarious liability claim, noting that there, plaintiffs failed to allege that there was anything unique about the service which the ISP offered, where it was alleged only that the ISP "offer[ed] a conduit to the World Wide Web." (*Id.* at 10, citing 2020 WL 3957675, at *5 (M.D. Fl. July 8, 2020) (slip copy).) Altice asserts that the same is true here.

Altice maintains that, at most, Plaintiffs' allegations suggest the ability to infringe is "just an added benefit" of subscribing to Altice's services for a very small subset of people, rather than

the requisite main draw to the service. (*Id.* at 11, citing *Ellison*, 357 F.3d at 1079.) Essentially, Altice puts forth a "slippery slope" argument, contending that the imposition of liability here would read "direct" out of the "direct financial benefit" requirement, thereby creating liability risk for every ISP. (*See id.* at 10–11, citing *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) *adopted by* 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018); *Bright House*, 2020 WL 3957675, at *4.)

The Motion next addresses two additional arguments by Plaintiffs that Altice receives a direct financial benefit from the infringing activity. First, the complaint alleges that Altice's advertising and marketing of its high-speed internet services served as a draw for prospective infringing subscribers. Altice contends this fails to establish direct financial benefit because Plaintiffs do not actually say that subscribers chose these subscriptions because of an enhanced ability to infringe. (*Id.* at 11–12, citing Dkt. No. 1, ¶¶ 15, 32, 37.) Second, the complaint also asserts that Altice's failure to police infringing subscribers purposefully attracted such subscribers. Altice says this similarly fails. (*Id.* at 12–13.) It insists this theory would require a "lengthy chain of inferences" to achieve plausibility—that Altice loosely policed its network, that subscribers knew about the lack of policing, and then chose Altice because of it. (*Id.* at 13.)

Altice generally complains of a lack of specificity in the complaint. (*See id.* at 14–15.) It argues that Plaintiffs failed to allege that any of the infringing subscribers using Altice's services did so to infringe Plaintiffs' works in particular or that the drawn subscribers were the ones who actually infringed. (*Id.*) In sum, Altice argues that Plaintiffs failed to allege that subscribers actually chose its internet services over others because of an enhanced ability to infringe, and that Plaintiffs' allegations fail to meet the pleading standard as a result. (*See id.* at 12, 16.)

Plaintiffs respond that they have met their burden at the pleading stage—they have alleged that Altice gained subscribers due to the ease of infringement using Altice and that Altice would have lost subscribers if it had conducted its affairs so as to prevent infringement, or at least make it difficult. (Dkt. No. 23 at 17, citing, *e.g.*, Dkt. No. 1, ¶ 37.) They argue that Altice proffers incorrect, heightened causal nexus theories, and that Plaintiffs' allegations are sufficient to meet the applicable standard.

Plaintiffs rely on *Fonovisa Inc. v. Cherry Auction, Inc.* to support their argument that Altice's "heightened direct causality" standard is incorrect. (*See id.* at 13–14, citing 76 F.3d 259 (9th Cir. 1996).) In *Fonovisa*, the defendant operated a "swap meet" where vendors sold merchandise of varying types, including counterfeit copies of music recordings owned by the plaintiff. *Fonovisa*, 76 F.3d at 261. The trial court found that the plaintiff failed to plausibly allege a direct financial benefit. *Id.* The Ninth Circuit reversed, holding that the plaintiff sufficiently pled direct financial benefit where it alleged facts showing that "the defendants reap[ed] substantial financial benefits from admission fees, concession stand sales and parking fees, all of which *flow directly from* customers who want to buy the counterfeit recordings at bargain basement prices." *Id.*, at 263 (emphasis added). As Plaintiffs correctly point out, it did not matter in *Fonovisa* that all attendees of the swap-meet paid the same fees and expenses—whether or not they purchased infringing goods. (*Id.* at 14.)

The *Fonovisa* Court addressed the "draw" standard, holding that the direct financial benefit standard has been met where infringing performances enhanced the attractiveness of the venue to potential customers. *Id.* (internal citations omitted).  The sale of pirated recordings at the swap-meet was a "draw" for customers, as they "enhance[d] the attractiveness" of attending the swap-meet to potential customers. *See id.* at 263–64. Nowhere does *Fonovisa* indicate that the infringing

6

activity must be the "main" draw for direct financial benefit to result. *See id*. Further, Plaintiffs attack Altice's interpretation of *Ellison* as overstated.[1] As Plaintiffs point out, the *Ellison* Court held only that there was no evidence that the infringing content helped attract or retain subscriptions; it did not hold that the availability of infringement must be the primary draw for customers. (*Id.* at 16.)

