```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                             MARSHALL DIVISION

3    BMG RIGHTS MANAGEMENT (US),    (  CAUSE NO. 2:22-CV-471-JRG
     LLC., et al.,                  )
4                                   (
              Plaintiffs,           )
5                                   (
     vs.                            )
6                                   (
     ALTICE USA, INC., et al.,      )  MARSHALL, TEXAS
7                                   (  APRIL 12, 2024
              Defendants.           )  2:00 P.M.
8    _____

9

10

11   _____

12                          MOTION HEARING

13            BEFORE THE HONORABLE RODNEY GILSTRAP
                 UNITED STATES CHIEF DISTRICT JUDGE

14   _____

15

16

17

18

19

20

21

22                     SHAWN McROBERTS, RMR, CRR
                          100 E. HOUSTON STREET
23                     MARSHALL, TEXAS  75670
                           (903) 923-8546
24             shawn_mcroberts@txed.uscourts.gov

25
```

```
 1                        A P P E A R A N C E S

 2       FOR THE PLAINTIFFS:    STEPTOE, LLP
                                1330 CONNECTICUT AVE, NW
 3                              WASHINGTON, DC 20036
                                (202) 429-6749
 4                              BY: MR. MICHAEL ALLAN
                                    MR. JOHN CARACAPPA
 5
                                STEPTOE, LLP
 6                              227 WEST MONROE, SUITE 4700
                                CHICAGO, ILLINOIS  60603
 7                              (312) 577-1283
                                BY:  MR. JOHN BYRON
 8
                                THE DAVIS FIRM, PC - LONGVIEW
 9                              213 NORTH FREDONIA STREET
                                SUITE 230
10                              LONGVIEW, TEXAS  75601
                                (903) 230-9090
11                              BY:  MR. BO DAVIS
                                     MR. RUDY FINK
12
         FOR THE DEFENDANTS:    WINSTON & STRAWN/CHICAGO
13                              200 PARK AVENUE
                                NEW YORK, NEW YORK  10166
14                              (212) 294-6729
                                BY:  MR. MICHAEL ELKIN
15                                   MR. KRISHNAN PADMANABHAN
                                     MR. SEAN ANDERSON
16
                                WARD, SMITH & HILL, PLLC
17                              1507 BILL OWENS PARKWAY
                                LONGVIEW, TEXAS  75604
18                              (903) 757-6400
                                BY:  MS. CLAIRE HENRY
19
         OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
20                              100 E. HOUSTON STREET
                                MARSHALL, TEXAS  75670
21                              (903) 923-8546

22

23

24

25
```

1          THE COURT:  Be seated, please.

2      All right.  This is the time set for various motion

3  practice before the Court in the matter of BMG, et al., versus

4  Altice, et al., Case No. 2:22-CV-471.

5      Let me ask for announcements on the record at this time.

6      What says the Plaintiffs?

7          MR. FINK:  Good afternoon, Your Honor.  Rudy Fink

8  for the Plaintiffs.  I'm joined by Mr. John Byron, lead

9  counsel Mr. Mike Allan, Bo Davis, and Mr. John Caracappa.

10  And we are ready to proceed.

11          THE COURT:  Thank you.

12      What's the announcement for the Defendants?

13          MS. HENRY:  Good afternoon, Your Honor.  Claire

14  Henry for the Defendants.  I'm joined today by Michael Elkin,

15  Krishnan Padmanabhan, and Sean Anderson.  And we're ready to

16  proceed, Your Honor.

17          THE COURT:  All right.  Counsel, it's my

18  understanding that various of the matters set for today have

19  been resolved through your meet and confer efforts which have

20  been ongoing most of the day.  It would seem appropriate to me

21  that we get a recitation in the record of what's been resolved

22  so that we can then turn to what remains outstanding.

23      Have you discussed how we're going to present that?  I

24  don't care who presents it as long as the other side agrees

25  with it, but we need to get it clear in the record.

1          MR. FINK:  Your Honor, Rudy Fink.  I'll speak.

2     We have not directly talked about this with Altice, so

3     I'll let them correct me if I'm wrong.

4     We have worked together to create two joint agreed orders

5     for the Court.  My understanding is the agreed order in

6     regards to the motions that Altice has brought are now finally

7     agreed.  There's about one or two turns left on Plaintiffs'

8     motions that put all of that -- basically there's just a final

9     set of edits that we have not had time to check.  But overall

10    we prepared agreed orders for the Court's consideration.

11          THE COURT:  All right, sir.  So, in other words,

12    you're both satisfied that you know what you've agreed to, and

13    you're going to document that in the record shortly but you

14    haven't done it at this point.

15          MR. FINK:  Correct, Your Honor.

16    Absolutely for Altice's motions.  There's potentially --

17    there's a final set of revisions to be exchanged towards

18    Plaintiffs' motions.

19          THE COURT:  All right.  And does that comport with

20    Defendants' understanding of where you are?  Obviously my

21    point is I don't want to understand now that something's been

22    worked out and find out later it has not been worked out.

23          MS. HENRY:  Understood, Your Honor.  I think we have

24    a couple of edits with regard to timing that are sort of the

25    hold-up right now, a timing when things will be produced.  And

1    so we're about to send them the most recent draft that will

2    have our most recent edits.  I'm confident we can work through

3    this and -- but I don't want to hold up the hearing, but we'll

4    proceed in whatever way the Your Honor would like to.

5              THE COURT:  All right.  Well, I'm going to direct

6    the parties to continue their efforts to memorialize those

7    agreed matters that were otherwise set for today and to file

8    that memorialization on the docket as soon as it's completed,

9    and also to furnish a courtesy copy to chambers.

10       And in the meantime, we'll take up what appears to be at

11   an impasse.  And I'll trust that we don't have to double back

12   on the agreed matters at a later date, but if that happens

13   that happens.

14             MS. HENRY:  Thank you, Your Honor.

15             THE COURT:  All right.  Then with that, let's turn

16   to the matters you've identified for the Court as effectively

17   you're at an impasse on, and let's particularly focus on the

18   Plaintiffs' motion to compel material withheld on improper and

19   unsupported assertions of privilege.  That is Document

20   No. 134.

21       And let me hear from the moving Plaintiffs on this first.

22             MR. BYRON:  Your Honor, I have a slide deck that I'd

23   like to use as a demonstrative through the argument here.  Do

24   you mind if I approach the bench?

25             THE COURT:  That will be fine.

1     Let me say this.  We apparently are going to have

2 different people arguing different things, so let's everybody

3 start with identifying who you are for the record, and then

4 we'll proceed.

5          MR. BYRON:  Yes, Your Honor.  This is John Byron

6 with the Steptoe firm for the Plaintiffs.

7          THE COURT:  All right.  Let me hear your argument.

8          MR. BYRON:  You know, Your Honor, I'm always

9 reluctant to bring a motion to compel on privilege issues,

10 but really here the motion was important because Altice has

11 attempted to hold back from discovery some of the most

12 important material in the case.  I want to jump into the slide

13 deck to show you why.

14     So Altice in this case is -- it's staring at a potential

15 judgment of hundreds of millions of dollars for allowing

16 repeat infringers to run rampant on its network.  Their entire

17 defense rests on that it took reasonable steps to address

18 copyright infringement and terminate service of repeat

19 infringers.

20     To establish the safe harbor that you see on the slide 2,

21 they're going to have to tell the jury that they reasonably

22 implemented a policy providing termination of repeat

23 infringers in appropriate circumstances.  That's going to be

24 difficult in this case, Your Honor.  The discovery has shown

25 there's significant blemishes in that defense.

1       Altice not only had just one policy, it had four

2   inconsistent ones.  The only thing that was consistent about

3   those policies was their limitations.  Altice adopted business

4   rules, including grace periods and notice processing caps,

5   that allowed it to ignore millions of infringement notices.

6   It had long periods of time where no infringement notices were

7   processed, including one period that went more than one year

8   without processing.

9       If you turn to slide 3, you see Altice's evidentiary

10  plan.  The first thing they're going to do is they're going to

11  argue to the jury that they have an appropriate policy for

12  terminating repeat infringers.  When doing that, they're going

13  to try to justify their limitations in the policies, including

14  the grace periods, the notice processing caps, the numbers of

15  levels in the DMCA process, and other things.  And they're

16  also going to defend the number of policies and the times that

17  that policy changed over and over.

18      Then they're going to go to reasonable implementation.

19  They're going to try to explain away long periods of time that

20  there were notice processing gaps, one of which lasted over a

21  year.  Another which lasted approximately six months.  They're

22  also going to try to excuse deviations from the policy that

23  happened repeatedly throughout the discovery period.

24          THE COURT:  Well, rather than wander down the path

25  of what you expect they're going to try to do, why don't you

1    tell me about the documents and materials that haven't been

2    produced and why you think they should be compelled.