While Plaintiffs acknowledge that some case law does support Altice's "main draw" standard, they argue that "the limited authorities Altice cites" for this heightened standard "do not displace the thrust of authority against it." (*Id.* at 17.) *See Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001); *Sony Discos*, 2010 WL 1270342, at *4; *Bright House*, 2020 WL 3957675, at *3. Plaintiffs contend that *Adobe* added the word "main" to the standard without citation or any supportive analysis, and that *Sony Discos* "simply recited *Adobe*, again without analysis."[2] (*Id.*) Lastly, Plaintiffs argue that *Bright House* suffers from similar flaws—they contend that the *Bright House* Court misinterpreted *Fonovisa* to require admission fees to be driven primarily by the availability of infringing content. (*Id.*, citing 2020 WL 3957675, at *3.) Plaintiffs maintain that *Fonovisa* and *Playboy Enterprises v. Webbworld, Inc.*[3] rejected such a strict definition of direct financial benefit, and that *Bright House* simply ignored the reasoning of those decisions. (*Id.* at 18.)

Plaintiffs argue that Altice improperly attempts to elevate the pleading standard by arguing that Plaintiffs must plead that the individuals who actually committed the infringing acts were also

---

[1] Namely, that *Ellison* held that a claim for financial benefit grounded in a one-time set-up fee and flat periodic payments for a service by infringers only amounts to a direct financial benefit where the availability of infringing materials is the sole or main draw to the service. (*Id.* at 15, citing Dkt. No. 22 at 8.)

[2] Plaintiffs also argue that *Ellison* rejected a substantiality threshold for a draw, and that because *Ellison* was decided after *Fonovisa* but before *Adobe*, it overrode *Adobe* to the extent that case required a "main" draw. (Dkt. No. 23 at 17.)

[3] The *Webbworld* Court noted that *Fonovisa*'s reasoning applied to that case, "in which plaintiff's photographs *enhanced the attractiveness* of the [Defendant's] website to potential customers." 968 F. Supp. 1171, 1177 (N.D. Tex. 1997) (emphasis added).

drawn to the services by that prospect. Plaintiffs argue that *Fonovisa* rejected that position, intentionally declining to require that the plaintiff "directly tie[] the sale of particular infringing items" to the financial benefit. (*Id.* at 20–21, citing 76 F.3d at 263.) To provide some specific context, Plaintiffs have "alleged that Altice received more than a million notices of infringement of Plaintiffs' copyrighted works and derived financial benefit attributable to that infringing activity." (*Id.* at 21, citing Dkt. No. 1, ¶¶ 9, 36–49.) They contend that is adequate to state a plausible claim for vicarious liability.[4] (*Id.*) Lastly, Plaintiffs point out that they did allege— contrary to Altice's assertion—that that the direct infringement at issue was committed by Altice's subscribers, as opposed to others who use Altice's services. (*Id.* at 21–22, citing Dkt. No. 1, ¶¶ 34, 36–37.)

The Court finds that Plaintiffs have met their burden to sufficiently allege direct financial benefit. As made clear by the Ninth Circuit, the central inquiry "is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison*, 357 F.3d at 1079. Plaintiffs' complaint alleges the following: Altice is incentivized to tolerate and foster music piracy and the infringement it facilitates is profitable (Dkt. No. 1, ¶¶ 10, 31–33, 37, 49–51, 66); Altice receives monthly fees from its subscribers (*id.*, ¶ 66); if Altice terminated subscriptions of repeat infringers, it would have lost revenue from those ongoing subscription fees (*id.*, ¶ 37); had Altice exercised some of its authority to limit or terminate service for infringers, its services would be less attractive to prospective infringing customers (*id.*, ¶¶ 37, 49); and Altice marketed and offered tiered pricing schemes providing faster access to customers who pay more,

---

[4] Plaintiffs distinguish Altice's proffered authority for the proposition that the "draw" allegations must be tied to the specific infringement at issue in this case. (*See* Dkt. No. 22 at 14; *see also* Dkt. No. 23 at 21.) In *Perfect 10, Inc. v. Giganews, Inc.*, the district court held that evidence attributable to infringement of other people's works was insufficient to establish a material benefit attributable to the infringing activity at issue, and the Ninth Circuit affirmed. 2014 WL 8628031, at *4 (C.D. Cal. Nov. 14, 2014), *aff'd*, 847 F.3d 657. Plaintiffs explain that here, they have alleged infringement of *Plaintiffs'* copyrighted works. (Dkt. No. 23 at 21.)

which is more attractive to music pirates (*id.*, ¶¶ 8, 31–32). These factual allegations, which must be taken as true at the 12(b)(6) stage, adequately demonstrate a causal nexus between the infringing activity and the alleged financial benefit gained by Altice in this case.