3              MR. BYRON:  Yes, Your Honor.

4         And I think the background I was just giving is very

5    helpful to understand at least the business issue and also the

6    safe harbor issue.

7         And I'm just going to need to get a glass of water real

8    quick, Your Honor.

9         I'm sorry, Your Honor.  My voice was cracking there.

10             THE COURT:  That's all right.

11             MR. BYRON:  Okay.  So there are three categories of

12   documents.  You'll see on slide 4 where Altice is making

13   fundamentally unfounded privilege assertions.  Right?  So

14   there is an improper privilege claim that includes documents

15   where they're withholding business and operational materials,

16   and also includes kind of your typical type materials that you

17   see parties debate in these privilege disputes; so non-lawyer

18   documents, third party documents, and other non-confidential

19   communications.

20        The second issue that we're dealing with is actually the

21   first issue in the motion, which is a sword/shield issue.  So

22   the reason I was going through the background, albeit with a

23   voice that was a little bit dry, we see in the background that

24   they're going to have this whole case about explaining why

25   they did things that resulted in ignoring millions and

1    millions of copyright infringement notices.  That's going to

2    include these justifications about the limitations, it's going

3    to include explanations about long periods of time where they

4    weren't processing notices.

5         And why is that important?  Because they're offering

6    those reasons to you at summary judgment and they'll offer

7    those reasons to the jury at trial, but what we're seeing in

8    the documents is we're seeing that the Altice folks are

9    withholding the full picture.  Right?  So we'll see some of it

10   in interrogatory responses or in corporate representative

11   testimony, but when we go to the contemporaneous record, we're

12   running into, Oh, it's privileged.

13        The last issue in the motion is Altice's unsupported

14   privilege claims.  Altice -- we identified in the motion

15   several problems with Altice's privilege log.  Altice agreed

16   to produce a new privilege log, but they have not yet done

17   that.  So we're sitting here more than a month after the

18   motion was filed, we're sitting here more than three months

19   after we raised this issue, and we still don't have an updated

20   privilege log.

21        On top of that, the Court has a pretty-established

22   process for these privilege motions.  Right?  So when a

23   privilege issue is raised, the party who is asserting the

24   privilege needs to meet its burden, and they ordinarily do

25   that through affidavit are or declaration, and we haven't seen

1    that in this case.

2         So let's go into some examples to make this a little bit

3    more concrete.  So if you go to slide 5 in the slide deck,

4    you're going to see the -- a summary of some of the improper

5    privilege claims that Altice is making in this case.  I'm

6    going to use the screen here to show you some documents and

7    show you why they're problematic.

8         So the motion had an exhibit, it had a chart in the back

9    of it, it was Exhibit 1, and there were two categories in the

10   chart.  There were the business and operational documents and

11   then there were the documents that were sort of the other

12   issues that I described.  And the business and operational

13   documents --

14        And if you want to just pull up in the Exhibit 1 here.

15        So you see it -- the business and operational documents

16   have various sort of buckets or categories.  So this was the

17   state of affairs when we filed the motion.  The state of

18   affairs has somewhat changed.  So Altice has made productions

19   of certain documents.  They made a production when they filed

20   their opposition, then they made a production on April 5th,

21   and they made another production last night at 7:30.  So we

22   have some of this stuff, but there are still categories that

23   we know are still active.  Right?  There are still categories

24   where we are at an impasse as to the privilege on certain

25   documents.

1          The first category I want to go to --

2          If you can go to the next folder.  So it's the DMCA

3     policy review, and I'll go to tab 1.

4          So I'm going to explain to you this project.  So in 2018,

5     late 2018 and early 2019, the Altice company did a study of

6     their policies.  Right?  So at that time they had two policies

7     in place.  And what happened is that the COO of the company, a

8     gentleman by the name of Hakim Boubazine.

9          Could you go to tab 1, please?

10         Okay.  So this is the -- this tab is a setup -- and Your

11    Honor, I'm sorry.  I had a document binder, but we had a bit

12    of a snafu with it, so I'm doing this with the computer.  It

13    would be preferable with the binder.  But this is what we

14    have.

15         So here we have the setup for this first example.  So

16    this is late 2018, early 2019.  There's two policies in place

17    at Altice at the time, one for Optimum and one for Suddenlink.

18    The COO comes in and says, We need to look at this.  Right?

19    His name was Hakim Boubazine.  So he orders a policy review.

20    Right?  Give me the information about the Suddenlink policy

21    and give me the information about the Optimum policy.

22         The team that he directed to do that was the customer

23    experience team, a group of business folks.  The customer

24    experience team puts together a comprehensive presentation,

25    makes the presentation to Mr. Boubazine on the 3rd of January

1  and 2019, and then Mr. Boubazine makes some comments.

2       So if we go to tab 2 in this section, you'll see that the

3  presentation here is attached to an email that a person by the

4  name of Lisa Farrell sends, who is in the customer experience

5  team, and what she's saying, Here is the final deck from that

6  presentation we gave to Mr. Boubazine.  And low and behold,

7  what do we find when we go to the attachment?  We find a

8  privilege block.

9       And if we go to tab 3--and I'm just going to move

10  quicker--if we go to tab 3, we see not only have they redacted

11  the presentation or just completely withheld it; they've also

12  redacted the notes or the comments from Mr. Boubazine after

13  the presentation.

14       When we go into the record, we don't see any evidence

15  that a lawyer drafted the presentation.  We know it was the

16  customer experience team.  We don't see any evidence that a

17  lawyer participated in the drafting of that presentation.  We

18  don't see any evidence that the lawyer presented at this

19  meeting.  There's no evidence to give any indication that this

20  is attorney/client material.

21       And this is extremely important stuff.  Not only are we

22  dealing with a review of the policies they're going to rely on

23  at summary judgment and at trial; we're dealing with the

24  development of a new policy, but we're also likely dealing

25  with some bad stuff.

1          So if you could go to tab 4 in the binder, please.

2          This is a document in tab 4 that we just got on April

3     5th.  This is after discovery.  And you'll see in this

4     document Mr. Boubazine the COO, who ostensibly takes the reins

5     of the DMCA process, he's being very critical of the policies

6     that are in place at the Altice company.

7          So if you go down to the second page, you'll see an

8     exchange between Pragash Pillai and Mr. Boubazine.  About the

9     third email up Mr. Boubazine says, "I was explicit in stating

10    that I didn't want to implement the Optimum policy," and the

11    reason was because he believed that the -- after a review,

12    that the Optimum policy was obscure, not validated, and,

13    therefore, definitely not the model to be implemented.

14         So we see stuff like this--right?--now after discovery,

15    but we have stuff still in this motion that are things that

16    kind of appear just like this--right?--but are being withheld,

17    and we don't see any basis for that happening.

18         So if we go back to the slide deck, we have these reviews

19    or these sort of reviews of the existing policies, but we also

20    have as another issue a big problem with these enforcement

21    gaps.  So I mentioned there were long periods of time where

22    the company wasn't actually applying its policy at all.

23         The first example I want to go through is in the middle

24    of page 5 on the slide deck.

25         And if we can go to tab 1 in the enforcement gap section.

1      And I'll give a little background here.  So in 2019, in

2   September of 2019, there was a migration or combination of the

3   systems, and what happened when that occurred was that there

4   was something that happened with the systems that made it so

5   that Suddenlink notices for Suddenlink customers, these

6   copyright infringement notices, weren't processed all the way

7   from September of 2019 to January of 2021.  So we're talking

8   about over a year.

9      And then on top of that, we had another issue but on the

10  other side of the house where the Optimum folks had their

11  notice system go offline from July of 2020 all the way till

12  January or February of 2021.

13     So what happens after that?  Mr. Boubazine, the guy

14  who's kind of a taking the reins of this project, this is the

15  guy that we had a big fight over we get these documents,

16  whether it's relevant, et cetera--it's clear it's relevant--he

17  comes in and says, you know, What the heck happened.  Right?

18  And he orders a sort of a review of what happened.

19     So we see in tab 1 here -- that's some background

20  information about this review.

21     If you scroll down.

22     So he -- this is kind of the questions he is asking.

23     And then if you go to tab 2, what do we see?  So we see

24  three gentlemen who aren't lawyers.  We have a gentleman who's

25  in the customer experience team, we have a gentleman in the

1    product team, and we have a gentleman in the HSD security

2    team, and they're putting together the answers to these

3    questions, the talking points.  Right?

4         So if you scroll down, you'll see when did this process

5    stop?  In 2020.  And why.  Right?  This is the big 'why'

6    problem.  Here we have the 'why' and perhaps the 'when'

7    redacted.  Right?  And there's no good reason for it because

8    there's no lawyers on this.  This was a review led by -- or

9    ordered by the COO Mr. Boubazine.  This is a process that's

10   being sort of spearheaded by three non-lawyers, and,

11   nonetheless, we see a redaction.