Additionally, the Court is persuaded by Plaintiffs' characterization of the case law discussing the "draw" requirement. While some decisions cited by Altice (principally trial courts) suggest that the availability of services to infringe must be the main draw, the majority of case law cited by the parties—including circuit court guidance—does not support this proposition.[5] As detailed above, Plaintiffs have alleged that Altice received a direct financial benefit through retention of the accounts of infringing subscribers from which it was paid monthly subscription fees. Plaintiffs have additionally alleged that Altice's marketing scheme and failure to police its infringing subscribers was uniquely appealing to music pirates, constituting a draw to those seeking to infringe music copyrights.

The allegations in the complaint, taken as true, plausibly allege a causal connection between the infringing activity via Altice's services and a financial benefit to Altice. Plaintiffs' complaint sufficiently demonstrates how Altice's marketing practices and lack of policing "enhanced the attractiveness" of Altice's services. *See Playboy Enterprises*, 968 F. Supp. at 1178; *see also Fonovisa*, 76 F.3d at 263. Similarly unavailing are Altice's arguments that Plaintiffs failed to tie the alleged direct infringers to their "draw" allegations, or to properly allege that the direct infringers were actual subscribers of Altice's services. Plaintiffs' complaint does allege that Altice's subscribers were the direct infringers (*see, e.g.,* Dkt. No. 1, ¶ 37 ("serially infringing

---

[5] *See, e.g.*, *Fonovisa*, 76 F.3d at 264 – 65 ("[T]he sale of pirate recordings at the Cherry Auction swap meet is *a 'draw'* for customers, as was the performance of pirated music in the dance hall cases and their progeny.") (emphasis added); *Ellison*, 357 F.3d at 1078–79; *Webbworld*, 968 F. Supp. at 1177 ("[T]he Ninth Circuit found it sufficient that the infringing materials *likely enhanced* the swap meet for its customers. The Ninth Circuit's reasoning applies as well to this case…") (emphasis added).

subscribers").) The complaint further alleges that subscribers were "drawn" to Altice's services. (*Id.*, ¶ 66.) That is sufficient at this stage. A careful reading of Altice's Motion makes it clear that the complaint was more than sufficient to inform Altice and put it on reasonable notice of Plaintiffs' underlying claims.

The Court does not find that a denial of the Motion would lead to imposition of liability "on every ISP," as Altice implies. (*See* Dkt. No. 22 at 10–11, citing *UMG Recordings*, 2018 WL 1096871, at *10.) Taking the allegations in the complaint as true, Altice is not simply providing internet services. It is directly profiting from the retention of accounts which are used for music piracy. Subscribers were drawn to Altice's services both because of lax policing of such piracy as well as faster internet speed for those willing to pay more. (*See* Dkt. No. 23 at 20 n.10.) Plaintiffs have met their burden to plausibly allege direct financial benefit.

### ii.      Right to Supervise and Control Infringing Activity

Altice contends that the vicarious liability claim fails because Plaintiffs did not adequately allege that Altice has the right and ability to supervise and control its subscribers' alleged infringing activity. (Dkt. No. 22 at 16.) It asserts that under the requisite standard of control for a vicarious liability claim, where a defendant "has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so," Plaintiffs' allegations are insufficient. (*Id.*, quoting *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1173 (9th Cir. 2007).) Altice insists that the notion that it has the ability to police the conduct of its subscribers is "flatly implausible" as it does not control the internet nor its user's devices. (*See id.* at 16–17, 20.)

Altice says the only theory of control provided by Plaintiffs is a "termination theory of control"—i.e., that Altice can supervise and control its subscribers' conduct by terminating their accounts, *after* infringement has occurred. (*Id.* at 17, 20, citing Dkt. No. 1, ¶¶ 65, 10, 37, 46, 49.)

Altice then says, however, that "termination is not control." (*Id.* at 17.) Relying on *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, Altice argues that "[i]n the first place, '[e]ven though' a defendant may 'have the right to refuse their services, and hence the literal power to stop or limit the infringement'—that is, terminate access—that power does not signify 'sufficient control over the actual infringing activity for vicarious liability to attach.'" (*Id.*, quoting 494 F.3d 788, 806 (9th Cir. 2007).)

Altice claims that Plaintiffs incorrectly rely on cases holding that "the contractual right to condition the availability of the internet" is enough to establish the requisite control. (*Id.*, quoting *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015).) Altice asserts, under *Visa*, that contractual terms which give the defendant a right to deny service do not amount to the power to stop infringement. (*Id.* at 17–18, citing 494 F.3d at 804.) Altice argues that the pertinent inquiry is whether the defendant has the right and ability to control the infringing activity itself, rather than to control its own system. (*Id.* at 18, citing *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008).)