12        Now, this is kind of where the issue of business

13   documents overlaps or intersects with the first issue the,

14   safe harbor issue.  What we see, Your Honor, is that Altice

15   wants to offer its preferred explanation of what happened

16   here.  Right?  So we ask an interrogatory, What were the times

17   that the systems weren't working and what was happening, like

18   why.  And they give their narrative.  It's Interrogatory 19.

19   I think it's one of the tabs here in the folder -- in the

20   enforcement gap folder, tab 3.  And they give a narrative

21   explaining it away.  Right?  And so what they're trying to do

22   is make it look as innocent as possible.  Right?  Presumably

23   in an attempt to avoid a willfulness finding.  So they give

24   all their preferred explanations about it.

25        But what we don't see -- this is, of course a lawyer-

1    driven interrogatory process.  What we don't see, what we were

2    just looking at, is we don't see all the material that would

3    let us test the veracity of the statements here.  Right?

4    Because we're getting them redacted.

5              THE COURT:  Counsel, two things.  Let's see if we

6    can't move onto the second and third categories.

7              MR. BYRON:  Sure.

8              THE COURT:  And just as a matter of personal

9    preference, you seem to pepper your argument with rhetorical

10   'rights' throughout, like you're asking me a question.  And

11   every time you say 'right', I think, Is he wanting me to

12   respond to his statement or not.  I understand it's

13   rhetorical, but it would help me follow your argument better

14   if you'd leave those out of it.

15             MR. BYRON:  Understood, Your Honor.

16             THE COURT:  I think I have a grasp of what's at

17   issue with the first category of the asserted privilege, but

18   I'd like you to turn also, for the interest of time, if we

19   could go to the sword/shield, and the third what you're

20   calling 'unsupported categories'.

21             MR. BYRON:  Okay.  And there are other examples.

22   Like I said, I have a whole binder full of stuff.

23             THE COURT:  We don't have the time.

24             MR. BYRON:  I completely understand.

25             THE COURT:  And we need to talk one at a time for

1   the record, so if I'm talking you should stop and --

2           MR. BYRON:  Yes, Your Honor.

3           THE COURT:  -- if you're talking I try not to

4   interject.

5           MR. BYRON:  Okay.

6           THE COURT:  Okay?

7           MR. BYRON:  So the sword/shield issue, we were just

8   starting to see the sword/shield issue in the documents that

9   we were looking at.  So this is an issue where -- it's a

10  pretty well-established principle you can't use privilege in

11  order to shield information if you're going to assert stuff

12  that implicates the privilege.  Right?  And, you know, the

13  cases talk about it in different ways.  Your typical

14  circumstance where you see this arise is the lawyer opinion

15  that's put at issue and then, you know, everything around the

16  lawyer opinion will go in because of the sword/shield issue.

17      But the courts also say that if you make an assertion of

18  fact and the assertion of fact can only be tested or

19  understood through the assessment of privileged information,

20  then the -- that's a sword/shield issue, and the information

21  that's behind that assertion of the fact, privileged or not,

22  is something that needs to be produced.

23      We sort of liken this case to the cases in the sexual

24  harassment context with the Faragher-Ellerth defense, if

25  you're familiar with those cases, Your Honor.  The defense

1    essentially says if you're an employer and there is sexual

2    harassment that's happening at your facility, what you need to

3    do is you need to take reasonable steps to address it, and

4    then you can avoid vicarious light.  Right?  So --

5          Excuse me, Your Honor.

6          So the safe harbor here operates almost identical to

7    that.  We have a situation where there is a vicarious

8    liability claim in the case, the safe harbor defenses -- we

9    took reasonable steps to address copyright infringement, and

10   Altice is making assertions of fact about why it believed

11   those steps were reasonable steps.

12         So you see some of those background principles on slide 8

13   of the slide deck, but if you go to slide 9 of the slide deck,

14   you'll see those background principles applied in more

15   concrete ways.

16         So on the left side we have the sword issue.  Right?

17   This is what Altice is saying in interrogatory responses, in

18   corporate representative testimony, they're giving

19   justifications for notice processing limitations, notice

20   format restrictions, inapplicability of the process, the

21   business customers' grace periods, process length, et cetera,

22   but they're withholding material that clearly bears on each of

23   those issues under an assertion of privilege.  It doesn't --

24   when you do that, we get a circumstance where the company is

25   allowed to come and say, We did the grace periods for X and Y

1    reasons, but there may be a Z reason, and we're not allowed to

2    see the Z reason because they're asserting a privilege over

3    it.  So that's a quintessential assertion of fact where

4    they're using the fact as a sword and using the privilege as

5    the shield.

6         Another is these explanations of processing gaps and

7    limitations where we have the innocuous responses and Altice

8    is responding to interrogatories or questions at deposition

9    and giving their preferred explanation, but we're seeing in

10   contemporaneous documents the redacted material, which is

11   another sort of sword/shield problem.

12        So that's the biggest sort of sword/shield issue.  And, I

13   mean, it really is a big issue in this case, Your Honor,

14   because what's going to happen is that Altice is going to have

15   one of their in-house lawyers sponsor their narrative at trial

16   for the safe harbor.  The gentleman who served as their

17   corporate representative was one of their in-house lawyers.

18   He was the corporate representative on many, many topics,

19   including the policies and how they operated and terminations,

20   et cetera; he's the person that's here saying the why, he said

21   also, I was the one that developed a lot of these systems, but

22   some of the material around that Altice is holding back from

23   us.  And that's a big problem because we have a lawyer who's

24   going to sponsor a story to the jury and we're not allowed to

25   fully test it.

1          Now let's go to the third issue.  So the third issue is

2     on page 10.  The third issue is about the failure of Altice to

3     support the privilege claim.  It's fundamental that if you're

4     going to assert the privilege, you have the burden to support

5     it.  The privilege, of course, is meant to be interpreted

6     narrowly.  It is especially meant to be interpreted narrowly

7     in the context of an in-house lawyer, the company arrangement,

8     because in-house lawyers as is common in most organizations,

9     they wear several different hats.  Right?  They wear the

10    business hat, they wear the legal hat, and they wear all sorts

11    of different hats as well.  So it's really important in these

12    kinds of cases where you're dealing with assertions of

13    privilege involving in-house counsel to come and support the

14    privilege.

15         Altice's initial logs didn't do that.  There was really

16    no way to tell from Altice's initial logs why something was

17    privileged.  We can look at, for example --

18         If you would pull up in the first folder, tab 2.  We can

19    look at the third page of this, so if you'll go to page 3.

20         And you see log entry 18 --

21         Go one more down.  You're on page 2.

22         You see log entry 1879 there.  This is the presentation

23    that we saw in the DMCA policy review.  This was the

24    presentation that was prepared by customer experience and

25    delivered to the COO of the company.  And what this says is

1    this is a document providing information to obtain the legal

2    advice of in-house counsel regarding policies and procedures

3    for addressing notices of alleged copyright infringement.

4    Well, that doesn't jibe with what we saw in the document, but

5    it also doesn't really, you know, let us -- even if it

6    did--right?--it doesn't really let us assess the privilege in

7    a meaningful way because we don't know who the in-house

8    counsel, was we don't know when, you know, the advice was

9    asked for, delivered, et cetera.

10        So there are many different types of examples.  I don't

11   want to take up the Court's time with all the examples, but

12   there are many different types of examples in the privilege

13   log that we pointed out in the motion as to why the claim is

14   unsupported.

15        I think Altice realized that their privilege log had some

16   problems with it.  They had promised to supplement their

17   privilege log like they did promise a re-review of documents

18   because I think they also realized there was a problem with

19   the withholdings, and that was promised to us now over a month

20   ago and it's something we still don't have.  So we're sitting

21   at a hearing on the motion to compel and, frankly, I don't

22   -- I couldn't tell you right now what the full scope of the

23   problem is because I don't know what has been produced and not

24   produced.  I don't know what they're saying the reason is for

25   not producing stuff.

1          And I think that's a big problem, especially because this

2     Court has a well-established process for the privilege.  The

3     motion to compel is filed.  This is in the Court's discovery

4     order.  And 14 days later when the party asserting the

5     privilege is meeting the privilege in their opposition they're

6     meant to provide facts and not just lawyer argument.  And

7     that's why there's a declaration and affidavit process, and

8     that didn't happen here.

9          So all of these are pretty big problems, Your Honor.

10    There are many different categories of what we would consider

11    fundamentally important documents that are being withheld and

12    we're -- from every angle, whether it be business or

13    operational, whether it be sword/shield, or whether it be

14    unsupported privilege assertions, from every angle those are

15    documents that should be produced.