Plaintiffs respond that while Altice "pays proper lip service" to the correct standard, Altice incorrectly insists that vicarious liability can only exist where the defendant can actively police or monitor the tortious conduct. (Dkt. No. 23 at 7, citing Dkt. No. 22 at 16–19.) Plaintiffs argue that the "active policing" theory has been squarely rejected, maintaining that "the defendant must only exercise the ability to 'stop or limit the direct infringing conduct.'" (*Id.*, quoting *Warner Records Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1078–79 (D. Colo. 2020) (citing cases).)

Plaintiffs point to authority that "'[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise.'" (*Id.* at 6, quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (citing *Fonovisa*,

76 F.3d at 262).) They contend that the complaint, which alleges that Altice had the right and ability to prevent or limit infringements using its services by virtue of its terms of service and acceptable use policies, more than satisfies the supervision and control standard at the pleading stage. (*See id.*, citing Dkt. No. 1, ¶ 46.) The complaint further alleges that Altice retained broad rights to discipline users of its services, which Altice could exercise in the case of a subscriber's copyright infringement, and further, that Altice has sophisticated mechanisms to detect such abuses by its subscribers. (Dkt. No. 1, ¶¶ 33, 35–36, 46.)

In Plaintiffs' view, Altice's contention misses the point and is legally incorrect. (*See id.* at 8.) First, Plaintiffs point out that Altice's policies give it broad authority over the use of its services, termination being just one method. (*Id.*, citing Dkt. No. 1, ¶¶ 35, 46.) Plaintiffs contend that *Visa* draws a clear distinction between a defendant's ability to make infringement *unprofitable* and a defendant's ability to *prevent* distribution of infringing material outright. (*Id.* at 8–9, citing *Visa*, 494 F.3d at 806) (emphasis added.)

In *Visa*, the plaintiffs argued that defendants, which were credit card companies that had processed payments for websites hosting infringing images, had the requisite control because they could make it impossible for a website selling infringing materials "to compete and operate at a profit" by terminating the website's payment-processing account. *Visa*, 494 F.3d at 805. Indeed, the Ninth Circuit held that the plaintiffs failed to state a claim for vicarious liability because it "conflate[d] the power to stop profiteering with the right and ability to control infringement," explaining:

> [Plaintiff's] allegations do not establish that Defendants have the authority to prevent theft or alteration of the copyrighted images, remove infringing material from those websites or prevent its distribution over the internet. Rather, they merely state that this infringing material could not be profitable without access to Defendants' credit card payment systems.

*Id.* at 806. *Visa* does not stand for the proposition that a right to refuse services can never support a claim for vicarious infringement. (*See id.* at 8.) Plaintiffs assert—and the Court agrees—that the present case falls within the distinction recognized by the *Visa* Court, that being where a defendant has the authority to prevent distribution of infringing material over the internet. (*Id.*)

Plaintiffs also address Altice's reliance on both *Perfect 10 v. Amazon* and *Io Group, Inc. v. Veoh Networks, Inc.* (*Id.* at 9–10, citing *Amazon*, 508 F.3d 1146 (9th Cir. 2007); *Io Group*, 586 F. Supp. 1132 (N.D. Cal. 2008.) The holding of *Amazon*, Plaintiffs argue, is irrelevant here—the complaint in this case "amply alleges that Altice *has already* implemented specific measures by which it *can* prevent infringement" (*id.* at 9, citing Dkt. No. 1, ¶ 46), whereas *Amazon* held that the defendant's *capacity to change* its operations to avoid facilitating infringement was too imprecise and overbroad to constitute control. (*Id.*, citing *Amazon*, 508 F.3d at 1174) (emphasis added.) Plaintiffs urge that Altice's reliance on *Io Group* is similarly misplaced; there, on a summary judgment record, the court pointed out that the defendant "had taken steps to reduce, not foster" infringement. (*Id.* at 10, quoting 586 F. Supp. at 1154.) Here, the complaint alleges that Altice's actions and inaction have fostered infringement. (*Id.*, citing Dkt. No. 1, ¶¶ 47, 50.)