16              THE COURT:  All right.  Thank you, counsel.

17         Let me hear from Defendants on this in response.

18              MR. ANDERSON:  Good afternoon, Your Honor.  Sean

19    Anderson on behalf of Defendants.  Thank you.

20              THE COURT:  Good afternoon.

21         Please proceed.

22              MR. ANDERSON:  Thank you.

23         So a lot of what Plaintiffs' counsel just recited with

24    respect to the facts of the case are incorrect and warrant

25    correction and clarification in terms of the underlying merits

1    of this dispute, but in light of the timing this afternoon and

2    addressing the issues at hand, I'm going to focus on the three

3    issues as opposing counsel set them forth.

4        As a preliminary matter, in this case Altice has reviewed

5    over 200,000 substantive emails from 17-plus custodians,

6    including Mr. William Heberer who is Altice's lead lawyer in

7    charge of not only issues related to copyright infringement

8    but other issues, and has a dual role on litigation and

9    business side as well.

10       Altice has produced tens of thousands of documents

11   relating to the development, implementation, and essentially

12   execution of its policies for addressing copyright

13   infringement.  Many thousands of those emails include in-house

14   counsel William Heberer and others.

15       Altice is not withholding documents that are purely

16   business and operational.  Plaintiffs have in their

17   possession--and I'm not exaggerating; I know I've used some

18   large numbers several times--thousands of documents relating

19   to what the company did with respect to its policies; why it

20   did what it did with respect to its policies; if questions

21   were coming in from operational people, people in sales,

22   people in -- on the IT side, they have the answers to those

23   questions; they have the notes from the weekly and bi-weekly

24   meetings in which the folks who were responsible for operating

25   these things talked about issues that may arise, the reason

1    why one thing is happening.  Frankly, they even have emails in

2    which our in-house counsel is asking questions about what the

3    policy is and how it should be implemented.  They have those.

4    They have these in the form of, as I said, emails, PowerPoint

5    presentations, and policy reviews, similar to what Mr. Byron

6    was describing.  They've had these documents and they've been

7    logged since, pursuant to the Court's docket control order,

8    November the 1st.  That's when our first log was served.

9        When Plaintiffs raised the concern in their present

10   motion with respect to the documents that Mr. Byron pointed

11   out that are identified in that chart in Exhibit 1, we made

12   clear during pre-motion meet and confer discussions that we

13   were not taking the position that purely business and

14   operational documents were privileged, and we agreed to

15   undertake a review of the documents identified in the motion,

16   which we did.

17       We also explained to Plaintiffs that we were -- we would

18   look for--and we referenced this in our opposition--similar

19   documents, and we expanded our remediation or re-review to

20   include any documents that included Mr. Heberer, in-house

21   counsel.

22       We produced all of the documents subject to our

23   remediation review identified in the exhibit Mr. Byron

24   pointed to, save for those that had an issue with respect

25   to no attorney being identified in the log, at the time of our

1   opposition, and made clear to opposing counsel that we were

2   not taking the position that purely business and operational

3   documents were privileged.  And we finished the balance of our

4   expanded re-review yesterday, as Mr. Byron represented.

5        Mr. Byron and I had a meet and confer, among other

6   counsel, before this hearing for Your Honor.  We were not

7   shown any of these documents.  We were not told what specific

8   documents that they still have issues with.  All of those

9   documents that Mr. Byron went through were the first time

10  we've heard that they still have issues with those.

11       I can speak to some specific background facts with regard

12  to particular documents, but our position is to the extent the

13  document remains withheld or redacted, it's because it

14  implicates legal advice, either because it's reflecting legal

15  advice, it's containing information for the provision of legal

16  advice, or it's being commented upon by in-house counsel.

17       Outside of those categories, for the types of documents

18  that fall into this business and operations category, Altice

19  is not withholding any of these, and, frankly, Plaintiffs have

20  hundreds if not thousands of documents that reflect the same

21  facts as those that Mr. Byron represented Plaintiffs currently

22  do not have.

23            THE COURT:  What about the next category?

24            MR. ANDERSON:  With respect to the sword/shield

25  category, there is a -- respectfully, a fundamental

1    misunderstanding I believe on Plaintiffs' side with respect

2    to what the law is and what the law requires.

3         At base, no court has ever held that a party's assertion

4    of the DMCA safe harbor vitiates or waives its privilege with

5    respect to communications regarding attorney/client

6    communications regarding the development of the policy that is

7    serving as the basis for that defense, and that would be an

8    extraordinary finding given the fact that the safe harbor

9    defense is a fundamental defense to cases of secondary

10   copyright infringement.

11        Plaintiffs claim that Altice has put the 'why' at issue

12   in this case, but the 'why', why it developed a policy is,

13   frankly, irrelevant to the DMCA safe harbor.  Mr. Byron

14   referenced--I wrote it down here--reasonable steps.  What's

15   required under the -- and made reference to the sexual

16   harassment cases and that particular defense of it that's at

17   issue in this those cases.  By what the DMCA requires is that

18   an ISP, here Altice, adopted and reasonably implemented a

19   policy that results in the termination of repeat infringers in

20   appropriate circumstances.  In other words, what's required is

21   that there is a policy, that the ISP generally follows that

22   policy--the way the courts have interpreted that 'reasonably',

23   which modifies 'implement', is that it doesn't need to be

24   perfect but it needs to follow it--and that the policy has to

25   have a step at which termination is effectuated, and that when

```
1    that steps is reached it happens, generally.  That's what's

2    required.

3         Mr. Byron's comparison to cases relating to reasonable

4    care, non-willfulness, whether you took diligent or had a

5    -- you maintained your duty of care, those cases have no

6    analogy to the copyright context.  Of course there is -- there

7    are situations in which, for example, if a party were

8    asserting a legal opinion to refute willfulness and relying on

9    that legal opinion, certainly any documents relating to the

10   provision of that advice would be at issue, but that's not the

11   case here.

12        The notion that Plaintiffs are being deprived of facts to

13   test the 'why' is not supported by the record.  Every single

14   fact--and we could go through this point by point if the Court

15   wanted to--is supported by documents in their possession, to

16   the extent that there are any.  What Altice is withholding on

17   the basis of privilege and information that has not been put

18   at issue in this case is the provision of legal advice in

19   connection with, among other things, the development or the

20   existence of its policy.  For example, is this legal?  Are we

21   more -- are we exposed by doing this?  Do we have liability if

22   we do this?  That is not at issue in this case.  Plaintiffs

23   know exactly why we -- the non-privileged business reasons why

24   we deploy certain policies.

25        Mr. Byron focused on these lapses in gaps.  They know
```

1    exactly why those happen.  There are dozens of documents that

2    describe them, and they've had 30(b)(6) testimony on it as

3    well, all of which were met with no privilege objection.

4    Certain of the gaps happened because there were hardware or

5    technology failures.  Others happened because -- for example,

6    there was one with respect to the -- during the early days of

7    the COVID pandemic, the company decided to suspend certain

8    actions, including its terminations and suspensions, along

9    with, you know, non-payment, like many other utilities did.

10   They have all of these facts.

11        The -- and I guess the final point on the sword/shield is

12   that the -- at base the 'why' behind the company's policies is

13   not only not relevant to the DMCA safe harbor, it's not even

14   relevant to the claims of secondary copyright infringement

15   here.  And then the notion that Altice has put this at issue

16   is belied by Plaintiffs' own interrogatories which Mr. Byron

17   referenced which ask Altice the reasons for certain of these

18   things.

19        The provision of background facts and context regarding

20   its policies does not put this information in and of itself at

21   issue, and even if it were at issue, Plaintiffs have the full

22   facts to test those, and all that they are being deprived of,

23   if anything, are the hypothetical documents that would contain

24   legal advice about certain of those elements; in other words,

25   is this legal, what is the risk with respect to this.  And

1    Your Honor, I'm not representing that there are even such

2    documents.

3              THE COURT:  Let me ask you this question, counsel.

4        But for the Court granting this motion and ordering or

5    compelling additional production, has your side made its

6    complete production in regard to these matters, so far as you

7    know, or are you still in the process of generating and

8    potentially producing additional material compliant with these

9    requests?  Give me some idea of where you are in a real-world

10   sense here.

11             MR. ANDERSON:  Certainly, Your Honor.

12       I'll note that--and Mr. Byron and I spoke a bit about

13   this before the hearing today--there are documents that are on

14   the chart that is Exhibit 1 to Plaintiffs' motion that I think

15   were within the categories that Plaintiffs outlined as being

16   outstanding that they have not yet had a chance to confirm or

17   review yet because those documents were just produced

18   yesterday.  So it's not entirely clear whether there truly

19   are as many issues as Plaintiffs believe that there may be,

20   but perhaps Mr. Byron has more specific information.