In reply, Altice emphasizes that termination of subscriptions after-the-fact would not stop the complained of infringing activity because the Plaintiffs' notices of infringement are "alleged evidence of *past* acts of infringement" that "do not somehow confer on Altice the technical ability to control or supervise its subscribers' *ongoing or future behavior*." (Dkt. No. 24. at 6.) Altice further argues that its ability to revoke internet access cannot impact a direct infringer's decision to share such content on his or her own device. (*Id.* at 7.) On the other hand, Plaintiffs explain that they do not allege nor seek to hold Altice liable for infringement on the internet as a whole— rather, they complain of direct infringers "using Altice's services to share infringing files using a

particular, decentralized protocol fine-tuned to facilitate rapid, mass-scale file sharing, including piracy." (Dkt. No. 30 at 5, citing Dkt. No. 1, ¶¶ 3–4, 31.) Addressing Altice's argument that it cannot stop past infringement, Plaintiffs explain that "[a]s alleged in the complaint, Altice has allowed subscribers to infringe persistently" for long periods of time, and could have prevented infringement had it exercised control to stop such activity. (*Id.* at 7, citing Dkt. No. 1, ¶¶ 10, 44.)

The Court finds that Plaintiffs have adequately alleged that Altice has the authority to supervise or control the infringing activity. The Court is not persuaded by Altice's argument that the contractual right to condition the availability of the internet is never enough to plausibly allege supervision or control over infringing conduct. As demonstrated by the case law and explained below, Plaintiffs' termination theory of control is sufficient.

In *UMG Recordings, Inc. v. Grande Commn's Networks, LLC,* the district court granted the defendant ISP's motion to dismiss the plaintiffs' vicarious infringement claims, finding that the plaintiffs failed to plausibly allege direct financial benefit. 2018 WL 1096871, at *10. However, the *UMG Recordings* Court first addressed the ISP's argument based on the right and ability to supervise or control element, wherein the ISP made essentially the same arguments proffered by Altice here:

> Grande asserts that because it cannot block access to the peer-to-peer software used to infringe the copyrights here, it cannot stop or limit the infringing conduct taking place by its subscribers. Additionally, Grande argues that, even if it terminates subscribers, such action will only indirectly affect the infringing conduct, as Internet access is ubiquitous, and the subscribers can simply obtain the service from another ISP. The Court disagrees. Grande can stop or limit the infringing conduct by terminating its subscribers' internet access. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015), *reversed on other grounds*, 881 F.3d 293 (4th Cir. 2018). This is clearly sufficient to state a claim on the first element of vicarious liability.

*Id.* Further, in *BMG Rights Management*, that court found that a defendant ISP had "the contractual right to condition the availability of its internet access to users who do not use that service to

14

violate copyrights. If users listen when Cox [the ISP] exercises that power, infringement stops. If users do not and Cox terminates them, that also stops or at least limits infringement." 149 F. Supp. at 674. In *Warner Records Inc. v. Charter Communications, Inc.*, the court found—under facts similar to *UMG Recordings* and *BMG Rights Management*—that where plaintiffs alleged that defendant's policies expressly prohibited copyright infringement, reserved the right to terminate users' accounts for participating in privacy, and plaintiffs provided defendants with "hundreds of thousands" of notices of infringement, the plaintiffs had plausibly alleged the right to control element. 454 F.Supp.3d 1069, 1086 (D. Colo. 2020). The Court finds *UMG Recordings*, *BMG Rights Management*, and *Warner Records* persuasive on this point.

"[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). In the present case, the complaint alleges:

> During all pertinent times, Altice had the full right and ability to prevent or limit the infringements using its services. Under Altice's terms of service and acceptable use policies, which its subscribers agreed to as a condition of using its internet services, Altice was empowered to exercise its right and ability to terminate a customer's internet access. Altice could do so for a variety of reasons, including a subscriber's copyright infringement activity. Despite these stated policies and despite receiving over one million infringement notices concerning Plaintiffs' works, not to mention the untold numbers of similar notices regarding other copyright owners, Altice knowingly permitted repeat infringers to continue to use its services to infringe.

(Dkt. No. 1, ¶¶ 46–47.) At the pleading stage, the foregoing sufficiently alleges that Altice had the requisite ability to supervise and control the infringing conduct.

**B.  Contributory Infringement Claim**

Altice argues that Plaintiffs additionally failed to state a contributory infringement claim because they did not plausibly allege that Altice acted with culpable intent, which Altice contends

is a required element of contributory infringement liability. (Dkt. No. 22 at 21.) The Court finds that Plaintiffs plausibly alleged contributory infringement.