21       But to answer Your Honor's question directly, we have

22   finished our privilege remediation.  All that remains, subject

23   to any specific odd documents that Plaintiffs would wish to

24   discuss on a document-by-document basis in the coming days, we

25   have finished our privilege review remediation and all that

1    remains is serving a supplemental log, which we plan to do by

2    Wednesday.

3            THE COURT:  All right.  Do you have anything further

4    for me on this?

5            MR. ANDERSON:  Just in terms of the substantiating

6    privilege claims, as we said in our opposition, we did not

7    take the position that any of the documents that are purely

8    business or purely operational are privileged and, therefore,

9    we were waiting or expecting and are prepared to engage in a

10   process with Plaintiffs in which if there remain documents

11   that they believe--not withstanding our remediation efforts

12   and our representations and our supplemented logs--are not

13   privileged or they wish to challenge those privileged claims,

14   we will review those and stand ready to substantiate them

15   consistent with local practice and Your Honor's rulings.

16       And then the final point with respect to the privilege

17   logs, we believe our logs were sufficient and consistent with

18   the parties' agreements through letters back in August and

19   September.  They're very similar to the nature of descriptions

20   that Plaintiffs have been providing in their logs as well.

21   And aside from this motion, there was no complaint with

22   respect to any of the descriptions until this motion.  As we

23   represented during meet and confer discussions and in our

24   opposition, we're willing to supplement any descriptions that

25   is necessary.

1          THE COURT:  So tell me again when you anticipate

2     supplementing your log.

3          MR. ANDERSON:  Wednesday, Your Honor.

4          THE COURT:  Okay.  All right.  Anything further?

5          MR. ANDERSON:  Not unless Your Honor has any

6     questions.

7          THE COURT:  No additional questions at this

8     juncture.

9          MR. ANDERSON:  Thank you, sir.

10          THE COURT:  All right.  I think in the interest of

11     time, counsel, I'd like to move on to the opposed motion for

12     protection from apex depositions filed by the Plaintiffs, and

13     I'd like to hear from Plaintiffs on this motion to begin with.

14          MR. ALLAN:  Good afternoon, Your Honor.  Thank you.

15     Michael Allan for the Plaintiffs.

16          THE COURT:  Good afternoon.

17        Please proceed.

18          MR. ALLAN:  Thank you.

19        Your Honor, we've laid out the basis for this motion in

20     our papers.  There's a couple of additional points I'd like to

21     make.

22        The Defendants have noticed the depositions of Thomas

23     Coesfeld, the chief executive officer of BMG, who resides in

24     Germany, and Mr. Bob Valentine, who is the chief executive

25     officer of Concord.  Neither one of those executives has

1    specific information related to any of the issues in this

2    case.  They weren't disclosed in the interrogatory answers,

3    they weren't disclosed in a initial disclosures, they're

4    not -- it's not a scenario, Your Honor, where these CEOs

5    signed an agreement that is in dispute or negotiated a

6    particular provision where they've got percipient fact

7    testimony.  And this court and many courts in the Fifth

8    Circuit have held that depositions of this sort are not

9    appropriate to proceed unless there is a particularized

10    firsthand knowledge.

11        In addition, there are plenty of other less exhaustive

12    means that are available and have been available to Defendants

13    for purposes of deposition.  In fact, they claim that they

14    have had no other testimony other than lawyers.  That's not

15    the case.

16        So to take Concord, for example, they've deposed Kent

17    Hoskins, who is the chief financial officer for the entire

18    company.  He is probably the number three person in the

19    organization; not a lawyer.  And they deposed him at length on

20    a number of financial related issues in the case.

21        They also deposed a gentleman by the name of Mr. Greg

22    Goldman, who is an executive vice president of business and

23    legal affairs.  Yes, he is an attorney, but he also wears a

24    business hat given his title.

25        And with respect to BMG, they deposed Keith Hauprich, who

          1    is executive vice president business and legal affairs and a

          2    general counsel, but Mr. Hauprich also wears a legal

          3    hat--sorry; a business hat.

          4        The Defendants have noticed 30(b)(6) topics, depositions

          5    with 60-plus topics covering a range of different scenarios,

          6    and they have had testimony from business people within the

          7    company and people that wear business hats within the company.

          8        There is one piece of information that is not in our

          9    papers I'd like to point out, Your Honor.

         10            THE COURT:  What's that.

         11            MR. ALLAN:  With respect to other intrusive means, I

         12    went back to look at our various interrogatory responses, and

         13    in one of the very first interrogatory responses when we were

         14    negotiating or debating over venue and the propriety of venue

         15    in this court, Altice served an interrogatory on all of the

         16    Plaintiffs that said, "Please identify those particular"--and

         17    they defined these terms--"relevant Plaintiff representatives

         18    who have information as to relevant issues in the case."  And

         19    they defined 'relevant issues' to mean Plaintiffs' ownership

         20    or possession of an exclusive right in the asserted

         21    copyrighted works, the amount of revenue that is earned from

         22    the exploitation of works, and the generation of financial

         23    information, Plaintiffs' copyright infringement enforcement

         24    efforts, lawsuits, notice sending programs and the like, and

         25    then, of course, collection of evidence.  They wanted to know

1    where the relevant people would be for purposes of venue.

2        And in response to that, BMG identified Eric Scott, the

3    executive vice president of rights and royalties; Brian Sub,

4    the vice president business and legal affairs; Nils Eismann,

5    senior vice president income tracking and royalty audit; Josh

6    Mancuso, the VP of rights management; and Keith Hauprich, the

7    GC and executive vice president of business legal affairs.

8        Concord identified Maureen Bacon, the director of

9    business affairs and administration; Hazel Malit, the chief

10   financial officer for the recorded music division; Ricky

11   Hernandez, the vice president business and legal affairs; and

12   Greg Goldman, a business and legal affairs executive vice

13   president; and a gentleman named Mark Duckworth, who is

14   responsible for IT -- the IT department.

15       Altice never noticed any of those folks for deposition

16   other than the ones that they've taken--Mr. Hauprich and

17   Mr. Goldman.  And we designated Kent Hoskins, who's the

18   overall company-wide CFO for Concord.

19       They clearly had less intrusive means to seek whatever

20   discovery they tried to -- they're interested in seeking with

21   respect to the apex depositions, the CEOs, of Mr. Coesfeld and

22   Mr. Valentine.  And they didn't take advantage of that, Your

23   Honor.

24       And I think that, coupled with the fact that these folks

25   don't have particularized knowledge of any of the issues in

1    this case beyond what has already been offered from testimony,

2    requires that this motion be granted and those deposition

3    notices be quashed.

4              THE COURT:  All right.  What's the response from

5    Defendants?

6              MR. ELKIN:  Good afternoon, Your Honor.  Michael

7    Elkin for the Defendants.

8              THE COURT:  Good afternoon.

9              MR. ELKIN:  May I proceed?

10             THE COURT:  Please do.

11             MR. ELKIN:  Thank you, Your Honor.

12        Mr. Allan just referenced the interrogatory answers to

13   venue discovery, which was illuminating, but what we're

14   governed by here are the Rule 26 disclosures that are made in

15   connection with the merits.  And if you take a look at the BMG

16   Rights disclosures--and this is not the initial disclosure,

17   it's not the amended disclosure; it's the second supplemental

18   disclosure that was actually submitted on April 1, 2024--all

19   you see there is Mr. Hauprich, the lawyer who's been the

20   lawyer for the company for all of the years in question.

21        Then you have the Concord, not the initial, not the

22   amended, but the second set of disclosures that's required

23   again dated April 1, 2024, and other than the lawyer

24   Mr. Goldman, what we have is Kent Hoskins, who was designated

25   for four of the 61 topics specifically for the annual reviews.

1        The reason why we got to where we are, Your Honor, is

2   that the Plaintiffs are litigating this case as if it were

3   filed 10 years ago.  If Your Honor takes a look at Docket 86,

4   which is the Plaintiffs' amended complaint, which reads to a

5   degree like a manifesto, paragraph 38, the first sentence

6   really says it all.  "Over the past two decades, as P2P piracy

7   became widespread, record labels, music publishers, studios,

8   and other copyright owners have sought to curb the massive

9   infringement of their copyrighted works caused by online

10  piracy through a variety of means, including litigation

11  against both P2P sites and internet service providers."

12       What's happened, Your Honor, is the world has changed in

13  the past 10 years.  The landscape has changed.  The music

14  industry now has benefited from the proliferation of wide

15  availability of broadband connections with these interactive

16  streaming, coinciding with the complete dismantling of

17  peer-to-peer piracy that they've -- that is -- permeates their

18  first amended complaint.

19       We have asked for the depositions of the two people who

20  we could identify, Mr. Coesfeld and Mr. Valentine, because

21  those are the gentlemen who actually appeared in articles, who

22  gave quotes on these very issues related to the coinciding of

23  the dismantling of P2P piracy with the advent of interactive

24  music.