"A party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Altice urges that in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, the Supreme Court clarified that culpable intent is a required element under each theory of contributory infringement. (*See id.* at 22 (citing 545 U.S. 913, 930 (2005).) Altice's argument relies on the statement in *Grokster* that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." (Dkt. No. 22 at 22, quoting *Grokster*, 545 U.S. at 930.) Altice asserts that this statement "reconciles a line of common-law contributory copyright infringement decisions with both the Supreme Court's previous *Sony* decision and the line of closely related patent cases that informed *Sony*"—in other words, Altice argues that this sentence clarifies intent as a bedrock requirement of contributory infringement.[6] (*See id.*)

Altice notes that where evidence of direct intent is lacking, there must be a sufficient basis to impute intent. (*Id.*, citing *Grokster*, 545 U.S. at 934.) However, it argues, the Supreme Court's bright-line rule from *Sony* applies to prevent imputation of intent where—as here—the defendant's service is capable of substantial, noninfringing uses. (*Id.*, citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984).)

---

[6] Altice notes that the Supreme Court subsequently made clear in the *patent* context that inducement and contributory infringement require intent and knowledge, arguing that this holding "further underscore[es] the general applicability of the intent requirement." (Dkt. No. 22 at 23, citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 763, 760, 765 (2011).) In response, Plaintiffs contend that Altice's reliance is misplaced because *Grokster* made clear that it did not disturb the doctrines of contributory liability in copyright law, "and these subsequent patent law decisions did not hold otherwise." (Dkt. No. 23 at 26–27, citing 545 U.S. at 931, 934–35.)

Alice asserts that Plaintiffs have failed to plausibly allege any of the available contributory infringement theories. (*Id.* at 21–22.) First, Altice contends that Plaintiffs simply do not plead an inducement theory, reasoning that Plaintiffs' perfunctory argument that Altice "induced and encouraged…infringers" by "creating a safe haven for infringement" (Dkt. No. 24 at 7, citing Dkt. No. 23 at 30) is insufficient under *Grokster*, which requires that active steps be taken to direct infringement under an inducement theory. (*Id.* at 7 n.2, citing *Grokster*, 545 U.S. at 936.) Second, Altice contends that Plaintiffs have not (and cannot) show that culpable intent can be imputed on a material contribution theory from the nature of the service because that theory is unavailable where the service is capable of substantial noninfringing uses. (*See* Dkt. No. 24 at 7–8.)

Altice contends that Plaintiffs' "single conclusory statement" that Altice "acted affirmatively to…encourage" (Dkt. No. 1, ¶ 54) infringement fails under *Twombly/Iqbal*. (Dkt. No. 22 at 24–25.) It also argues that this threadbare allegation is undermined by Plaintiffs' admission that third parties were encouraged to infringe by Altice's subscribers, rather than by Altice itself. (*See id.* at 25.) Under *Sony* and *Grokster*, Altice contends, supplying the means to accomplish an infringing activity is insufficient to establish contributory infringement because Altice's internet service "is unquestionably capable of substantial lawful use." (*Id.*, citing *Sony*, 464 U.S. at 436; *Grokster*, 545 U.S. at 933.) Altice argues that Plaintiffs have only alleged that Altice had knowledge of the infringing conduct and failed to terminate the accounts of such infringers, which falls well short of stating a claim for contributory infringement. (*Id.* at 24.)

Instead, Altice contends that the mere ability to terminate service cannot support liability because providing uninterrupted services to customers is an "ordinary act[] incident to product distribution," and contributory infringement liability will not lie based only on a failure to take affirmative steps to prevent infringement if the service was capable of substantial noninfringing

uses. [7] (*Id.*, citing *Grokster*, 545 U.S. 937, 939 n.12.) Altice further contends that even if actual knowledge of infringement sufficed to impose liability, Plaintiffs do not meet their burden because the notices of infringement were unverified and unverifiable—it reasons that these notices of past infringement could not put it on notice of hypothetical future infringements. (*Id.* at 28.)

In response, Plaintiffs assert that they have sufficiently pled both that Altice's provision of internet services materially contributed to the direct infringement and induced and encouraged such infringement. (Dkt. No. 23 at 29.) Plaintiffs argue that *Grokster* was an inducement case, and that the sentence upon which Altice relies—that "one infringes contributorily by intentionally inducing or encouraging direct infringement"—is a recitation of a sufficient condition to establishing liability, rather than the only viable theory. (*Id.* at 23.) For support, Plaintiffs point to numerous decisions in which courts have determined that *Grokster* "did not suggest that a court must find inducement to impose contributory liability under common law principles." *See, e.g., Perfect 10 v. Amazon*, 508 F.3d at 1170 n.11; *UMG Recordings*, 384 F. Supp. 3d at 766–67.