25       I deposed all of the Plaintiffs in these cases -- in this

1   case, and, in particular, I wanted to find out who would know

2   something about this particular subject.  And I asked

3   Mr. Goldman, who was the in-house lawyer who I deposed on the

4   30(b)(6) for Concord, and this is what he said when I asked

5   him a key question, which is -- this is the deposition that

6   took place on February the 22nd, 2024, and this is on page 202

7   of the transcript, lines 3 to 14.  It's just one question and

8   answer.

9       "And does Concord have any particular views about whether

10  the availability of its music on the streaming platforms that

11  we just identified had a positive effect on reducing piracy?"

12      And after Mr. Allan's objection, the witness responds, "I

13  don't know the answer to that question."

14      Then I asked him a follow-up question:  "Okay.  Is there

15  anyone within the company that would have a better idea?"

16      Answer:  "I don't think so."

17      Your Honor, I would be -- these gentlemen -- we

18  referenced articles and interviews in the record as part of

19  the opposition to the motion.  The burden, as the Court well

20  knows, under Rule 26, once we demonstrate the relevance of the

21  witnesses in question, the burden shifts to the Plaintiff to

22  demonstrate--not us--but they have the burden to demonstrate

23  whether there's a less obtrusive way for us to get the

24  testimony.

25      I'm not standing hat on who the actual 30(b)(1) witnesses

 1    are, but all we've had, other than a couple of -- one witness

 2    as to one aspect of some financial data for BMG was -- the

 3    lawyer even answered those questions.  He was designated on

 4    all 61 topics.  We would like to have a witness for each of

 5    these two Plaintiff groups who can testified as to what the

 6    business strategy is concerning dealing with P2P piracy given

 7    the fact that its business has changed.  We could not get

 8    answers to that question either from Mr. Hauprich from BMG or

 9    Mr. Goldman from Concord.  They have the burden to come up

10    with someone else.

11         I had a meet and confer, I think two of them, with

12    Mr. Allan on this subject, and we didn't get anyone that was

13    offered up who could possibly substitute.

14         So yes, we are opposing this motion.  We do think that we

15    need factual testimony; someone that has knowledge who can

16    speak to these business strategy issues.

17              THE COURT:  All right.  Anything further?

18              MR. ELKIN:  No, Your Honor.  Thank you for the

19    argument.

20              THE COURT:  All right.  Well, let's move upon.

21         Based on what you've updated the Court on, there appears

22    to be one subpart of Document 143, Defendants' motion to

23    compel Wrights Corp, Inc., that seems to be live.  I'd like to

24    hear argument on this at this juncture.

25              So let me hear from the Defendants on this.

1          MR. PADMANABHAN:  Thank you, Your Honor.  Krishnan

2     Padmanabhan.

3          And I have slides, but I don't have them printed out, so

4     I'm going to go without slides, Your Honor, if that's okay.

5          THE COURT:  I went to law school before there were

6     slides.  I understand that presentation format.

7          MR. PADMANABHAN:  Thank you, Your Honor.

8          So what Altice is seeking here are -- is data,

9     information, so documents regarding post-hoc attempts to

10    verify Wrights Corp's--I'm sorry--to verify Wrights Corp's and

11    Plaintiffs' -- let me start again.

12         What Defendants here are seeking are documents and data

13    regarding Plaintiffs' and Wright Corp's attempt to do a

14    post-hoc verification of the music files.

15         So what we know is that they have downloaded files that

16    have the hash ID--okay?--which is a digital marker from the

17    internet, after the claims period.  So the claims period in

18    this case ends in December 2022.  After that they have

19    downloaded files, and they are now trying to run them through

20    an audio verification system.  As we understand it, it's

21    Audible Magic based on the fact they recently subpoenaed

22    Audible Magic regarding the operation of their software today;

23    not during the claims period, but today.  And the output of

24    that work will be something that says that the file they have

25    downloaded either matches or does not match the database.

1        In their correspondence with us and in testimony given by

2   one of Plaintiffs' witnesses, they have acknowledged that this

3   work is being undertaken.  The issue is they say that they

4   want -- they don't want to provide the data output from their

5   verification whether these files actually match the Audible

6   Magic database or not because they say it's privileged--it's

7   the work of their experts.  But we're not seeking the opinions

8   early; what we're seeking is the full output of that testing

9   process.

10        THE COURT:  Let me stop you with a question here at

11   this juncture, counsel.

12        MR. PADMANABHAN:  Yes, Your Honor.

13        THE COURT:  Am I correct, from a procedural

14   background there was a subpoena issued at your side's request,

15   and it was originally filed through a court in one of the

16   districts in California, which then kicked it back to this

17   court.  And there is currently a miscellaneous case in this

18   court identified as Case No. 2:23-MC-09 assigned to Magistrate

19   Judge Payne, which is, in effect, the resolution of that

20   subpoena that was originally issued through the district in

21   California.

22        Is there a procedural reason why this is before me

23   instead of Judge Payne?  I don't think there's a problem with

24   me ruling on this, but it looks like procedurally it's teed up

25   to be presented to him.  Can you fill in the blanks here for

1    me?

2              MR. PADMANABHAN:  Yes, Your Honor.

3         So the reality is it's not clear whether this data lies

4    with Wrights Corp or with Plaintiffs, and we sort of did it as

5    an amalgam motion in that sense.  This was -- there was

6    information coming from both the Plaintiffs' witness as well

7    as a Wrights Corp witness that it was some sort of collective

8    effort to perform this post-hoc verification.  So I think it's

9    styled a motion with respect to both Wrights Corp and

10   Plaintiffs for that reason.  And it's not clear who has the

11   data.  I'm sure Plaintiffs' counsel can speak to it.  But we

12   know the work's being done.

13             THE COURT:  And what's the status or have there been

14   representations from the Plaintiffs with regard to whether or

15   not they would rely on this post-hoc material in their expert

16   reports or use them as evidence at trial?  Have there been

17   concessions with regard to scope and use that I need to be

18   brought up to speed on, or have there not been?

19             MR. PADMANABHAN:  Your Honor, there have been -- the

20   representation has been that it's the work of the experts.

21   And we'll get the reports, and when we get the reports we'll

22   see what they did or didn't do.  Our fear, Your Honor, is that

23   what we will get is an expert report saying, We put these

24   hundred files into Audible Magic; they hit the database.  That

25   doesn't tell us about the files that didn't hit the database.

1    What we'd like is the underlying data showing what did and

2    didn't; the totality of the underlying data, if you will.

3         Now, this same material has been found to not be work

4    product in previous cases.  Particularly, there was a district

5    of Colorado case, DMCA case brought by the music companies

6    against Charter, and this same post-hoc verification files

7    were found to not be work product and were to be produced;

8    again, the underlying data.

9              THE COURT:  All right.  What else do you have for me

10   on this?

11             MR. PADMANABHAN:  Your Honor, I think that's it,

12   Your Honor.  I think that the issue's pretty simple.  If we

13   get the data, we'll be happy.

14             THE COURT:  Let me hear from the Plaintiff, please.

15        Thank you.

16             MR. CARACAPPA:  Good afternoon, Your Honor.  John

17   Caracappa from the Steptoe firm.

18             THE COURT:  Good afternoon.

19             MR. CARACAPPA:  So I'll be brief, and I have a

20   couple of points.

21        First, we do think this is in the wrong court.  We do

22   think it should be before Judge Payne, to the extent the

23   Defendants are moving to compel information from Wrights Corp.

24   You asked counsel why it wasn't before Judge Payne, and he

25   said, Well, we don't know who has the information.  They do

1    know who has the information.  They know that Wrights Corp

2    doesn't have it because that came out at a deposition.  They

3    asked Wrights Corp, Have you used Audible Magic to verify any

4    audio files?  Wrights Corp said no.  They know that.

5        So now switching to the Plaintiffs, UMG, BMG, and

6    Concord, they asked at least UMG and BMG, Have you used

7    Audible Magic to verify any of the files?  The answers for

8    both parties was no.  The only answer they have on the record

9    was, It's possible my attorneys may be using Audible Magic or

10   my attorneys may be working with our experts to use Audible

11   Magic.

12       To the extent Steptoe is using Audible Magic, it has done

13   so during the pendency of this case.  That is the definition

14   of work product material.  To the extent Steptoe is working

15   with its experts to use Audible Magic, they'll get that

16   report, they'll see how, if at all, those experts are going to

17   use Audible Magic, and then they can depose the experts at the

18   time.  And to the extent they are going to allege that we did

19   something inappropriate or we withheld information or the

20   experts withheld information, they can make that argument at

21   the time.