Plaintiffs urge that *Grokster* and *Sony* did not establish culpable intent as an element of each theory of contributory infringement, which they contend would essentially eliminate contributory infringement liability for the distribution of products with substantial noninfringing uses. (*Id.* at 25.) Plaintiffs recognize that contributory liability is not available "where a manufacturer's generalized knowledge of the possibility that a product with substantial non-infringing uses could be used to infringe." (*Id.*, citing *Sony*, 464 U.S. at 439–42.) However, they argue that there was an important distinction drawn in *Sony* which was recognized in *Grokster*—there was no ongoing relationship between the defendant VCR manufacturer and the direct

---

[7] Altice contends that Plaintiffs have misapplied the Digital Millennium Copyright Act ("DMCA"), which Altice argues creates a safe harbor for ISPs when they meet certain requirements, rather than imposing liability. (Dkt. No. 22 at 27, citing Dkt. No. 1, ¶ 10.) The Court notes that nowhere in the complaint do Plaintiffs reference the DMCA.

infringers in *Sony*. (*Id.*, citing *Sony*, 464 U.S. at 439.) Plaintiffs note that *Sony* itself distinguished cases "involving an ongoing relationship between the direct infringer and the contributory infringer at the time the infringing conduct occurred." (*Id.* at 25–26, citing 464 U.S. at 437.) Further, *Grokster* expressly noted that *Sony* "did not displace other theories of secondary liability." *Grokster*, 545 U.S. at 934.

Plaintiffs argue that this case is nothing like *Sony* or *Grokster*; rather, it squarely falls within those cases where there is an ongoing relationship between the alleged direct and contributory infringers at the time of infringement. (*Id.* at 26.) Instead of contending that Altice has generalized knowledge of the use of its services for piracy, Plaintiffs' complaint alleges that "Altice provides an ongoing service to infringers contingent upon terms and conditions and an acceptable use policy, and it continues to provide the service to those very same infringers, even after it learns of the infringement." (*Id.*, citing Dkt. No. 1, ¶ 46.) Plaintiffs rely on multiple decisions where courts have distinguished *Grokster* and *Sony* based on such an ongoing relationship.[8] Plaintiffs contend that under such circumstances, Altice's ongoing provision of services to known infringers is knowledge that the infringers would use the services to continue to infringe, and that this knowledge is sufficient for purposes of contributory infringement. (*Id.*) Plaintiffs further contend that "neither *Sony* nor *Grokster* bars contributory liability premised on knowledge of specific instances of infringement combined with material contribution." (*Id.* at 27.)

Plaintiffs argue that the "knowledge element" of contributory infringement is satisfied by either actual knowledge or willful blindness, and contend that the allegations in the complaint are more than sufficient to put Altice on notice of both. (*See id.*, citing *e.g., R A Guthrie Co., Inc. v.*

---

[8] *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Comm'ns, Inc.*, 881 F.3d 293, (4th Cir. 2018) (distinguished one-off sales of VCRs in Sony from providing continued VCR leasing service); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *8–9 (D.N.J. Aug. 31, 2020) (infringement in *Sony* was "markedly different from the use of BitTorrent protocols that is alleged here").

*Boparai*, 2021 WL 1148957, at *6 (E.D. Tex. Mar. 1, 2021), *BMG Rts. Mgmt. (US) LLC v. Cox Comm'ns, Inc.*, 881 F.3d 293, 308 (4th Cir. 2018).) In the complaint, Plaintiffs allege that: Altice received millions of notices detailing specific acts of direct infringement (Dkt. No. 1, ¶¶ 39, 55); each notice included the title and artist of the infringing work, the unique IP address of the customer, the "port" used to communicate via BitTorrent protocol, and date and time of the infringement (*id.*, ¶¶ 34, 40–41); the infringers were "chronic and repeat infringers" persistently infringing over time (*id.*, ¶¶ 42–43); and Altice had the ability to identify which subscription was used to commit the direct infringement in each notice (*id.*, ¶ 40.)  Further, the complaint alleges that Altice willfully avoided knowledge of infringement. (*Id.*, ¶¶ 45, 47, 52, 56.)

As Plaintiffs correctly note, multiple courts have determined that allegations of knowledge of infringement based on infringement notices sent to ISPs were sufficient to support a contributory infringement claim. (Dkt. No. 23 at 28, citing *UMG Recordings, Inc. v. RCN Telecom Servs., LLLC*, 2020 WL 5204067, at *8 (D.N.J. Aug. 31, 2020); *UMG Recordings,* 384 F. Supp. 3d at 768; *BMG Rights Mgmt.*, 881 F.3d at 307–08; *After II Movie, LLC v. Grande Commc'ns Networks, LLC*, 2023 WL 1422808, at *5–6 (W.D. Tex. Jan. 31, 2023).) Plaintiffs argue that Altice's contentions that the notices were unverified and unverifiable is a factual dispute that is irrelevant, especially at the pleading stage. (*Id.*, citing *RCN*, 2020 WL 5204067, at *8 (internal citations omitted).)