22       We talked to them about this in the meet and confer.  We

23   said, We don't even know what you're asking the Court to

24   compel because the record says Wrights Corp doesn't have the

25   info and the clients don't have the info.

```
1         THE COURT:  If Wrights Corp doesn't have the info,
2    and that's basically undisputed at this point, then the
3    miscellaneous action for Judge Payne would seem to be a
4    nullity.
5         MR. CARACAPPA:  That is correct, yes.
6         THE COURT:  So if it's a nullity, your statement
7    "this ought to be before Judge Payne" doesn't seem to ring
8    true.
9         MR. CARACAPPA:  Well, it seems like we should be
10   making that argument in front of Judge Payne.  They are
11   alleging that it's with either Wrights Corp or the other named
12   parties.  We're explaining it's not with Wrights Corp and it's
13   not with the other claimed parties.
14        THE COURT:  And the statement "IT'S not with Wrights
15   Corp," is that coming from your clients or is that coming from
16   Wrights Corp, or is that coming from somewhere else?  Where's
17   the source of that "it's not with Wright's Corp" coming from.
18        MR. CARACAPPA:  Sure, Your Honor.
19     It's with the deposition of Greg Boswell.  I believe they
20   cite to it in their motion, but I have a cite here for the
21   record.  It's Greg Boswell at page 229.
22        THE COURT:  And tell me again who he is.
23        MR. CARACAPPA:  Sure.  I'm sorry, Your Honor.
24     Greg Boswell is the 30(b)(6) deponent for Wrights Corp.
25   He was testifying on behalf of Wrights Corp.
```

1          THE COURT:  Okay.

2          MR. CARACAPPA:  They deposed him for seven hours,

3     and they asked him about the code and they asked him about

4     Audible Magic.  And the question, "Has Wrights Corp been

5     running any of the legal samples through Audible Magic?"

6          Answer:  "Not in forever."

7          Question:  "When is the last time Wrights Corp used

8     Audible Magic?

9          "I'd have to look.  Let me see if I can find it."

10         He goes on and later says, "Look, if you force me to give

11    an answer it will be 2012, 2013."

12         And we explained that to the Defendants, and the

13    Defendants said, Okay, well, if it's not with Wright's Corp,

14    it must be with you, Steptoe.

15         And we said, What do you want?  Do you want us?  Do you

16    think Steptoe lawyers to be deposed on this issue?

17         And they sort of hedged and didn't really say anything.

18         So again, Your Honor, in conclusion, we just don't think

19    there's anything to compel.  To the extent there are Audible

20    Magic reports run by Steptoe, it's privilege.  To the extent

21    they're run by the experts, they'll get that information in

22    the expert report and they can depose the expert at the time.

23         THE COURT:  All right.  Anything further?

24         MR. CARACAPPA:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  Well, let's look at one

1    additional item which seems to be live and remaining, and that

2    is a portion or a subpart of Defendants' motion to compel,

3    Document 144.  And this apparently has to do with the sixth

4    subpoint of that motion with regard to agreements from four

5    additional DSPs.  And it may be three DSPs.  Perhaps the issue

6    with regard to YouTube is no longer live.  But there appear to

7    be issues live with regard to TIDAL, Deezer, and Qobuz.  I'm

8    not sure how to pronounce that.

9         Let me hear from the moving Defendants on this.

10             MR. ELKIN:  Michael Elkin again, Your Honor.

11        May I proceed?

12             THE COURT:  You may.

13        Is this still live with regard to YouTube or --

14             MR. ELKIN:  No, it isn't.  At the time the motion

15    was filed, it was before the Harrison deposition, the

16    representative from UMG as to whom we deposed.  In connection

17    with preparing for that deposition, we determined that even

18    though we only asked for Google+, Google fortunately very

19    nicely provided the YouTube agreement.  We don't know that we

20    had everything at the time, but Mr. Harrison was, in fact,

21    deposed on that, so we withdrew --

22             THE COURT:  That's fine.

23             MR. ELKIN:  -- the request, Your Honor.

24             THE COURT:  So the other three are live?

25             MR. ELKIN:  Yes, Your Honor.  And TIDAL is a

1    company, for what it's worth, based in New York, and the other

2    two, Deezer and Qobuz, are large French companies that have

3    worldwide streaming businesses, and each of these three are

4    premium -- what I'll call premium streaming services, very

5    prolific.  Each of them have over a hundred million songs

6    available on their platforms.

7         And I probably mentioned TIDAL when we argued this motion

8    originally before Your Honor.  We were here on December 21,

9    2023, and at Docket 110 at page 2, your Honor ordered the

10   Plaintiffs to in granting our -- part of our motion, to

11   have --

12             THE COURT:  As I recall, I gave you substantial

13   relief at that point.

14             MR. ELKIN:  Yes, you did, Your Honor, and we very

15   much appreciate --

16             THE COURT:  Part of what I'm concerned about now is

17   the late hour at which this request comes to the Court.

18             MR. ELKIN:  I appreciate that.  And two things, if I

19   may, and I will address that point.

20        First, we needed to be able to come back to the Court and

21   represent, based on Your Honor's very careful admonition that,

22   you know, this is a test case and you better find something

23   that is worth it, and low and behold, after studying these

24   various agreements and eventually having the deposition, it's

25   clear that these agreements--and I won't get into any

1    individual name just to protect the confidentiality because I

2    know that's a sensitive issue here--goes far beyond the

3    per-song revenue numbers that dominated a lot of the argument

4    that was before the Court on December the 21st.  We're talking

5    about minimum guarantees that are, in two cases, in the

6    billions of dollars, and in the other agreements in the very

7    significant hundreds of million of dollars that have nothing

8    to do with per-work revenues.  These are monies that are being

9    made available to UMG just to have their repertoire available.

10   There are per-stream content fees across various tiers of

11   services.  There are very lucrative advertising partnerships

12   and credits worth many millions of dollars.

13        Our damages expert is busy working on this and

14   incorporating that into their report.  On the basis of that

15   and Mr. -- the deposition that we took, we looked at all of

16   the potential range of other digital service provider

17   agreements, and we limited it to this set of three because

18   it's a premium tier.  These are premium tiers and would have

19   financial aspects to it.

20        I wish we could have brought this earlier.  Your Honor

21   ordered these agreements to be produced on December 21st.

22   They weren't produced until March in connection with Spotify.

23   As Your Honor will recall from the protective -- the amended

24   protective order, they required that their document--and we

25   agreed to it, of course--would only be shown for a limited

1  period of time through a portal.  We had to agree on this

2  declaration in terms of what the terms are.

3      We were going to take Mr. Harrison's deposition earlier.

4  They had some issues on the other side, which we understood.

5  And so we came to the Court as quickly as we could in the

6  circumstances.  I wish this were January or February as well.

7  It's not, but it is very important material, Your Honor, and

8  we would urge the Court to consider the circumstances in need.

9      And the other thing I would just point out, I know the

10  other side has made an issue in the past, and I understand it,

11  and they'll -- I'm sure they'll saunter up to the lectern soon

12  and regale you with all the problems they were put through in

13  order to produce the other agreements.

14      There's already now a protective order in place; a

15  protective order that satisfied the more significant companies

16  like Apple and Amazon and Google.  I would hope that, to a

17  large extent the work, that has been done by the Court and the

18  parties with regard to that protective order would help pave

19  the way.

20          THE COURT:  All right.  What else?

21          MR. ELKIN:  That's it, Your Honor.

22          THE COURT:  Let me hear from the Plaintiff, please,

23  in response.

24          MR. ELKIN:  Thank you.

25          MR. ALLAN:  Thank you, Your Honor.  Michael Allan.

1                    THE COURT:  Please proceed.

2                    MR. ALLAN:  A couple of quick points.

3          This -- the Court's deadline for filing motions to compel

4    in this case was March 25th, and literally at 9:00 p.m. on

5    March 25th we had the final meet and confer to discuss various

6    outstanding issues, and for the first time at 9:00, three

7    hours before the deadline to file motions to compel in this

8    case, opposing counsel said, Well, we want four more DSP

9    agreements, knowing full well what we went through.  And the

10   Court I'm sure quite well remembers the difficulties we've

11   had.  And obviously we were not in a position to advise one

12   way or the other whether we would be able to do that, and the

13   motion was already drafted and ready to file.  So it's not

14   only late in terms of the discovery time; it's late -- the

15   request came at the very, very end.

16         I'd also point out that these are four DSP agreements

17   that they've asked for, they filed motions on.  And I

18   understand Mr. Elkin just said about YouTube, but he had

19   -- Altice had that agreement in its hand, the YouTube-Google

20   agreement which covered the YouTube materials for a month, and

21   the only thing I can see is why they put it in a motion to

22   seek to compel it is that they didn't even know that they had

23   the YouTube agreement.  And I question whether how important

24   it is if they didn't even know they had it and filed a motion

25   to compel on it.

1        The other three agreements, Your Honor, there was a

2    30(b)(6) witness for UMG that testified.  He was examined

3    briefly about TIDAL, and I think there was testimony to the

4    effect that TIDAL was effectively almost all a European

5    entity, and that the revenue that company generated was all

6    outside the U.S.

7        The two others now that they're seeking, Deezer and

8    Qobuz--and one of us is probably getting it right, Your

9    Honor--were not even mentioned at the deposition of

10   Mr. Harrison, the 30(b)(6) witness at UMG on both of these

11   issues.  It wasn't even discussed.  And I think, as I think I

12   just heard Mr. Elkin testify, both of those entities are

13   French entities.

14           THE COURT:  He said European.  I don't think he

15   identified it further.

16           MR. ALAN:  Maybe I got it wrong.  Certainly outside

17   the United States.

18       And I do have to say, although I did saunter up here,

19   Your Honor, that it was a very, very difficult process to get

20   this through.  And, you know, as I went back and read the

21   transcript earlier with respect to the DSP agreements, and

22   Mr. Elkin stated back in December, "Plaintiffs have vastly

23   overstated the hurdles that have to be traversed here."  I

24   don't think we did.  I think we very adequately stated the

25   hurdles, as the Court knows.

1          And yes, there are -- just even with the five DSPs that

2     had been produced, there are two separate provisions, two

3     separate orders because there couldn't even be agreement on

4     that.  These DSPs have no idea why they're relevant to this

5     case.  I still don't quite understand it, but we've tried to

6     explain it to them.  They don't want their materials put into

7     the case.  They certainly -- if it's in there, they want it

8     all protected in their own certain way.  It's going to take a

9     significant amount of time to get these other three DSPs

10    notified.

11         And I'll just leave you with one other point.  I do think

12    Mr. Elkin has overstated what these agreements say.  Yes,

13    there are minimum guarantees.  During the discovery period all

14    of them have been met.  There are some advertising benefits

15    that UMG gets out of it that's been referenced in the

16    agreements, but the notion that there is some huge payout,

17    that there's some balloon payment or some other amount of

18    money that comes into these that's being redressed in these

19    DPS agreements has not been borne out by the evidence.

20         So I think it's too late.  It's going to be too difficult

21    with these given the nature of the DSP agreements.  I think

22    the motion should be denied.

23              THE COURT:  All right.

24              MR. ALLAN:  Thank you, Your Honor.

25              THE COURT:  Thank you.

1       Now, let me ask this.  Are there other matters that were

2  not resolved in the meet and confer and that have not been

3  taken up by the Court with the presentation of argument today?

4  Said another way, have I overlooked anything or between what

5  you've already resolved through the meet and confer and these

6  matters have we covered the waterfront?

7       What's each side's understanding?

8            MS. HENRY:  I believe that's everything, Your Honor.

9            THE COURT:  Plaintiff, what's your view?

10           MR. DAVIS:  I believe that's correct, Your Honor.

11           THE COURT:  Okay.  Well, as I told you this morning

12  when we met in chambers, your ability to resolve these

13  disputes will be more palatable to you than me resolving them

14  for you, but nonetheless, that's why I'm here.  And with

15  regard to these matters that we've heard argument on today,

16  let me give you the Court's ruling.

17      With regard to the Plaintiffs' motion to compel material

18  withheld on improper and unsupported or asserted

19  privileges--or privilege, rather--brought by the Plaintiff,

20  I'm going the deny that motion.  I don't see a compelling

21  basis to grant the relief requested.

22      With regard to the opposed motion for protection of the

23  apex depositions brought by the Plaintiffs, I'm going to grant

24  that motion.  I think there have been more than adequate

25  high-level persons made available, I think they've shown a

1    less intrusive means available, and, quite honestly, there is

2    a sense the Court gets that this might be something of a

3    fishing expedition.  I do not find that there is a real

4    prejudice to be visited upon the Defendants for not being able

5    to depose these chief executives.  I'm going to grant the

6    motion for protection sought by the Plaintiffs.

7        With regard to the post-hoc verification issue in the

8    Defendants' motion to compel Wrights Corp, Document 163, I'm

9    going deny that motion.  I just do not see a basis upon which

10   to grant the relief sought.

11       And finally, with regard to the Defendants' motion to

12   compel, Document 144--and this is what we just recently heard

13   from counsel with regard to three remaining DSPs--I'm going to

14   deny this motion.  This is way late in the game.  This is not

15   the first go-round here.  I understand this is a highly

16   contested and complex issue, but we're well into this case and

17   beyond many of the deadlines, and if I were to grant this, not

18   only do I not see that these are absolutely necessary, but

19   this is more or less guaranteed to blow up the schedule for

20   the remaining portion of the trial, and I have no desire to do

21   that.  Given the late hour of this request and given what's

22   already been produced, I do not see a compelling reason to

23   grant that relief, and I'm going to deny that portion that

24   remained live in Document 144.

25       All right.  Those are the Court's rulings.  I appreciate

1    the hard work that both sides have put in to narrow the issues

2    as you have today.

3         Are there other issues that, while I have you before me,

4    need any input.

5              MR. DAVIS:  Yes, Your Honor.

6         May I be heard?

7              THE COURT:  You may be.

8              MR. DAVIS:  Thank you.

9              THE COURT:  And I think I may have misspoken and

10   said Document 163.  I meant 143, just for the record.

11        What do you have, Mr. Davis?

12             MR. DAVIS:  Your Honor, two somewhat housekeeping

13   matters that I'd like to seek the Court's guidance on.

14        With respect to a number of the agreements that were

15   reached today as a part of the meet and confer process, the

16   parties having agreed to some additional discovery for which I

17   believe we need to seek the Court's leave.  Should we seek

18   that in a separate motion outside of the proposed order that

19   we're going to submit?

20             THE COURT:  Let me ask this.  Have you agreed on the

21   scope of that additional discovery as a part of resolving what

22   you have resolved?

23             MR. DAVIS:  We have, Your Honor.

24             THE COURT:  I would say, then, the most

25   straightforward way is to submit as a part of your agreed

1    order for the Court's entry not only the resolution of the

2    substantive issue but the ancillary provisions for additional

3    discovery to address those that you've agreed on.

4         MR. DAVIS:  Thank you, Your Honor.  That answers

5    that question.

6         THE COURT:  Okay.

7         MR. DAVIS:  The second and final point is with

8    respect to the schedule again related to the agreements

9    reached today and the additional discovery that will be

10   undertaken over the next few weeks, the parties would like to

11   reurge our request for an additional week to the schedule to

12   serve opening expert reports and rebuttal expert reports.  I

13   know we previously filed a motion requesting two weeks and the

14   Court denied that and granted a one-week extension again.

15   We're reurging that, with the Court's permission.  This time

16   the motion is agreed or unopposed by the Defendants without

17   any requirement for a change to the remainder of the deadlines

18   in the schedule, including the trial date.

19        So I wanted to raise that for Your Honor.  I understand

20   we need to file a motion to amend the docket control order,

21   but I just wanted to preview it for the Court and see if the

22   Court had any guidance on that and for us before we do so.

23        THE COURT:  Well, you're more intimately familiar

24   with this than I am, at least as I sit here.  You're correct

25   if your reading of the tea leaves is that the rationale behind

1    the Court's partial grant of the earlier request was to avoid

2    a ripple effect that would cause many of the other dates to

3    then become jeopardized.

4         If your representation is that there's no opposition

5    to that additional week and there is, more importantly, a

6    representation that there would not need to be other

7    adjustments in the schedule of the case because of it, I'll

8    look at it favorably.

9         I want to be real clear to everybody.  This case was

10   originally scheduled, and I pretty much unilaterally

11   significantly extended the scope of the timeline for this case

12   given what was apparent to the Court on the front end of

13   things as being not a simple case.  But having done that and

14   having materially extended the timeline early in the case, I

15   am committed to keeping the trial date that we have and I'm

16   committed to getting this case resolved on the remaining dates

17   and deadlines that we have, so I'm going to be very stingy

18   with any changes to any of these dates.

19        But if this one week extension is unopposed and if it is

20   not going to open the door to further request to change other

21   dates, then in all likelihood you'll see an order approving

22   it, Mr. Davis, but I need to focus on that when I'm off the

23   bench.

24             MR. DAVIS:  I understand, Your Honor.  Thank you for

25   the guidance.

```
1            THE COURT:  Do Defendants have anything of a similar
2    nature related to housekeeping that needs to be raised?
3            MS. HENRY:  No, Your Honor.
4            THE COURT:  Again, counsel, thank you for a
5    productive day.  You are excused.
6         And the Court stands in recess.
7                         (End of hearing.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2              CORRECT TRANSCRIPT FROM THE RECORD OF

3              PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4              I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5              FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6              COURT AND THE JUDICIAL CONFERENCE OF THE

7              UNITED STATES.

8

9              S/Shawn McRoberts        04/18/2024

10            _____DATE_____
              SHAWN McROBERTS, RMR, CRR

11           FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25