Plaintiffs assert that they have plausibly alleged both material contribution and inducement and encouragement. They point to the complaint, which alleges that Altice acted affirmatively to cause or materially contribute to its customers' infringement with knowledge of each customer's ongoing infringement, and that it continued to provide the necessary means for such infringement despite its knowledge. (*Id.* at 29, citing Dkt. No. 1, ¶¶ 45–52, 54–55.) Further, the complaint

contains allegations that Altice, by creating a safe haven for infringement, induced and encouraged existing and prospective infringers to purchase and use Altice's services for such infringing uses. (*Id.*, citing Dkt. No. 1, ¶¶ 49–50, 54.)

The Court agrees that the allegations in the complaint properly set forth a claim for contributory infringement. The Court is not persuaded that culpable intent is a mandatory requirement for any theory of contributory infringement. The reasoning in *UMG Recordings* is instructive. *See* 384 F. Supp. 3d 743 (W.D. Tex. 2019). In that case—as here—record companies brought a contributory infringement action against an ISP on the basis that it continued to provide services to customers who repeatedly infringed music copyrights in the face of over a million infringement notices. *Id.* at 751–52. The ISP moved for summary judgment, contending that there was no recognized independent contributory liability theory of material contribution; it further argued that even if there was, there was no evidence it had actual knowledge of direct infringement by its customers. *Id.*

In denying the summary judgment motion, the court directly addressed the statement in *Grokster* that Altice relies on here, explaining that *Grokster*'s expression that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement," 545 U.S. at 914, "should not be taken as writing out of the law liability based on material contribution." *UMG Recordings*, 384 F. Supp. 3d at 766–67. Rather, the *Grokster* Court was clear that liability for contributory infringement must still analyzed by applying the "rules of fault-based liability derived from the common law"—in other words, this statement was a "simple restatement of the same principles of liability found in *Gershwin*" that "one who with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another" contributorily

infringes.[9] *See id.* (citing *Grokster*, 545 U.S. at 934–35; *Gershwin Pub. Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

While the *UMG Recordings* Court recognized that mere generalized knowledge is not enough to impose contributory liability, it agreed with the Fourth Circuit that "when a person sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights…the seller intends to cause infringement." *Id.* (quoting *BMG Rights Management (US) LLC v. Cox Comm'ns, Inc.*, 881 F.3d 293, 311 (4th Cir. 2018) (emphasis in original). There, the court referenced the common law rule that if a person knows that consequences are certain or substantially certain to result, and still goes ahead, he is treated by the law as if he in fact desired that result. *Id.* at 767–78 (citing Restatement (Second) of Torts § 8A cmt. b (1965)). It also addressed the argument that the plaintiffs' theory of liability was imposing a duty to act on the ISP through account termination, finding that this was not a case of a refusal to act; rather, "[the ISP] *acted affirmatively* by continuing to sell internet services and continuing to provide internet access to infringing customers." *Id.* at 767 (emphasis added).

Synthesizing these principles into a rule of liability, the *UMG Recordings* Court held that service providers can be held contributorily liable if they have actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damages to copyrighted works, yet continue to provide access to infringing works. *Id.* at 768 (citing *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007)). It also found that the ISP had at least one simple measure available to it—account termination. *Id.* Based in large part

---

[9] Far from "simply ignoring *Grokster*" (Dkt. No. 22 at 27), the *UMG Recordings* Court discussed and incorporated Grokster into its analysis, finding that under facts on all fours with those in this case, plaintiffs' contributory infringement claim survived at the summary judgment stage.

on the receipt of the infringement notices, the Court held there was an existing question of fact regarding whether the ISP had the requisite actual knowledge of the infringement. *Id.*

This Court agrees with the reasoning in *UMG Recordings*. This is especially true at the pleading stage, where all factual allegations in the complaint must be taken as true. Here, Plaintiffs' complaint alleges that Altice "had actual and ongoing specific knowledge" of the repeated infringing conduct of its customers (Dkt. No. 1, ¶ 51); it "deliberately turned a blind eye to its subscribers' infringement" (*id.*, ¶ 10); Altice "encouraged" further infringement (*id.*, ¶ 50); and that by failing to terminate known repeat infringers, Altice acted affirmatively to facilitate, encourage, and materially contribute to" infringement (*id.*, ¶ 54). These allegations, together with others noted above and referenced in the Plaintiffs' argument, are clearly sufficient to properly state a claim for contributory infringement.

## IV.   CONCLUSION

For the foregoing reasons, Altice's Motion to Dismiss is **DENIED**.

**So ORDERED and SIGNED this 12th day of May, 2023.**


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE